IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| MICHELE KELLER, individually and on behalf of a class of all persons similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>LENDVIA, LLC,<br><br>Defendant. | Case No.: 6:25-cv-02982-JDA<br><br>**Declaration of Markel Samuel** |

I, Markel Samuel, declare as follows:

## QUALIFICATIONS AND EXPERTISE

1. I am over the age of 18 and am competent to testify to the matters set forth herein. I have been retained by counsel for Plaintiff Michele Keller to conduct technical analysis regarding Defendant's claims of website consent.
2. I am a Senior Cybersecurity Analyst with over 5 years of professional experience in network forensics, digital evidence analysis, telecommunications systems, and internet infrastructure investigation.
3. I hold the following professional credentials: ISC2 Certified in Cybersecurity, AWS Certified Cloud Practitioner, and a B.S. in Cybersecurity from Anderson University.
4. My professional experience includes conducting compliance audits and cybersecurity assessments across multiple industries, including financial institutions, retail, energy, technology, and higher education. I have led engagements with Fortune 500 companies, supported law enforcement-adjacent investigations through digital forensics readiness, and partnered with third-party auditors and external vendors to ensure adherence to SOC 2, PCI-DSS, FedRAMP, HITRUST, ISO, and other regulatory frameworks. My background spans both internal roles and client-facing consulting, giving me broad exposure to telecommunications systems, GRC tool implementations, and identity and access management solutions.

5. I am professionally familiar with industry standards for internet infrastructure, IP address allocation protocols, device identification methodologies, and digital forensics best practices.

## SCOPE OF ANALYSIS

7. I was asked to analyze the technical claims underlying LendVia's alleged evidence that Ms. Keller visited their website on April 1, 2025, at 8:48 AM.

8. My analysis included examination of IP address geolocation data, telecommunications carrier network architecture, device fingerprinting metadata, and a digital forensics examination of Ms. Keller's device (iPhone 13 Pro assigned phone number ending in 9961) and iCloud data, as well as an assessment of LendVia's evidence collection methodology.

9. I have reviewed the Declaration of Chase Webb filed in support of LendVia's Motion to Compel Arbitration, LendVia's purported "video" evidence, and related technical documentation.

## IP ADDRESS ANALYSIS – GEOGRAPHY

10. The alleged website visit, according to LendVia's evidence, originated from IP address 174.215.128.233.

11. Using standard industry databases including ARIN WHOIS records, MaxMind GeoIP, and IP2Location services, this IP address is registered to Verizon Communications Inc.

12. Geolocation analysis using multiple independent databases consistently places this IP address in Buffalo, New York, with precision estimates indicating the IP address serves the Buffalo metropolitan area.

13. Buffalo, New York is approximately 650 miles from both Laurens County, South Carolina (where Ms. Keller resides) and Spartanburg, South Carolina (where Ms. Keller works).

14. I have verified personally with Ms. Keller that she was physically located in South Carolina on April 1, 2025, as described in her affidavit. Thus, unless Ms. Keller is lying about her location, the IP address relied upon as evidence by LendVia could not correspond to Ms. Keller's location on the date in question (even given the dynamic nature of cellular IP addresses). Moreover, as discussed below, even if Ms. Keller were lying (and was present in Buffalo, NY, instead of at work in South Carolina), this IP address does not relate to her phone because, as discussed below, it is on a separate carrier network.

## TELECOMMUNICATIONS CARRIER ANALYSIS - TECHNICAL IMPOSSIBILITY

15. I have confirmed that Ms. Keller is a customer of AT&T Inc., not Verizon Communications, through an interview and analysis of her device information.

16. Internet Service Providers (ISPs) and mobile carriers maintain separate and distinct IP address ranges allocated through the Internet Assigned Numbers Authority (IANA) and Regional Internet Registries (RIRs).

17. IP address allocations are strictly maintained by carriers and are not shared or cross-assigned between different telecommunications companies. Each carrier's IP address space is uniquely assigned and geographically distributed according to its network infrastructure.

18. Using standard industry databases, including ARIN WHOIS records, MaxMind Geo IP, and IPLoopkup.net services, the provided IP address is 174.215.128.233, registered to host domain *233.sub-174-215-128.myvzw.com*, which can be traced to a Verizon Wireless device utilizing Data Roaming capability, while the Plaintiff Michelle Keller utilizes a AT&T device with a different AT&T hosting domain which would have a default public address starting with 192.168.1.[x], making it impossible to visit the site as alleged with her mobile device.

