UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

---

EDWARD B. HUBBUCH,

        Plaintiff,

*v.*

BETTER DEBT SOLUTIONS LLC, its agents, affiliates, and marketers; LENDVIA LLC; RANGE VIEW MANAGEMENT LLC; BETTER TAX RELIEF LLC; BETTER COMPANIES LLC; MOHAMMAD GHAFARINIA a/k/a MATT GHAFARINIA a/k/a MATT NIA; and JOHN DOES 1-9,

        Defendants.

Case No. 26-CV-2389-PKC-TAM

**SECOND AMENDED COMPLAINT
FOR DAMAGES & INJUNCTIVE RELIEF**

*(Federal Telephone Consumer Protection Act
& Related State Law Claims)*

**[ TRIAL BY JURY DEMANDED ]**

---

Plaintiff Edward B. Hubbuch, proceeding *pro se*, respectfully brings this Second Amended Complaint against BETTER DEBT SOLUTIONS LLC and its agents, affiliates, and marketers; LENDVIA LLC; RANGE VIEW MANAGEMENT LLC; BETTER TAX RELIEF LLC; BETTER COMPANIES LLC; MOHAMMAD GHAFARINIA a/k/a MATT GHAFARINIA a/k/a MATT NIA; and JOHN DOES 1-9, for repeated and unlawful violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §227, its implementing regulations, and New York state law.

## I. INTRODUCTION

1. This civil action arises from Defendants' egregious campaign of at least 730 documented, unsolicited telemarketing calls to Plaintiff's registered cellular telephone between July 1, 2025, and April 24, 2026. Defendants placed approximately 480 automated calls before Plaintiff's brief, investigative callback on December 24, 2025, and at least 250

documented calls between December 25, 2025, and January 23, 2026. The harassment ceased only upon proper service of the original Complaint on Defendant BETTER DEBT SOLUTIONS LLC ("BETTER DEBT SOLUTIONS") on April 24, 2026.

2. Plaintiff asserts five (5) causes of action under federal and state law:

   (i)     **TCPA violations for prerecorded and artificial voice calls (47 U.S.C. §227(b));**

   (ii)    **TCPA National "Do Not Call" Registry violations (47 U.S.C. §227(c));**

   (iii)   **TCPA internal "Do Not Call" policy failures (47 C.F.R. §64.1200(d));**

   (iv)    **New York General Business Law §399-p violations;** and

   (v)     **New York General Business Law §349 deceptive practices.**

3. Plaintiff pleads vicarious enterprise liability and willful conduct supporting treble damages across all counts.

4. Defendants by their own multiple admissions operate a coordinated enterprise—BETTER DEBT SOLUTIONS, LENDVIA LLC ("LENDVIA"), RANGE VIEW MANAGEMENT LLC ("RANGE VIEW"), BETTER TAX RELIEF LLC ("BETTER TAX RELIEF"), BETTER COMPANIES LLC ("BETTER COMPANIES"), and MOHAMMAD GHAFARINIA (the "Enterprise")—sharing operations to systematically target consumers. Despite having no prior relationship with Plaintiff, Defendants relentlessly promoted their financial services using spoofed caller IDs, prerecorded voices, and automated dialing platforms.

5. To deceptively maximize callback rates, Defendants deployed rotating algorithmic voicemail scripts staging fictitious financial "teaser" amounts ($40,000 to $70,000) and

masking their identity behind fabricated divisions (*e.g.*, the "Loan Approvals Department").

6. Defendants knowingly disregarded Plaintiff's continuous registration on the National "Do Not Call" Registry (effective since May 2017). Furthermore, Plaintiff's repeated electronic opt-out attempts, including replying "STOP" to text messages, were ignored. On January 1, 2026, Plaintiff transmitted a formal pre-litigation demand to Defendants' registered counsel to cease the unlawful telemarketing. Defendants ignored this warning and continued the daily onslaught unabated, proving their willful disregard for federal and state law.

7. The willful character of Defendants' unlawful conduct is conclusively proven by its termination. After 10 months of relentless automated calls, the campaign stopped immediately upon service of the Complaint on April 24, 2026. This pinpoint cessation demonstrates Defendants maintained the centralized operational capacity to suppress calls to Plaintiff's number at all times, thereby rendering every prior call a deliberate, knowing act.

8. Consequently, Plaintiff suffered repeated invasions of privacy, disruption of his business operations, and emotional distress. Plaintiff seeks statutory and treble damages under the TCPA, uncapped actual business damages under New York General Business Law, *pro se* costs, and declaratory and prospective relief to prevent resumption of this unlawful conduct.

## II.  JURISDICTION AND VENUE

9.  This Court has subject-matter jurisdiction under 28 U.S.C. §1331 because the TCPA is a federal statute. *See Mims v. Arrow Fin. Servs. LLC*, 565 U.S. 368, 372 (2012). The Court also has supplemental jurisdiction over the related state-law claims under 28 U.S.C. §1367.

10.  This Court has personal jurisdiction over all corporate Defendants because they conduct business within the State of New York and intentionally directed the unlawful telemarketing communications at issue into this District. This Court has personal jurisdiction over Defendant MOHAMMAD GHAFARINIA because he personally selected New York as a target market for the Enterprise's telemarketing campaign, personally directed the deployment of prerecorded voice calls into New York, and personally benefited from the enrollment of New York consumers in the Enterprise's programs. GHAFARINIA's personal direction of telemarketing activities into New York, and his personal receipt of financial benefit from New York consumer enrollments, constitutes purposeful availment of the New York forum under *Walden v. Fiore*, 571 U.S. 277 (2014), and CPLR §302(a)(3)(ii).

11.  Venue is proper in this District under 28 U.S.C. §1391(b) because Plaintiff resides in this District, received the unlawful calls and voice messages here, and Defendants conduct business in or directed communications into this District.

## III.  PARTIES

12.  Plaintiff Edward B. Hubbuch is a resident of Brooklyn, New York, and a small-business owner.

13. Defendant BETTER DEBT SOLUTIONS is a California LLC (Entity No. 202250118638) with its principal place of business at 2525 Main Street, Suite 500, Irvine, California 92614. The company provides consumer financial services nationwide, including directing telemarketing into New York. BETTER DEBT SOLUTIONS was properly served via registered agent Nima Asadi, Esq., on April 24, 2026.

14. Defendants LENDVIA (California Entity No. 202357919960), BETTER TAX RELIEF (California Entity No. 202251018498), and BETTER COMPANIES (California Entity No. B20250085242) are consumer financial services providers that share BETTER DEBT SOLUTIONS' Irvine, California headquarters. Defendant RANGE VIEW is a Wyoming LLC (California Entity No. 201724310500) with its principal place of business at 15303 Ventura Blvd., Suite 1190, Sherman Oaks, California 91403. Defendants' counsel Mario Iskander, Esq., accepted proper service on behalf of LENDVIA, BETTER TAX RELIEF, BETTER COMPANIES, and RANGE VIEW on May 8, 2026.

### The "Enterprise" Identity

15. BETTER COMPANIES operates as the parent and managing entity of the coordinated Enterprise described herein. As Defendants explicitly admitted in a July 2024 federal filing before the U.S. Judicial Panel on Multidistrict Litigation (*In re Range View Management LLC, et al.,* TCPA Litigation, MDL No. 3123) (the "MDL Motion"), BETTER DEBT SOLUTIONS, LENDVIA, RANGE VIEW, and BETTER TAX RELIEF share common ownership, management, counsel, telemarketing infrastructure, witnesses, documents, and policies. Furthermore, BETTER COMPANIES publicly identifies these

entities—alongside related brands—as a single, unified corporate family operating under its centralized direction and control.

16. Defendant MOHAMMAD GHAFARINIA a/k/a MATT GHAFARINIA a/k/a MATT NIA is a California resident and the owner, managing officer, and controlling person of the Enterprise entities. As alleged herein, GHAFARINIA personally ideated, coordinated, directed, and participated in the unlawful telemarketing campaign targeting Plaintiff. GHAFARINIA was properly served on May 1, 2026.

17. Defendants JOHN DOES 1-9 are unknown entities and individuals (including affiliates, agents, or lead generators) who participated in, directed, or benefitted from the unlawful telemarketing. Plaintiff will seek leave to amend to identify them once discovered.

### IV.  STATUTORY AND REGULATORY FRAMEWORK

### The TCPA (47 U.S.C. §227)

18. Enacted to prevent unrestricted telemarketing from becoming *"an intrusive invasion of privacy,"* the TCPA prohibits making non-emergency calls using an artificial or prerecorded voice to a cellular telephone without prior express consent. *See* 47 U.S.C. §227(b)(1)(A)(iii); Pub. L. No. 102-243, §2(5). Under *Facebook, Inc. v. Duguid*, 592 U.S. 395 (2021), this prohibition applies independently of the dialing equipment used. Violations carry statutory damages of $500, trebled to $1,500 for willful or knowing conduct. *See* §227(b)(3).