19. Under normal internet usage circumstances, it is technically impossible for an AT&T customer to generate internet traffic that would appear to originate from a Verizon-owned IP address.

20. The only scenarios that could theoretically explain such cross-carrier attribution would involve sophisticated technical manipulation such as advanced VPN services with specific exit points, proxy servers, or deliberate IP address spoofing—none of which are consistent with casual website browsing or Ms. Keller's mobile application history.

21. I have examined Ms. Keller's phone including currently installed applications and software and previously installed software, as well as her iCloud account and confirmed Ms. Keller does not have installed (nor in the past has she installed or used) VPN services, proxy servers, or any other network obfuscation technologies that could explain the carrier and geographic discrepancies.

## DEVICE FINGERPRINTING ANALYSIS - IDENTIFICATION INCONSISTENCIES

21. Device fingerprinting involves analyzing technical metadata transmitted by web browsers and devices during internet interactions, including browser type and version, operating system details, screen resolution, installed fonts, time zone settings, language preferences, and hardware specifications.

22. I analyzed the device fingerprinting data allegedly associated with the April 1, 2025, website visit and compared it with the actual technical specifications of Ms. Keller's devices.

23. The alleged website visitor's device shows the following technical characteristics: mobile device with (750x1334 screen size), iOS operating system, Apple Safari as the browser.

24. Ms. Keller's actual devices show different technical specifications: mobile device with (2532x1170 screen size), iOS operating system, Apple Safari as the browsers. The screen resolution in LendVia's evidence is more in line with an iPhone manufactured from 2014-2017, while Ms. Keller's device was manufactured in 2021.

25. The device fingerprinting analysis reveals fundamental inconsistencies between the alleged visitor's device characteristics and any device owned by Ms. Keller. Simply put, the device purported by LendVia to be Ms. Keller's is not her phone, as confirmed by my examination.

26. As above, these inconsistencies cannot be explained by software updates, browser changes, or normal device variations, as they involve hardware-level specifications that remain constant over time.

## DIGITAL FORENSICS EXAMINATION - ABSENCE OF SUPPORTING EVIDENCE

27. I conducted a comprehensive digital forensics examination of Ms. Keller's electronic devices, including computers, mobile devices, and tablets, focusing on activity relevant to LendVia's allegations surrounding April 1, 2025.

28. This examination included analysis of iCloud application download history to identify any financial or loan-related applications, review of VPN configurations and usage on her mobile devices, and review of her historical email records, including backups dated April 2, 2025.

29. Application download records maintained through iCloud provide reliable forensic evidence of what applications were installed or removed on a device. Similarly, VPN configuration and usage records identify whether attempts were made to conceal internet traffic through external servers. Email accounts, including backed-up histories, document registration attempts, confirmations, and account creation for financial services or VPN providers, which nearly always require verification via email.

30. My forensic examination revealed no evidence of any downloads of LendVia or any similar loan-related applications. No VPN usage, or VPN configuration records were present on any of Ms. Keller's devices. In addition, review of her email history revealed no evidence that an account was ever created with LendVia or any similar financial loan platform.

31. The absence of any digital forensic evidence supporting LendVia's claims is particularly significant given that legitimate use of loan platforms would necessarily leave multiple forms of persistent forensic evidence across applications, email verification logs, and VPN usage records that cannot be easily eliminated

## NETWORK ROUTING AND INFRASTRUCTURE ANALYSIS

33. I analyzed the network routing paths that would be required for internet traffic to travel from Ms. Keller's locations in South Carolina to LendVia's web servers.

34. Standard internet routing protocols would not normally direct traffic from South Carolina through Buffalo-based Verizon infrastructure when the user is an AT&T customer accessing websites hosted on standard commercial hosting platforms.
35. The network proxy records implied by LendVia's claims defies standard internet routing protocols and would require unusual network configurations inconsistent with normal consumer internet usage.
36. I found no evidence of network proxy configurations, specialized routing, or technical circumstances that would explain how Ms. Keller's internet traffic could appear to originate from the claimed Verizon IP address in Buffalo, New York.