### National and Internal 'Do Not Call' Protections

19. The TCPA prohibits telephone solicitations to consumers registered on the National "Do Not Call" ("DNC") Registry, which must be honored indefinitely. *See* 47 U.S.C. §227(c); 47 C.F.R. §64.1200(c)(2). Furthermore, any entity initiating telemarketing calls must maintain a written internal DNC policy, train agents, and honor entity-specific opt-out requests for at least five years. *See* 47 C.F.R. §64.1200(d). Internal DNC rules apply regardless of any established business relationship and are enforceable via a private right of action. *In re DISH Network, LLC*, 28 F.C.C. Rcd. 6574, ¶29 (2013). Violations permit recovery of $500 per violation, trebled for willful conduct. *See* §227(c)(5).

### The 'Prior Express Written Consent' Requirement

20. Prior express written consent requires a "written agreement, signed by the person called, that clearly authorizes the seller" to deliver automated telemarketing. *See* 47 C.F.R. §64.1200(f)(9). A system-generated internal Customer Relationship Management ("CRM") notification—created entirely by a telemarketer's own employee logging an inbound consumer callback—is not a signed, written agreement by the consumer. Such a notification is not a "written agreement," was not "signed by the person called," was not submitted by the consumer through any voluntary opt-in action, and was generated entirely by the telemarketer's own data-entry operations. It therefore cannot constitute prior express written consent to future telemarketing communications under federal law as a matter of law, regardless of when it was created relative to any consumer contact.

## Vicarious & Individual Liability

21. Entities are vicariously liable under federal common-law agency principles for TCPA violations committed by third-party telemarketers on their behalf (including via actual authority, apparent authority, and ratification). *DISH Network*, 28 F.C.C. Rcd. at 6584 ¶28. Additionally, corporate officers are personally liable for TCPA violations if they "had direct, personal participation in or personally authorized the conduct found to have violated the statute." *Texas v. American Blastfax, Inc.*, 164 F. Supp. 2d 892, 898 (W.D. Tex. 2001).

## New York General Business Law

22. New York General Business Law ("GBL") §399-p prohibits prerecorded telemarketing to New York consumers without prior express consent or an established business relationship, and mandates specific call disclosures. GBL §349 prohibits materially misleading "[d]eceptive acts or practices" that cause actual injury. Under both statutes, violations permit recovery of actual damages or $50 per violation (trebled up to $1,000 for willful conduct). Furthermore, GBL §349(h) expressly permits a prevailing plaintiff to recover reasonable fees and costs.

## New York Telemarketer Registration (GBL §399-pp)

23. GBL §399-pp mandates that any person or entity acting as a telemarketer must obtain a certificate of registration from the New York Department of State prior to initiating telemarketing calls into the state. *See* GBL §399-pp(3). Operating without this mandatory registration constitutes a violation of New York law and demonstrates a disregard for state consumer protection regulations.

**Cumulative Damages**

24. The statutory damages available under the TCPA, GBL §399-p, and GBL §349 are independent and cumulative remedies. Each statute provides a separate and distinct private right of action for the same unlawful conduct, and recovery under one does not preclude or offset recovery under the others. A single unlawful call to Plaintiff's number simultaneously violated federal law and two independent state statutes, each of which provides its own measure of statutory damages. Plaintiff therefore seeks cumulative damages under all five counts for each documented violation.

## V.  FACTUAL ALLEGATIONS

### A.  The Calls to Plaintiff

25. Plaintiff uses a single cellular telephone number ending in 7597 (the "7597 Number") for both personal and business communications as a sole proprietor. The 7597 Number has been continuously registered on the National "Do Not Call" Registry since May 13, 2017. *See Exhibit A*.

26. Beginning on or about July 1, 2025, and continuing daily through service of the original Complaint on April 24, 2026, Defendants initiated hundreds of unsolicited telemarketing calls to Plaintiff's 7597 Number. Based on available carrier records, at least seven hundred thirty (730) of these calls occurred between July 1, 2025, and January 23, 2026. *See Exhibit B*. Approximately 480 of these documented calls were placed prior to Plaintiff initiating a brief, investigative callback on December 24, 2025. At least 250 additional documented calls were placed after that date. Upon information and belief,

dozens or hundreds of additional calls occurred between January 24, 2026, and April 24, 2026.[1]

27. The simultaneous cessation of all calls immediately upon service of the original Complaint on Defendant BETTER DEBT SOLUTIONS on April 24, 2026, conclusively demonstrates that the Enterprise controlled the dialing infrastructure, not independent third parties.

28. Each call was placed using a prerecorded or artificial voice. The messages left on Plaintiff's voicemail were not produced live by a human caller; rather, they were standardized, repeating recordings delivering identical scripted content across hundreds of calls. The mechanical, repetitive character of these messages—deployed across varied times of day from a rotating array of spoofed caller-ID numbers—confirms they were prerecorded or artificial within the meaning of 47 U.S.C. §227(b)(1)(A)(iii).

29. To maximize callback rates and deceptively exploit consumer data, Defendants' algorithmic voicemail scripts manufactured a false sense of urgency. The scripts staged fictitious financial "teaser" amounts, falsely stating Plaintiff was approved for loans of "$40,000," "$45,000," "$60,000," "$64,000," "$65,000," or "$70,000." Defendants further masked their corporate identity by hiding behind a revolving array of fabricated institutional divisions, including the "Loan Approvals Department," the "Loan Issuance

---

[1] Plaintiff possesses his AT&T call records from July 2025 through January 23, 2026. Due to a carrier change in late April 2026, Plaintiff lost online access to the account and has been unable to obtain his late January, February, March, and April 2026 AT&T call records. AT&T's legal department now requires a subpoena for their release, which Plaintiff will promptly seek from this Court. Upon receipt of third-party carrier records establishing the volume of calls placed between January 24, 2026, and April 24, 2026, Plaintiff will seek leave to amend the documented call total and the corresponding damages calculations under all five counts accordingly.

Department," the "Loan Request Department," the "Loan Review Department," the "Client Evaluation Division," and the "Eligibility Review Office."

30. Plaintiff consistently used provided "opt-out" mechanisms—such as replying "STOP" to text messages or following unsubscribe instructions—yet Defendants uniformly ignored these requests. When Plaintiff blocked one number, Defendants simply used spoofed numbers to continue the harassment. Plaintiff never applied for any financial services from Defendants, and never entered into any agreement, terms of service, or arbitration contract with them.

31. On December 24, 2025, after receiving approximately 480 automated calls, Plaintiff placed a brief, investigative callback for the sole purpose of identifying his harassers. Defendants routed Plaintiff to a representative named "Anthony," who held himself out as an underwriter for "Capital Loan Center." "Anthony" attempted to verify a bogus third-party lead profile, asking if Plaintiff resided at *"7801 Risden Road."* Plaintiff explicitly denied recognizing this address. The representative failed to consummate any transaction because Plaintiff refused to provide his Social Security Number over the telephone. Plaintiff did not provide prior express written consent to future telemarketing during this call; he merely requested the representative email him a form so that Plaintiff could document the identify of the company that had been calling him so relentlessly.

32. Having successfully identified the Enterprise, Plaintiff then transmitted a formal pre-litigation settlement demand letter to Defendants' registered counsel on January 1, 2026, expressly demanding that the unlawful telemarketing immediately cease. *See **Exhibit C***. This written notice explicitly advised Defendants of:

- **The hundreds of robocalls, voicemails, and text messages Plaintiff had received from Defendants over the prior six (6) months;**

- **Plaintiff's DNC Registry registration since May 13, 2017;**

- **Plaintiff's repeated electronic "STOP"-reply opt-out requests that Defendants had ignored;**

- **Defendants' unlawful use of prerecorded voices and spoofed caller ID;**

- **The fifteen (15) prior TCPA lawsuits against Defendants and their affiliates known to Plaintiff at that time, supporting willfulness;**

- **Defendants' statutory and treble-damages exposure under the TCPA and analogous New York law;** and

- **Plaintiff's intent to file a federal complaint absent resolution if no response was received.**

33. The letter also included as an attachment the draft federal complaint that Plaintiff was prepared to file.

34. Defendants ignored this formal, written internal-list request entirely. Instead of halting the campaign, they willfully placed at least 200 additional calls between January 1, 2026, and January 23, 2026, and the relentless harassment continued unabated until late April 2026.