## ANALYSIS OF LENDVIA'S EVIDENCE COLLECTION METHODOLOGY

37. I reviewed LendVia's "Verified Consent" platform methodology based on available documentation and technical descriptions provided in their court filings.
38. The platform appears to rely primarily on basic web analytics and screen recording technology without implementing the multi-layered verification protocols typically required for reliable attribution of online activity to specific individuals.
39. Industry best practices for website consent verification require multiple independent technical validation methods, including device authentication, geolocation verification, user behavior analysis, and digital identity confirmation.
40. LendVia's methodology lacks the technical rigor necessary for accurate attribution of website activity to specific individuals, particularly given the technical inconsistencies revealed through my analysis.
41. The technical deficiencies in LendVia's evidence collection system would make it susceptible to false attributions, data corruption, and attribution errors of the type evident in this case.

## AUTHENTICATION ANALYSIS OF VIDEO EVIDENCE

42. I examined LendVia's purported "video" evidence of the alleged website visit for compliance with digital evidence authentication standards. The technical metadata and forensic attributes of the file demonstrate critical deficiencies in authentication and attribution:

43. The video evidence lacks essential authentication elements required for reliable digital evidence, including:

    a. No chain of custody or provenance — The metadata provides no documentation of how the recording was created, transferred, or preserved. There is no evidence that the file was secured in a forensically sound manner.

b. No system reliability foundation — The file metadata indicates it was exported using TechSmith Camtasia 2020.0.14 (*Source: Camtasia,20.0.14,enu*) on July 23, 2025, at 20:04:19 UTC. This confirms it is not an original recording, but an edited/exported screen capture, lacking any proof that the recording system was operating properly at the relevant time.

c. Editable production tool — The presence of a Camtasia project identifier ("Manda_Keller_Cert_01") establishes that the video originated from an editing environment. This undermines reliability, as Camtasia is designed for creating and altering content rather than secure forensic capture.

d. Lack of identifying characteristics — The video contains no embedded device identifiers, user credentials, IP addresses, or other unique digital signatures that would link the content specifically to Ms. Keller or her computer. It is therefore impossible to attribute the recording to her with certainty.

e. No corroborating testimony or logs — There is no witness statement, system log, or independent validation to establish that the recording reflects actual activity on Ms. Keller's system at the alleged time

f. The video therefore represents only a generic, exportable screen recording that could have been produced by any individual with access to Camtasia. Industry standards for digital evidence authentication require a demonstrated chain of custody, system reliability, and definitive attribution. None of these elements are present in LendVia's proffered video evidence, rendering it unreliable for purposes of authentication.

**ASSESSMENT OF ALTERNATIVE EXPLANATIONS**

46. I considered various alternative technical explanations for the discrepancies in LendVia's evidence, including possible system errors, data corruption, or unusual network configurations.

47. None of the alternative explanations I evaluated can account for the combination of geographic impossibility (650-mile distance), carrier impossibility (AT&T vs. Verizon IP ranges), device fingerprinting inconsistencies, and complete absence of supporting digital forensic evidence.

48. The technical evidence indicates that either:

a. LendVia's evidence has been fabricated or deliberately manipulated;

b. Someone other than Ms. Keller, using different devices and network infrastructure, generated the website activity claimed by LendVia; or

c. LendVia's evidence collection and attribution systems are fundamentally unreliable and producing false results.

49. None of these scenario's support LendVia's contention that Ms. Keller personally visited their website and agreed to their terms of service.

**PROFESSIONAL CONCLUSIONS**

50. Based on my technical analysis, I can conclude with professional certainty that Ms. Keller's device was not the source of the alleged website visit on April 1, 2025, at 8:48 AM.

51. The combination of geographic impossibility (Verizon IP address in Buffalo, New York, while Ms. Keller was in South Carolina), telecommunications carrier impossibility (Ms. Keller is an AT&T customer and could not generate Verizon-assigned IP traffic), device fingerprinting inconsistencies (alleged visitor's hardware does not match Ms. Keller's devices), absence of supporting digital forensic evidence (no application history, VPN records, or email traces), and network routing impossibilities (traffic from South Carolina could not logically traverse Buffalo-based Verizon infrastructure under normal conditions) establishes definitively that someone other than Ms. Keller generated the website activity claimed by LendVia.

52. The technical evidence does not present close questions suitable for credibility determinations—it establishes objective impossibilities that cannot be overcome through testimony, conjecture, or argument.