35. Defendants' unceasing, 10-month campaign caused Plaintiff severe annoyance, invasion of privacy, emotional distress, and disruption of business operations. Plaintiff's personal cellular telephone—which doubles as his sole business line—was effectively rendered useless for normal communications due to the forced, continuous utilization of "Do Not Disturb" mode. Each call constitutes a separate, willful statutory violation.

**B.  Defendants' Cessation of Calls Upon Service Demonstrates
Continuous Operational Control, Willfulness, and Enterprise Unity**

36. Upon proper service of the original Complaint on Defendant BETTER DEBT SOLUTIONS on April 24, 2026, Defendants' calls to Plaintiff's number ceased completely and immediately, and have not resumed.

37. This instantaneous halt—after 10 months of relentless daily calls that continued through every prior electronic opt-out, every verbal request, and the formal January 1 written demand to Defendants' registered counsel—establishes three critical facts regarding Defendants' conduct:

(a) **Willfulness:** Defendants possessed throughout the entire 10-month violations period the centralized operational capacity to suppress calls to Plaintiff's number. They could have stopped the calls at any time, yet chose not to do so until facing concrete legal exposure. This conclusively forecloses any defense of inadvertence or technical malfunction, rendering every prior call a deliberate and willful act;

(b) **Direct Attribution:** The simultaneous halt across every originating number, spoofed caller ID, and affiliated brand upon the service of a complaint naming *only* BETTER DEBT SOLUTIONS demonstrates that all 730-plus calls originated from the same coordinated infrastructure. Had the calls originated from genuinely independent, unaffiliated third parties, the harassment would have continued. Defendants' own conduct upon service is the most reliable attribution evidence available; *and*

(c) **<u>Enterprise Unity</u>:** A single operational instruction, propagated through Defendants' coordinated network, was sufficient to halt all calls simultaneously. This confirms that Defendants operate a centralized calling infrastructure under unified control, which is irreconcilable with Defendants' anticipated argument that the named entities operate independently and cannot be held jointly liable.

38. Despite this cessation, the threat of future violations remains. In just the past 31 months, the Enterprise has been the subject of at least forty-three (43) other known TCPA lawsuits and a Minnesota Department of Commerce Consent Order alleging substantially identical illegal conduct. Because the Enterprise has demonstrated a pattern of temporarily suspending unlawful practices when facing immediate legal threats and resuming them once the threat recedes, Plaintiff seeks a declaratory judgment and such prospective relief as the Court deems appropriate to prevent resumption of these violations.

### C. Pattern and Practice of Defendants' Unlawful Telemarketing

39. The misconduct directed at Plaintiff is emblematic of a much broader nationwide pattern and practice of unlawful telemarketing by Defendants that extends far beyond Plaintiff. Defendants' conduct is not an isolated incident but rather part of a coordinated campaign that has targeted thousands of consumers across multiple states using the same tactics alleged herein.

40. Despite BETTER COMPANIES only being founded in 2022, the Enterprise has already been named in at least forty-three (43) other TCPA lawsuits filed just since October 5, 2023. These actions—which include at least seven (7) class-action complaints—each allege substantially similar violations: autodialed calls without consent, prerecorded and

artificial voice messages, spoofed caller ID numbers, failure to honor opt-out requests, and repeated calls to numbers listed on the National "Do Not Call" Registry. *See **Exhibit D***.

41. These lawsuits—filed at a rate of approximately 1.4 per month over the past thirty-one (31) months—include actions filed in federal courts in New Jersey, Texas, California, Michigan, North Carolina, Washington, Georgia, and Florida, among others, and demonstrate that Defendants were on clear, repeated, and continuing notice of their obligations under the TCPA and its implementing regulations throughout the period of Defendants' violations against Plaintiff.

42. Of the 43 other known TCPA lawsuits filed against the Enterprise, approximately thirty-four (34) were resolved rapidly, often within days or weeks of filing. The nine (9) currently unresolved known actions are primarily class-action proceedings in which the affected plaintiffs and their counsel have not yet accepted settlement terms acceptable to the Enterprise. The pattern demonstrates that the Enterprise possesses both the institutional infrastructure to make rapid individual settlements and the financial capacity to compensate consumers who have been harmed by its unlawful telemarketing practices.

43. The recurrence of identical allegations across 43 known and separate federal proceedings, combined with Defendants' continued unlawful conduct against Plaintiff during the period when those proceedings were pending, establishes that Defendants' violations against Plaintiff were committed with full knowledge of TCPA requirements and with deliberate disregard of those requirements. Defendants' use of rotating phone numbers, affiliated entities, and deceptive marketing scripts further evidences a calculated scheme

to evade detection, frustrate consumer enforcement, and continue unlawful telemarketing operations notwithstanding the substantial volume of pending litigation.

44. Further establishing Defendants' awareness of their legal obligations and deliberate disregard of them, BETTER DEBT SOLUTIONS entered into a Consent Order with the Minnesota Department of Commerce dated October 8, 2024, in which the Commissioner of Commerce found that the company's advertisements and telemarketing solicitations *"create[d] the likelihood of consumer confusion or misunderstanding"* in violation of Minn. Stat. §332B.11, subd. 1(1), and required the company to pay a civil penalty of $10,000 and to comply with Minnesota's debt-settlement services statutes going forward. *See __Exhibit E__*.

45. The Minnesota Consent Order was entered and became effective before the calls to Plaintiff's number began on July 1, 2025, and provided Defendants—including Defendant MOHAMMAD GHAFARINIA as controlling person—with specific, formal regulatory notice from a state government agency that their consumer-facing telemarketing practices had been found deceptive and in violation of applicable consumer protection law.

46. Notwithstanding this regulatory finding and the civil penalty imposed, Defendants commenced and sustained the unlawful calling campaign targeting Plaintiff and thousands of other consumers using the same deceptive telemarketing practices that the Minnesota Commissioner of Commerce had already condemned.

### D.  Orchestration by Defendant GHAFARINIA

47.  Defendant MOHAMMAD GHAFARINIA is the owner, managing officer, and controlling person of the Enterprise (BETTER DEBT SOLUTIONS, LENDVIA, RANGE VIEW, BETTER TAX RELIEF, and BETTER COMPANIES). California Secretary of State filings and prior TCPA litigation (*e.g.*, *Janzen v. Better Debt Solutions LLC*, 8:24-CV-1516, C.D. Cal.) consistently confirm his principal ownership and control.

48.  GHAFARINIA personally directed and authorized the unlawful telemarketing campaign targeting Plaintiff. Based on the documentary record from prior TCPA litigation, GHAFARINIA actively participated in the violations by:

   (a)  **Approving the specific prerecorded voice scripts used, including the deceptive "$64,000" voicemail deployed to Plaintiff;**

   (b)  **Directing the purchase of third-party lead data, including the bogus "7801 Risden Road" (Ohio) profile used to solicit Plaintiff during the December 24 callback;**

   (c)  **Setting up the unregistered "Capital Loan Center" alias and "Underwriting Department" intake process to extract consumers' sensitive financial information;**

   (d)  **Purchasing the automated dialing platforms and authorizing the continuous use of spoofed caller IDs;** and

   (e)  **Systematically selecting geographic targets, deliberately directing telemarketing into New York for his Enterprise's foreseeable economic benefit.**

49.  GHAFARINIA knowingly directed these operations in blatant disregard of the TCPA, having actual knowledge of federal and state telemarketing laws through:

(a) **Repeated Litigation**: Serving as the controlling person of entities named in at least 43 prior TCPA lawsuits;

(b) **Federal Admissions**: Authorizing the July 2024 MDL Motion, making express representations to a federal tribunal regarding his entities' shared calling operations;

(c) **Regulatory Penalties**: Receiving a Minnesota Department of Commerce Consent Order (Oct. 8, 2024)—prior to Plaintiff's violations period—which imposed a $10,000 penalty for telemarketing that created "consumer confusion";

(d) **Ignoring Demands**: Receiving Plaintiff's January 1, 2026 cease-and-desist letter via registered counsel and choosing to continue the campaign; *and*

(e) **Disregard of DNC**: Instructing agents to ignore the National DNC Registry and deliberately failing to implement mandatory internal DNC policies under 47 C.F.R. §64.1200(d).

50. As the controlling person of the Enterprise, GHAFARINIA's day-to-day authority is conclusively proven by his personal exercise of suppression power on April 24, 2026. Within hours of BETTER DEBT SOLUTIONS being served with the original Complaint, all calls to Plaintiff instantly ceased. This real-time halt demonstrates that GHAFARINIA maintained direct operational control over the Enterprise's calling infrastructure at all times. His choice not to stop the calls until facing concrete legal exposure forecloses any defense of structural inability, establishing his direct, personal liability for every preceding willful violation.