53. Furthermore, LendVia's video evidence is a Camtasia-exported screen recording lacking chain of custody, identifying markers, or forensic safeguards. Its evidence collection methodology fails to meet industry standards for reliable attribution of online activity to specific individuals and is demonstrably susceptible to attribution errors of the type evident in this case. I would also note that, if LendVia or its agents are making screen recordings of customers without notification or consent, that same may itself violate laws including, for example, California laws and EU laws.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct based on my professional expertise and technical analysis.

Markel Samuel

Sworn to before me this 4 of September 2025.

Kristen Woodward
Notary Public, State of South Carolina

My Commission Expires: 7-29-34

# CURRICULUM VITAE

Markel Samuel
Senior Cybersecurity & Compliance Consultant
Lexington, SC 29073
markelsamuel23@gmail.com

## SUMMARY

Seasoned compliance manager and cybersecurity analyst with a proven track record of ensuring regulatory adherence and mitigating risks. Experienced in developing and implementing compliance programs, conducting audits, incident response, and providing training. Detail-oriented, analytical, and adept at fostering a culture of compliance within organizations.

## EDUCATION

- Bachelor of Science in Cybersecurity — Anderson University, South Carolina

## CERTIFICATIONS

- ISC² Certified in Cybersecurity (CC)
- AWS Certified Cloud Practitioner

## PROFESSIONAL EXPERIENCE

***Cybesecurity and Compliance Consultant — Olliptic***

Lexington, SC | Jan 2022 – Present

- Provide expert consulting to organizations during cybersecurity incidents, breaches, and outages.
- Lead disaster recovery planning and incident response efforts, ensuring rapid restoration of critical systems.
- Extract, preserve, and present digital evidence from compromised environments in support of internal investigations, litigation, and regulatory inquiries.
- Advise legal teams, executives, and auditors on the forensic reliability of incident evidence.
- Develop and deliver tailored training workshops to enhance organizational incident response readiness.
- Guide clients in compliance with SOC 2, PCI DSS, ISO 27001, and FedRAMP through integrated incident response and compliance frameworks.

***Senior Cybersecurity Compliance Analyst — Soteria***

Charleston, SC | Oct 2023 – May 2024

- Monitored compliance with SOC 2 and FedRAMP.
- Developed customized compliance training materials.
- Directed and executed initiatives to achieve full SOC 2 compliance.

***Cybersecurity and Compliance Auditor — BDO***

Charlotte, NC | Jun 2022 – Dec 2023

- Conducted assessments for SOC 2, PCI DSS 4.0, FedRAMP, HITRUST, FFIEC CAT, SWIFT, ISO.
- Led audits for Fortune 500 companies in financial services, retail, energy, and technology.
- Delivered final reports and improved efficiency by 25% through streamlined assessments.

***Information Security Analyst (Contract) — Marqeta***

San Francisco, CA | Jan 2022 – Jun 2022

- Aligned systems with NIST 800-37, NIST 800-53, PCI, GDPR.
- Created documentation for SOC 2, NIST CSF, and PCI DSS compliance.
- Implemented MDM system and identity & access management platform, improving security posture.

***IT Security Contractor — Bigger Brains***

Anderson, SC | Oct 2017 – Jun 2022

- Supported GRC tool implementation and compliance with NIST CSF, PCI, GDPR.
- Documented IT controls, audited systems, and recommended improvements.
- Automated ticketing workflows using Python.

**AREAS OF EXPERTISE**

- Digital Forensics & Evidence Authentication
- Disaster Recovery & Incident Response
- IP Address Geolocation & Carrier Network Analysis
- Device Fingerprinting & Attribution
- Telecommunications Systems & Internet Routing Protocols

- Regulatory Compliance (SOC 2, PCI DSS, FedRAMP, HITRUST, ISO 27001)

**PUBLICATIONS & PRESENTATIONS**

- BSides Greenville 2025 Conference Speaker
  - *Black Box, Red Flags: Uncovering Hidden Risks in AI Systems*
- BSides Greenville 2024 Conference Speaker
  - *Defeating Doubt: How to Empower Early Cyber Professionals and Retain Great Future Talent*
- BSides Charleston 2024 Conference Speaker
  - *Defeating Doubt: How to Empower Early Cyber Professionals and Retain Great Future Talent*