### E.  The Enterprise's Coordinated Telemarketing Operation

51. Defendants operate through a coordinated scheme involving a nationwide network of related entities, lead generators, and marketing affiliates. This network is deliberately structured to obscure responsibility, evade consumer complaints, and perpetuate unlawful telemarketing practices across multiple jurisdictions.

52. Defendants' scheme relies on the use of overlapping corporate entities, unregistered trade names, and affiliated LLCs that share common ownership, management, branding, and telemarketing infrastructure. These entities include the named Defendants in this action and additional affiliates, including but not limited to:

- **ALLEVIATE FINANCIAL SERVICES LLC**;
- **ALLEVIATE FINANCIAL SOLUTIONS LLC**;
- **AMITY ONE, INC.**;
- **AMITY ONE DEBT RELIEF, INC.**;
- **AMITY ONE TAX, INC.**;
- **BETTER DEBT RELIEF LLC**;
- **BETTER RISE CAPITAL LLC**;
- **CREDIT ONE LENDING LLC**;
- **MN MGMT LLC**;
- **NEXT DAY SETTLEMENT**;
- **ONE STREET FINANCIAL LLC**;
- **RC MGMT LLC**;
- **RISEUP FINANCIAL GROUP LLC**; and
- **WILLOWBROOK CAPITAL PARTNERS**.

53. Collectively, these entities form a debt-relief, tax-relief, and financial-services marketing enterprise designed to funnel consumers into Defendants' programs while shielding individual entities from direct liability for the calling campaigns through which those consumers are acquired.

54. GHAFARINIA, as owner, managing officer, and controlling person of the Enterprise, orchestrates this coordinated network. By distributing outbound calling activities among affiliated entities and lead generators and routing inbound callbacks through the "Capital Loan Center" brand, Defendants attempt to create plausible deniability while continuing to benefit financially from every unlawful communication. The complete cessation of all calls upon service of the original Complaint on April 24, 2026—simultaneously across every number, every brand, and every affiliated entity that had been calling Plaintiff—demonstrates that this distributed network operates under a single point of centralized control, not as an uncoordinated collection of independent actors.

**F.  Enterprise Identity and Control:**
**Defendants' Own Judicial Admissions and Public Admissions**

55. The unified, coordinated nature of Defendants' Enterprise is not a matter of inference or speculation. Defendants themselves have admitted—through multiple independent acts in prior federal proceedings, in this very action, and in their own public marketing materials —that BETTER DEBT SOLUTIONS, LENDVIA, RANGE VIEW, BETTER TAX RELIEF, and BETTER COMPANIES operate as a single, coordinated enterprise sharing all material operational characteristics.

### i. Public Admissions of Unified Operations

56. The unified nature of the Enterprise is explicitly demonstrated by public representations made by Defendant MOHAMMAD GHAFARINIA himself. On his publicly accessible LinkedIn profile,[2] operating under the alias "MATT NIA," GHAFARINIA publicly lists himself as the Co-Founder of both BETTER DEBT SOLUTIONS LLC and BETTER TAX RELIEF LLC, confirming his direct, concurrent founding and controlling role across the purportedly distinct entities. A true and correct copy of GHAFARINIA's public LinkedIn profile is attached hereto as *Exhibit F*.

57. The unified structure of the Enterprise under GHAFARINIA's personal direction is further corroborated by a video published on BETTER DEBT SOLUTIONS' own publicly accessible LinkedIn account,[3] depicting a formal corporate event held upon information and belief in the Los Angeles area in December 2025—during the Violations Period in the instant complaint. At this formal event, GHAFARINIA personally addressed the assembled employees and associates of the Enterprise, while the graphics "BETTER RISE CAPITAL / BUSINESS FUNDING DONE BETTER," "LENDVIA," "BETTER DEBT SOLUTIONS," "BTR / BETTER TAX RELIEF," AND "BETTER COMPANIES LLC / FINANCIAL SOLUTIONS" were displayed in a rotating sequence on a large overhead screen to the assembled crowd.

58. The publication of this video on BETTER DEBT SOLUTIONS' own corporate LinkedIn account—depicting GHAFARINIA personally presiding over a unified celebration of all

---

[2] https://www.linkedin.com/in/mattnia/

[3] https://www.linkedin.com/company/better-debt-solutions/

Enterprise brands during the Violations Period—constitutes an admission by BETTER DEBT SOLUTIONS itself of the Enterprise's unified structure and GHAFARINIA's personal leadership role across all brands. As reproduced in the authenticated visual collage immediately below, this public event demonstrates that GHAFARINIA personally presides over the unified Enterprise and that all Enterprise brands operate under his common direction and control. True and correct individual screenshots of this video are compiled below and attached in full as **_Exhibit G_**.

  

 

**_Figure 1_**: Compiled video authentication captures from the December 2025 corporate event (detailed in ¶60-61 and attached in full as **_Exhibit G_**), visually establishing the unified promotional marketing, common branding, and operational integration of the corporate Defendants under the single umbrella of BETTER COMPANIES.

*ii.  The MDL Motion Admissions*

59.  On July 26, 2024, BETTER DEBT SOLUTIONS, LENDVIA, RANGE VIEW, and BETTER TAX RELIEF filed a joint motion before the U.S. Judicial Panel on Multidistrict Litigation seeking centralization of five then-pending TCPA actions. *See In re Range View Management, LLC, et al.*, MDL No. 3123 (**Exhibit H**).

60.  In that MDL Motion, Defendants made express representations to the federal tribunal, including:

   (a)  **That the entities are collectively represented by the same counsel;**

   (b)  **That cases involving these entities require the same factual discovery and the same witnesses;** and

   (c)  **That discovery involves the same or substantially similar types of documents, including call logs and internal DNC policies.**

61.  These representations, made by Defendants to a federal tribunal in support of their own request for procedural relief, constitute judicial admissions that BETTER DEBT SOLUTIONS, LENDVIA, RANGE VIEW MANAGEMENT, and BETTER TAX RELIEF operate as a unified enterprise sharing common counsel, witnesses, documents, calling policies, and telemarketing infrastructure.

*iii.  The Service Acceptance Admission in This Action*

62.  The Enterprise's operational unity is independently confirmed by Defendants' own litigation conduct in this action. On May 7, 2026, Defendants' counsel Mario Iskander, Esq., confirmed in writing his authority to accept service simultaneously on behalf of all five corporate defendants and GHAFARINIA personally. *See* **Exhibit I**.

63. Accepting unified representation and service for BETTER COMPANIES confirms it is a fully integrated member of the defense team and corporate family. Defendants cannot accept unified legal representation and unified service for all six parties while simultaneously arguing that those parties operate independently for liability purposes.

### *iv.  BETTER COMPANIES' Public Admission of Enterprise Unity*

64. The unified nature of the Enterprise is further established by BETTER COMPANIES' own public marketing materials. As of the date of this filing, BETTER COMPANIES publicly represents on its website (bettercompanies.com) that it operates as a unified corporate family under the tagline, *"One Family of Brands. One Commitment. Across our companies, we share a single purpose…"* The website explicitly identifies BETTER DEBT SOLUTIONS, LENDVIA, BETTER TAX RELIEF and related brands BETTER RISE CAPITAL LLC and RISEUP FINANCIAL GROUP LLC as interconnected components of BETTER COMPANIES' unified portfolio. A true and correct screenshot capturing this admission of enterprise unity is incorporated directly below, and a complete capture of the website is attached hereto as ***Exhibit J***.



**_Figure 2_**: Authenticated screenshot of the BETTER COMPANIES public website (detailed in ¶67-68 and attached in full as **_Exhibit J_**), visually establishing the explicit public admission of enterprise unity, shared commercial purpose, and the operational integration of Defendants BETTER DEBT SOLUTIONS, BETTER TAX RELIEF, and LENDVIA—alongside related affiliates—as a single, interconnected *"Family of Brands."*

65.  This public-facing statement—made by BETTER COMPANIES itself on its own website and directed at consumers and business partners—constitutes an admission in BETTER COMPANIES' own words that the entities comprising the Enterprise are not independent businesses operating at arm's length but rather a single corporate family operating under BETTER COMPANIES' unified direction and toward a common commercial purpose. Plaintiff intends to request judicial notice of this publicly accessible corporate publication pursuant to Federal Rule of Evidence 201.

66.  The MDL admissions of operational unity, combined with the unified service acceptance in this action and BETTER COMPANIES' own public identification of the Enterprise brands as a single corporate family, directly establishes that the calls placed in the name

of any one of these entities were placed using infrastructure shared with the others; that the policies governing TCPA compliance—or their absence—applied uniformly across all entities; and that the personnel directing the calling operations served the entire Enterprise.

67. By Defendants' own representations and litigation conduct, no meaningful operational distinction exists among BETTER DEBT SOLUTIONS, LENDVIA, RANGE VIEW MANAGEMENT, BETTER TAX RELIEF, and BETTER COMPANIES for purposes of telemarketing liability, and Defendant MOHAMMAD GHAFARINIA's personal direction of the unified Enterprise renders him jointly and severally liable with the corporate defendants for the violations alleged herein.

## G. Defendants' Reliance on Third-Party Data and Evidence-Creation Practices

68. Defendants claim possession of a purported "consent" record and a digital audio file corresponding to Plaintiff's December 24, 2025 investigative callback. Both the data and the underlying evidentiary systems fail as a matter of law and fact.

69. *First*, Defendants' internal records, as read aloud by their representative during the callback, associated Plaintiff's New York cellular number with an inaccurate address phonetically identified as "7801 Risden Road." Geographic database searches default this phonetic spelling to a location in Vermilion, Ohio. Plaintiff does not recognize this address and has never lived in or visited Vermilion, Ohio. The deployment of this fabricated data profile substantiates that Defendants rely on unverified, third-party lead generators rather than authentic consumer opt-ins.

70. *Second*, upon information and belief, any purported consent record Defendants may claim to possess regarding Plaintiff's December 24, 2025 investigative callback was generated internally by Defendants' own personnel or systems, rather than by Plaintiff. Because Plaintiff merely placed an investigative phone call, never executed a digital opt-in form, never signed a document, and explicitly refused to provide his Social Security Number to proceed with any transaction, any internal notation made by Defendants' representative does not satisfy the strict elements of 47 C.F.R. §64.1200(f)(9). Such an internal record is not a "written agreement," was not "signed by the person called," and was not submitted by the consumer through any voluntary opt-in action. It cannot constitute prior express written consent as a matter of law.

71. *Third*, the timing of any such record forecloses its use. Under established FCC guidance, prior express written consent must precede the calls for which it is claimed. A system record created contemporaneously with Plaintiff's December 24, 2025 callback cannot retroactively authorize the approximately 480 automated calls placed during the preceding five months.

72. *Finally*, the reliability of Defendants' consent-evidence systems has been successfully challenged and exposed as systematically fraudulent in multiple federal lawsuits against the Enterprise. Digital forensic expert Markel Samuel has submitted sworn declarations for the plaintiffs in both *Keller v. LendVia LLC* (No. 6:25-CV-2982, D.S.C.) and *Aurandt v. Range View Management LLC, et al.* (No. 3:25-CV-5785, W.D. Wash.) systematically challenging the authenticity of Defendants' purported digital consent evidence in those

cases. *See **Exhibit K** and **Exhibit L** (Sworn Declarations of Markel Samuel, including Curriculum Vitae).*

73. In these proceedings, the forensic expert concluded that the Enterprise's "verified consent" materials were materially inconsistent with the plaintiffs' actual devices and possessed the metadata signatures of fabricated, post-production files. Specifically, the expert found:

   (a) **Post-Production Fabrication:** Defendants use commercial editing software to manufacture consent videos. In *Aurandt*, the purported screen-recording metadata identified the *"Creator Tool"* as *"Adobe After Effects 2025 (Macintosh)."* In *Keller*, the video metadata revealed it was exported using *"TechSmith Camtasia 2020.0.14"* and contained an editable project identifier labeled *"Manda_Keller_Cert_01."* These files are edited, exported composites rather than native, forensically sound recordings of a user's device;

   (b) **Hardware Profile Mismatches:** The device fingerprints claimed by Defendants' systems consistently mismatch the actual hardware possessed by targeted consumers. In *Aurandt*, the system claimed a 720x1280 resolution while the plaintiff possessed a 1440x3120 Samsung Galaxy S24 Ultra. In *Keller*, the system claimed an iOS device with a 750x1334 resolution (matching older 2014-2017 iPhones), while the plaintiff actually possessed a 2021 iPhone 13 Pro with a 2532x1170 resolution;

(c) **Carrier and Geographic Impossibilities:** The IP addresses attributed to the plaintiffs by Defendants' consent systems logistically fail standard internet routing protocols. In *Keller*, the IP address belonged to Verizon Communications and geolocated to Buffalo, New York, while the plaintiff was physically located 650 miles away in South Carolina and was an AT&T customer. It is technically impossible for an AT&T customer to generate standard internet traffic from a Verizon IP address. Similar impossibilities were documented in *Aurandt; and*

(d) **Forensic Impossibility:** Comprehensive forensic audits of the targeted devices in both cases revealed no downloads of Defendants' applications, no corresponding VPN routing configurations, and no email verification logs that would be required to legitimately utilize or register for Defendants' platforms.

74. The *Keller* and *Aurandt* findings establish a documented federal court record that Defendants' evidentiary systems utilize commercial post-production software to render fabricated video consent files that lack proper chain of custody and fail basic forensic authentication. These findings reinforce the structural inadequacy and fundamental unreliability of any digital consent record Defendants may attempt to claim regarding Plaintiff's December 24, 2025 investigative callback.

### H.  Vicarious and Enterprise Liability

75. By Defendants' own judicial admissions in the MDL Motion—in which Defendants represented to a federal tribunal that BETTER DEBT SOLUTIONS, LENDVIA, RANGE VIEW, and BETTER TAX RELIEF share common counsel, witnesses, call logs, and DNC policies—and by BETTER COMPANIES' own public identification of all

Enterprise brands as *"One Family of Brands"* operating under its unified direction, the Enterprise operates as a unified telemarketing operation under the centralized control of MOHAMMAD GHAFARINIA. Each entity within the Enterprise is therefore liable for unlawful calls placed using shared infrastructure, regardless of which entity's name appeared on Plaintiff's caller ID at any particular moment.

76. Under federal common-law principles of agency recognized by the FCC, each Defendant entity is vicariously liable for TCPA violations committed by other entities within the Enterprise and by lead generators, call centers, marketing vendors, and other related entities operating on the Enterprise's behalf. *See In re Joint Petition Filed by DISH Network, LLC*, 28 F.C.C. Rcd. 6574, 6584 ¶28 (2013).

77. Vicarious liability attaches under each of the recognized agency theories:

    (a) *Actual authority*, by virtue of GHAFARINIA's direct personal control over each Defendant entity and over the lead generators, call centers, and dialing platform vendors acting in the Enterprise's name, as established by his personal exercise of suppression authority upon service of the original Complaint on April 24, 2026;

    (b) *Apparent authority*, by virtue of the Enterprise's deliberate use of overlapping branding, the shared "Capital Loan Center" inbound processing brand through which consumer callbacks were received regardless of which entity placed the outbound call, and the unified calling infrastructure that presented the affiliated

entities as components of a single operation to consumers including Plaintiff; *and*

(c) *Ratification*, by virtue of the Enterprise's continued acceptance of leads, enrollments, and revenue generated by the calling operation despite actual knowledge of its unlawful methods—knowledge established by at least 43 prior TCPA lawsuits, the October 2024 Minnesota Department of Commerce Consent Order, and receipt of Plaintiff's January 1, 2026 cease-and-desist letter—and by Defendants' consistent pattern of rapid individual settlements across those prior proceedings demonstrating institutional awareness of and financial management of TCPA exposure.

78. The cessation of all calls promptly upon service of the original Complaint on April 24, 2026—simultaneously across every originating number, every caller-ID variant, and every affiliated brand that had been calling Plaintiff—confirms that the entire Enterprise operates under unified control sufficient to suppress calls with a single instruction when Defendants choose to do so.

79. No genuinely decentralized, independently operating network of affiliates could have ceased operations simultaneously across every entity and brand on a single day without centralized coordination. The Enterprise is therefore appropriately treated as a single liable actor for purposes of TCPA enforcement, with each named Defendant jointly and severally liable for the violations described herein.

## I.  Willful and Knowing Conduct

80.  Defendants' violations of the TCPA, its implementing regulations, and New York state law were willful and knowing within the meaning of 47 U.S.C. §227(b)(3), 47 U.S.C. §227(c)(5), GBL §399-p(9), and GBL §349(h).

81.  The willful and knowing character of Defendants' violations is established by, among other things:

(a)  **Plaintiff's continuous registration on the National DNC Registry since May 13, 2017, more than eight (8) years before the calls began;**

(b)  **Plaintiff's repeated electronic opt-out requests, including at least 10 "STOP" responses to Defendants' text messages, all of which were ignored;**

(c)  **Plaintiff's January 1, 2026 formal cease-and-desist letter to Defendants' registered counsel, after which Defendants ignored the explicit written demand and willfully placed at least two hundred (200) additional documented calls to Plaintiff's number;**

(d)  **Defendants' history of at least 43 other TCPA lawsuits alleging substantially identical conduct, providing them with actual, repeated notice of TCPA requirements and their legal obligations;**

(e)  **Defendants' filing of the MDL Motion in July 2024, demonstrating their actual familiarity with TCPA requirements and the legal exposure created by their unified calling practices;**

(f)  **Defendants' entry into the October 8, 2024 Minnesota Department of Commerce Consent Order—which explicitly found BETTER DEBT SOLUTIONS' telemarketing solicitations deceptive and imposed a $10,000 civil penalty—before the violations period against Plaintiff even began, providing Defendants with specific regulatory notice that their consumer-facing practices violated applicable law;**

(g)  **Defendants' deliberate failure to register as a telemarketing business with the New York Department of State, as required by GBL §399-pp, prior to directing hundreds of automated calls into New York, demonstrating a systemic and intentional disregard for state regulatory requirements;** and

(h)   **The complete cessation of calls within hours of service of the original Complaint, demonstrating conclusively that Defendants possessed the operational capacity to comply with the TCPA throughout the entire 10-month violations period, yet deliberately chose not to do so until facing concrete legal compulsion.**

82.   The cumulative statutory exposure arising from Defendants' willful conduct under the federal TCPA alone, based on the currently documented call volume of seven hundred thirty (730) calls, totals no less than $1,095,000. This federal baseline is exclusive of Plaintiff's independent and cumulative actual business damages under New York state law, which remain uncapped and will be proven at trial, subject to further upward amendment upon receipt of third-party carrier records.

### VI. CAUSES OF ACTION

### COUNT ONE
### VIOLATIONS OF THE TCPA, 47 U.S.C. §227(b)(1)(A)(iii)
### (Prerecorded and Artificial Voice Calls to Cellular Number)
### *(Against All Defendants)*

83.   Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

84.   Each of the at least seven hundred thirty (730) documented calls to Plaintiff's cellular number—as well as the additional undocumented calls placed through April 24, 2026—was placed using an artificial or prerecorded voice in violation of 47 U.S.C. §227(b)(1)(A)(iii). A call made using an artificial or prerecorded voice violates this provision independently of the dialing equipment utilized.

85.   Plaintiff did not provide prior express consent to any of these calls. Plaintiff provided no consent for the approximately 480 calls placed prior to December 24, 2025. The

December 24, 2025 investigative callback did not constitute prior express written consent under 47 C.F.R. §64.1200(f)(9), which requires a signed written agreement, and did not authorize the approximately 250 or more calls placed after that date. To the extent Defendants claim to possess any consent record for Plaintiff's number, upon information and belief, that record was generated internally by Defendants' own personnel or systems. Because Plaintiff never executed a digital opt-in form or signed a written document, any such internal notation does not satisfy any element of §64.1200(f)(9) and is legally insufficient to establish prior express written consent as a matter of law.

86. Each automated call constitutes a separate violation and a separate basis for statutory damages under 47 U.S.C. §227(b)(3).

87. Consistent with the pleading standards set forth in *Bank v. Alleviate Tax LLC*, No. 23-CV-5457 (PKC)(PK), 2024 WL 1332635 (E.D.N.Y. Mar. 28, 2024), the specific conduct and operational roles attributable to each Defendant within the Enterprise are as follows:

   (a) **BETTER DEBT SOLUTIONS directed the calling campaign, operated the "Capital Loan Center" inbound processing desk that received Plaintiff's December 24, 2025 callback, and was the primary entity whose service with the original Complaint caused the complete, instantaneous cessation of all Enterprise calls on April 24, 2026;**

   (b) **LENDVIA shared the call logs, infrastructure, witnesses, and DNC policies used in the campaign, as Defendants judicially admitted in their July 2024 MDL Motion. Defendants' counsel also accepted service on LENDVIA's behalf on May 8, 2026;**

   (c) **RANGE VIEW shared the call logs, infrastructure, witnesses, and DNC policies used in the campaign, as admitted in the MDL Motion, and participated in the Enterprise's lead generation network through its joint operation under the alias "LENDBEE." Defendants' counsel also accepted service on RANGE VIEW's behalf on May 8, 2026;**

(d)     **BETTER TAX RELIEF shared the call logs, infrastructure, witnesses, and DNC policies used in the campaign, as admitted in the MDL Motion. Defendants' counsel also accepted service on BETTER TAX RELIEF's behalf on May 8, 2026;**

(e)     **BETTER COMPANIES operated as the parent, managing, and coordinating entity of the Enterprise, publicly identifying all Enterprise brands as *"One Family of Brands"* operating under its unified direction, and maintaining centralized operational authority over the telemarketing infrastructure of BETTER DEBT SOLUTIONS and its affiliated brands. Defendants' counsel also accepted service on BETTER COMPANIES' behalf on May 8, 2026;** and

(f)     **MOHAMMAD GHAFARINIA is personally liable based on his direct personal participation in, management of, and authorization of the conduct alleged. This includes his personal direction of the prerecorded calling campaign, his personal procurement of the unverified third-party lead data used to target Plaintiff, his personal authorization of the call routing protocols and spoofed caller-ID systems, and his personal exercise of authority to suppress all calls within hours of service of the original Complaint—establishing his direct, real-time operational control over the calling infrastructure throughout the violations period.**

88.    Defendants' violations were willful and knowing within the meaning of 47 U.S.C. §227(b)(3).

89.    Plaintiff is entitled to statutory damages of $500 per call, trebled to $1,500 per call for willful or knowing violations, on each of the at least seven hundred thirty (730) documented calls, with leave to amend upon receipt of third-party carrier records during discovery.

90.    The statutory damages awarded under this Count are independent of and cumulative with the statutory damages available under GBL §399-p (*Count Four*) and GBL §349 (*Count Five*), which provide separate state-law remedies for the same unlawful conduct.

## COUNT TWO
## VIOLATIONS OF THE TCPA, 47 U.S.C. §227(c)(5)
### (Calls to Number on National "Do Not Call" Registry)
### *(Against All Defendants)*

91.  Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

92.  Plaintiff's 7597 Number has been continuously registered on the National "Do Not Call" Registry since May 13, 2017, more than eight (8) years prior to the initiation of Defendants' telemarketing campaign.

93.  Defendants initiated and delivered more than one unsolicited telephone solicitation within a 12-month period to Plaintiff's DNC-registered number in violation of 47 U.S.C. §227(c) and 47 C.F.R. §64.1200(c)(2). Plaintiff had no established business relationship with any Defendant and provided no prior express invitation or permission for the approximately 480 automated calls placed prior to December 24, 2025. The December 24, 2025 investigative callback did not establish an business relationship and did not authorize the approximately 250 or more automated calls placed after that date.

94.  Each telemarketing call placed to Plaintiff's registered number following the initial solicitation constitutes a separate violation of 47 U.S.C. §227(c)(5) and a separate basis for statutory damages.

95.  Defendants are each directly liable as members of the unified Enterprise and are additionally vicariously liable under federal common-law agency principles. Consistent with the pleading standards of *Bank*, the specific conduct and operational roles attributable to each named Defendant regarding these National DNC violations are as follows:

(a) **BETTER DEBT SOLUTIONS directed and executed the National DNC-violating telemarketing campaign, and received actual, direct notice of Plaintiff's registration and opt-out demands through the January 1, 2026 formal cease-and-desist letter;**

(b) **LENDVIA, RANGE VIEW, and BETTER TAX RELIEF shared the DNC compliance policies, call logs, and infrastructure used in the campaign. This shared operational infrastructure was explicitly admitted in Defendants' July 2024 MDL Motion, which identified *"Defendants' policies or procedures regarding National DNC"* as common, shared documents utilized across all four entities;**

(c) **BETTER COMPANIES as the parent and managing entity, authorized and coordinated the Enterprise-wide campaign through which Plaintiff's National "Do Not Call" registration was repeatedly violated, and maintained centralized operational authority over the telemarketing infrastructure of BETTER DEBT SOLUTIONS and its affiliated brands;** and

(d) **MOHAMMAD GHAFARINIA personally directed and authorized the campaign with actual knowledge of the legal requirements of the National DNC Registry through his exposure to dozens of prior TCPA actions, and personally chose to continue the campaign in conscious disregard of Plaintiff's rights after his registered counsel received the January 1, 2026 cease-and-desist demand.**

96. Defendants' violations were willful and knowing within the meaning of 47 U.S.C. §227(c)(5).

97. Plaintiff is entitled to statutory damages of $500 per call, trebled to $1,500 per call for willful or knowing violations, on each of the at least seven hundred thirty (730) documented calls placed, with leave to amend the total damages calculation upon receipt of third-party carrier records during discovery.

98. The statutory damages awarded under this Count are subsumed within the single TCPA damages award sought under *Count One*, representing an alternative theory of recovery

under a separate TCPA provision for the same unlawful calls rather than an independent basis for additional damages.

**COUNT THREE**
**VIOLATIONS OF 47 C.F.R. §64.1200(d),**
**ENFORCED THROUGH 47 U.S.C. §227(c)(5)**
**(Failure to Maintain Internal "Do Not Call" Policy and**
**Honor Internal-List Requests)**
***(Against All Defendants)***

99.  Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

100.  Defendants initiated and delivered telephone calls to Plaintiff for telemarketing purposes within the meaning of 47 C.F.R. §64.1200(d). As a mandatory prerequisite to initiating any telemarketing communications, federal law required Defendants to establish and implement specific internal procedures, including maintaining a written internal "Do Not Call" policy, training personnel on its use, placing consumers who request opt-outs on an entity-specific list, and providing a copy of the policy upon demand.

101.  Defendants systematically failed to comply with these mandatory regulatory safeguards. Defendants failed to maintain a compliant written internal policy, failed to train their telemarketing agents, failed to place Plaintiff on an entity-specific do-not-call list despite explicit requests, and failed to provide a copy of their policy upon demand.

102.  Plaintiff explicitly requested placement on Defendants' internal "Do Not Call" list through multiple channels, including at least ten (10) electronic "STOP" responses transmitted to Defendants' text messages and the January 1, 2026 formal cease-and-desist letter delivered to Defendants' registered counsel. Defendants ignored these mandatory

directives and willfully initiated at least two hundred (200) additional documented telemarketing calls to Plaintiff's number following the January 1, 2026 written demand.

103. The internal do-not-call requirements under 47 C.F.R. §64.1200(d) are fully enforceable through a private right of action pursuant to 47 U.S.C. §227(c)(5). Because Defendants failed to implement the mandatory procedural prerequisites required to initiate telemarketing, each noncompliant call placed to Plaintiff constitutes a separate statutory violation.

104. Defendants are each directly liable as members of the unified Enterprise and are additionally vicariously liable under federal common-law agency principles. Consistent with the pleading standards of *Bank*, the specific conduct and operational roles attributable to each named Defendant regarding these internal DNC violations are as follows:

(a) **BETTER DEBT SOLUTIONS directly received Plaintiff's internal do-not-call list requests via its "Capital Loan Center" inbound desk on December 24, 2025, and through the January 1, 2026 cease-and-desist letter, yet continued the calling campaign in flagrant disregard of both directives;**

(b) **LENDVIA, RANGE VIEW, and BETTER TAX RELIEF shared identical DNC compliance policies, call logs, and suppression infrastructure as admitted in the July 2024 MDL Motion, establishing that each entity participated in the same deficient compliance framework that systematically failed to honor consumer opt-out requests;**

(c) **BETTER COMPANIES, as the parent and managing entity, bore ultimate responsibility for establishing and enforcing compliant internal telemarketing policies across the Enterprise brands and maintained centralized control over the shared telemarketing infrastructure used to target consumers;** and

    (d)    **MOHAMMAD GHAFARINIA personally failed to implement, execute, or enforce a compliant internal do-not-call policy across his corporate entities, actively authorizing the campaign to continue after each clear opt-out request and exercising his centralized suppression authority only when forced by concrete legal exposure on April 24, 2026.**

105. Defendants' violations were willful and knowing within the meaning of 47 U.S.C. §227(c)(5).

106. Plaintiff is entitled to statutory damages of $500 per call, trebled to $1,500 per call for willful or knowing violations, on each of the at least seven hundred thirty (730) documented calls placed, with leave to amend the total damages calculation upon receipt of third-party carrier records during discovery.

107. The statutory damages awarded under this Count are subsumed within the single TCPA damages award sought under *Count One*, representing an alternative theory of recovery under a separate TCPA provision for the same unlawful calls rather than an independent basis for additional damages.

## COUNT FOUR
### VIOLATIONS OF N.Y. GENERAL BUSINESS LAW §399-p
*(Against All Defendants)*

108. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

109. Defendants initiated and delivered unsolicited telemarketing calls to Plaintiff's 7597 Number using automatic dialing-announcing devices to deliver prerecorded messages within the meaning of GBL §399-p. The statutory term "automatic dialing-announcing device" under GBL §399-p is defined by New York law independently of the federal automated telephone dialing system ("ATDS") standard construed in *Facebook, Inc.*, and

encompasses the automated calling equipment Defendants deployed to deliver standardized, repetitive recordings to Plaintiff's number.

110. Defendants initiated these automated telemarketing communications without prior express consent and without any established business relationship with Plaintiff. Defendants further failed to provide the mandatory disclosures required by GBL §399-p, including systematically failing to disclose the true identity of the caller and the actual corporate entity on whose behalf the call was made. Instead, Defendants deliberately utilized a revolving array of fictitious department names to conceal their identity and mask the Enterprise, while completely failing to honor Plaintiff's repeated opt-out requests.

111. Each individual call placed in violation of GBL §399-p constitutes a separate and distinct violation of New York law.

112. Defendants are each directly liable as members of the unified Enterprise and are additionally vicariously liable under principles of agency. Consistent with the pleading standards set forth in *Bank*, the specific conduct and operational roles attributable to each named Defendant regarding these state-law violations are as follows:

   (a) **BETTER DEBT SOLUTIONS directed and executed the prerecorded calling campaign targeting New York consumers, placed automated calls to Plaintiff's New York cellular number without consent or an established business relationship, and systematically omitted the mandatory statutory disclosures required by GBL §399-p;**

   (b) **LENDVIA, RANGE VIEW, and BETTER TAX RELIEF actively participated in and shared the automated calling infrastructure, call logs, and marketing networks through which these noncompliant calls were routed into New York, as admitted in their July 2024 MDL Motion;**

(c) **BETTER COMPANIES, as the parent and managing entity, authorized, coordinated, and directly profited from the illegal prerecorded campaign targeting New York consumers, and as the self-identified managing entity of the *"Family of Brands,"* bears joint operational responsibility for the calling conduct of its subsidiaries;** and

(d) **MOHAMMAD GHAFARINIA personally directed the deployment of automatic dialing-announcing devices against consumers, deliberately selected New York as a core demographic and target market for the Enterprise, and personally authorized the use of deceptive, fictitious corporate aliases and department names that violated GBL §399-p's explicit disclosure mandates.**

113. Defendants' statutory violations were willful and knowing within the meaning of GBL §399-p(9).

114. As a direct and proximate result of Defendants' non-compliant automated campaign, Plaintiff suffered severe and ongoing actual business damages within the State of New York, including the persistent, 10-month structural disruption of his commercial telephone operations, the economic loss of missed legitimate business communications while his line was overwhelmed, and an extensive diversion of time and operational resources expended identifying and attempting to halt the campaign.

115. Plaintiff is entitled to recover his actual business damages resulting from the disruption of his commercial operations to be proven at trial, or fifty dollars per violation, whichever is greater. Furthermore, because Defendants willfully and knowingly violated the statute, Plaintiff is entitled to have the damage award increased to the maximum extent permitted by GBL §399-p(9), plus reasonable costs.

116. The damages awarded under this Count are independent of and cumulative with the statutory damages available under the TCPA (*Count One*, *Count Two*, and *Count Three*)

and GBL §349 (*Count Five*). GBL §399-p provides a separate and independent state-law remedy for Defendants' use of automatic dialing-announcing devices to deliver prerecorded calls to New York consumers without consent, and recovery under §399-p neither precludes nor offsets recovery under federal or other state law.

## COUNT FIVE
## VIOLATIONS OF N.Y. GENERAL BUSINESS LAW §349
### (Deceptive Acts and Practices)
### *(Against All Defendants)*

117. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

118. Defendants engaged in deceptive, consumer-oriented acts and practices in the conduct of trade or commerce within the State of New York in violation of GBL §349 by:

    **(a)** **Misrepresenting their true identity through systematic caller ID spoofing and a rotating array of telephone numbers explicitly designed to mask the source of the calls and bypass consumer call-blocking software;**

    **(b)** **Deploying rotating algorithmic scripts falsely offering varying loan amounts of "$40,000," "$45,000," "$60,000," "$64,000," "$65,000," and "$70,000" to manufacture a false sense of personalization and deceptively induce consumer callbacks;**

    **(c)** **Deceptively representing themselves to consumers as various official-sounding institutional bodies—including the "Loan Approvals Department," "Loan Issuance Department," "Loan Request Department," "Loan Review Department," "Client Evaluation Division," and "Eligibility Review Office"—to manufacture false corporate legitimacy;**

    **(d)** **Deceptively routing consumers to an "Underwriting Department" operating under the unregistered trade name "Capital Loan Center" to extract sensitive, personal financial data under the false guise of evaluating an active, legitimate loan application;**

    **(e)** **Outwardly pretending to operate as compliant, legitimate financial businesses while systematically ignoring Plaintiff's repeated electronic opt-out requests;**

**(f)** **Maintaining a deceptive corporate maze of overlapping LLCs and unregistered trade names intentionally designed to prevent consumers from identifying the true responsible party, while simultaneously representing to the public that these entities constitute *"One Family of Brands"* under unified direction—thereby exploiting a unified brand identity for commercial benefit while asserting corporate separateness to evade accountability;** and

**(g)** **Directing hundreds of commercial telemarketing solicitations into New York without holding the mandatory telemarketer business registration from the New York Department of State required by GBL §399-pp, thereby deceptively holding themselves out to New York consumers as a lawfully authorized and compliant business operation.**

119. Defendants' conduct was consumer-oriented, systematically directed at New York consumers at large, including Plaintiff, and was materially misleading. A reasonable consumer would have been deceived by the spoofed caller IDs, the false implications of a pre-existing financial relationship, the fictional department titles, and the corporate-structure obfuscation deployed by the Enterprise.

120. Plaintiff suffered actual, cognizable injury in New York as a direct result of Defendants' deceptive practices, including severe invasions of privacy, the total disruption of his sole business telephone line for ten consecutive months, economic harm resulting from missed legitimate business communications while his phone was overwhelmed, and the extensive time and personal resources expended identifying and attempting to halt the campaign. These injuries occurred entirely within the State of New York, where Plaintiff received each deceptive communication and sustained each injury, satisfying the requirements of *Goshen v. Mutual Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324-25 (2002). A private cause of action under GBL §349 does not require a completed consumer transaction, and the actual injuries alleged are independently actionable under New York

law. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25 (1995). See also *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.*, 37 N.Y.3d 169, 171 N.E.3d 1192 (2021).

121. Defendants are each directly liable as members of the unified Enterprise and are additionally vicariously liable under principles of agency. Consistent with the pleading standards set forth in *Bank*, the specific conduct and operational roles attributable to each named Defendant regarding these deceptive practices are as follows:

  (a) **BETTER DEBT SOLUTIONS deployed and operated the deceptive calling infrastructure targeting Plaintiff, including the spoofed caller IDs, fictional department names, and the "Capital Loan Center" trade name that actively concealed its corporate identity;**

  (b) **LENDVIA, RANGE VIEW, and BETTER TAX RELIEF actively participated in and directly profited from the deceptive campaign through their shared ownership, call logs, and marketing infrastructure, and each entity's active use of the unified Enterprise structure to shield itself from consumer identification constitutes direct participation in the corporate-structure deception;**

  (c) **BETTER COMPANIES designed, authorized, and managed the overlapping corporate structure deployed as a deceptive shield herein, and simultaneously represented that structure publicly as a unified corporate family while asserting corporate separateness as a defense—a dual position that is inherently deceptive toward consumers who had no structural mechanism to know that these distinct brands were components of a single corporate family operating under its centralized control;** and

  (d) **MOHAMMAD GHAFARINIA personally designed, authorized, and directed the deceptive core elements of the campaign, including the rotating script amounts, the fictitious department designations, the automated spoofed caller-ID systems, and the "Capital Loan Center" trade name.**

122. Defendants' deceptive statutory violations were willful and knowing within the meaning of GBL §349(h).

123. Plaintiff is entitled to recover his actual business damages resulting from Defendants' deceptive telemarketing campaign to be proven at trial, or $50 per violation, whichever is greater. Furthermore, because Defendants willfully and knowingly engaged in these deceptive acts, Plaintiff is entitled to have his actual damages increased to an amount not to exceed three times the actual damages up to $1,000 per violation, as permitted by GBL §349(h), along with reasonable *pro se* costs.

124. The damages awarded under this Count are independent of and cumulative with the statutory damages available under the TCPA (*Count One*, *Count Two*, and *Count Three*) and GBL §399-p (*Count Four*). GBL §349 provides a separate and independent state-law remedy for Defendants' deceptive acts and practices directed at New York consumers, and recovery under GBL §349 neither precludes nor offsets recovery under federal or other state law.

## VII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Edward B. Hubbuch respectfully requests that this Court enter judgment against Defendants BETTER DEBT SOLUTIONS LLC, LENDVIA LLC, RANGE VIEW MANAGEMENT LLC, BETTER TAX RELIEF LLC, BETTER COMPANIES LLC, MOHAMMAD GHAFARINIA a/k/a MATT GHAFARINIA a/k/a MATT NIA, and JOHN DOES 1-9, jointly and severally, as follows:

(a) **On *Count One*, *Count Two*, and *Count Three***: Award statutory damages under the TCPA of $500 per violation, trebled to $1,500 per violation for willful or knowing

conduct, for each of the at least seven hundred thirty (730) documented calls made to Plaintiff's number in violation of 47 U.S.C. §§227(b) and 227(c) and 47 C.F.R. §64.1200(d), with leave to amend the total violations and damages calculation upon receipt of third-party carrier records during discovery. Plaintiff seeks a single award of $1,500 per documented call under the TCPA counts, representing the maximum statutory damages available for each call that simultaneously violated one or more provisions of 47 U.S.C. §227 and its implementing regulations, for a total of no less than $1,095,000 on the TCPA counts based on the currently documented call volume;

(b)   **On *Count Four***: Award Plaintiff his actual business damages resulting from the disruption of his commercial operations to be proven at trial, or statutory damages of $50 per unlawful call, whichever is greater, and upon a finding of willful misconduct, increase said award to the maximum extent permitted under GBL §399-p(9), plus reasonable costs, for each of the at least seven hundred thirty (730) documented calls placed to Plaintiff's New York cellular number. The damages awarded under *Count Four* are independent of and cumulative with the damages awarded under *Count One, Count Two*, *Count Three*, and *Count Five*, as §399-p provides a separate and independent state-law remedy for the same unlawful conduct;

(c)   **On *Count Five***: Award Plaintiff his actual business damages resulting from Defendants' deceptive telemarketing campaign to be proven at trial, or statutory damages of $50 per violation, whichever is greater, and upon a finding of willful

and knowing deceptive acts, increase said actual damages to an amount not to exceed three times the actual damages up to $1,000 per violation, as permitted by GBL §349(h), plus reasonable costs and fees, for each of the at least seven hundred thirty (730) documented calls directed into New York. The damages awarded under *Count Five* are independent of and cumulative with the damages awarded under *Count One*, *Count Two*, *Count Three*, and *Count Four*, as §349 provides a separate and independent state-law remedy for the deceptive conduct alleged herein;

(d)   Plaintiff respectfully submits that the total statutory damages available under the federal TCPA counts alone, based on the currently documented call volume of seven hundred thirty (730) calls, is no less than $1,095,000. This federal baseline is exclusive of Plaintiff's independent and cumulative actual business damages under New York state law, which remain uncapped and will be proven at trial, exclusive of pre-judgment and post-judgment interest, costs and fees, and subject to upward amendment upon receipt of third-party carrier records establishing the volume of additional calls placed between January 24, 2026, and April 24, 2026;

(e)   **Declaratory Relief**: Enter a declaration pursuant to 28 U.S.C. §2201 that Defendants' telemarketing campaign and corporate structures during the violations period violated the TCPA, 47 U.S.C. §227, its implementing regulations, and applicable New York state law; that Defendants are legally obligated to maintain a compliant, written internal "Do Not Call" policy in strict conformity with 47 C.F.R. §64.1200(d); and grant such prospective relief as the Court deems appropriate to

prevent a resumption of Defendants' established pattern of telemarketing violations;

(f) **Interest and Costs**: Award Plaintiff the *pro se* costs of bringing this action, as well as pre- and post-judgment interest on all monetary awards at the maximum rate allowed by law; *and*

(g) **General Relief**: Grant such other, further, or alternative relief as the Court deems just, equitable, and proper.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: June 25, 2026
Brooklyn, New York

Respectfully submitted,

/s/**Edward B. Hubbuch**

EDWARD B. HUBBUCH
394 Lincoln Place #A5
Brooklyn, New York 11238
bhubbuch@gmail.com
(646) 544-7597

Plaintiff, *pro se*

TO:    MARIO ISKANDER, Esq.
Iskander Law
1111 N. Brand Blvd., Ste. 308
Glendale, Calif. 91202
mario@iskanderlaw.com
(240) 439-1970

*Attorney for Defendants*  BETTER DEBT SOLUTIONS LLC,
LENDVIA LLC,
RANGE VIEW MANAGEMENT LLC,
BETTER TAX RELIEF LLC,
BETTER COMPANIES LLC, and
MOHAMMAD GHAFARINIA
a/k/a MATT GHAFARINIA a/k/a MATT NIA