UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDWARD B. HUBBUCH,<br><br>Plaintiff,<br><br>v.<br><br>BETTER DEBT SOLUTIONS LLC, its agents, affiliates, and marketers; LENDVIA LLC; RANGE VIEW MANAGEMENT LLC; BETTER TAX RELIEF LLC; BETTER COMPANIES LLC; MOHAMMAD GHAFARINIA a/k/a MATT GHAFARINIA a/k/a MATT NIA; and JOHN DOES 1-9,<br><br>Defendants. | Case No. 26-CV-2389-PKC-TAM<br><br>**AMENDED COMPLAINT FOR DAMAGES & INJUNCTIVE RELIEF**<br>*(Federal Telephone Consumer Protection Act & Related State Law Claims)*<br><br>**[TRIAL BY JURY DEMANDED ]** |

Plaintiff Edward B. Hubbuch, proceeding *pro se,* respectfully brings this ~~First~~Second Amended Complaint against BETTER DEBT SOLUTIONS LLC and its agents, affiliates, and marketers; LENDVIA LLC; RANGE VIEW MANAGEMENT LLC; BETTER TAX RELIEF LLC; BETTER COMPANIES LLC~~,~~; MOHAMMAD GHAFARINIA a/k/a MATT GHAFARINIA a/k/a MATT NIA~~,~~; and JOHN DOES 1-9, for repeated and unlawful violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, its implementing regulations, and New York state law.

### I. INTRODUCTION

1. This civil action arises from ~~the initiation~~Defendants 'egregious campaign of at least ***seven hundred thirty (730)***730 documented, unsolicited ~~and automated~~ telemarketing calls ~~by Defendants~~ to Plaintiff's registered cellular telephone ~~number~~ between July 1, 2025, and April 24, 2026. ~~The calls~~Defendants placed approximately 480 automated calls before

https://api.draftable.com/compare/gaAYvdGiFnWN

 Draftable

Plaintiff's brief, investigative callback on December 24, 2025, and at least 250 documented calls between December 25, 2025, and January 23, 2026. The harassment ceased only upon proper service of the original Complaint ~~in this action~~ on Defendant BETTER DEBT SOLUTIONS LLC ("BETTER DEBT SOLUTIONS") on April 24, 2026.

2.  Plaintiff asserts five (5) causes of action under federal and state law:

    **(i)    TCPA ~~V~~violations ~~of the TCPA's prohibition on~~for prerecorded and ~~autodialed calls to cellular numbers pursuant to~~ artificial voice calls (47 U.S.C. § 227(b)~~(1)(A)(iii)~~);**

    **(ii)   ~~Violations of the TCPA's~~TCPA National "Do Not Call" Registry ~~protections pursuant to~~ violations (47 U.S.C. § ~~227(c)(5)~~);**

    **(iii)  ~~Violations of the~~ TCPA~~'s~~ internal "Do Not Call" policy ~~requirements pursuant to~~ failures (47 C.F.R. § ~~64.1200(d))~~;**

    **(iv)   ~~Violations of~~ New York General Business Law § ~~399-p~~ violations; and**

    **(v)    ~~Violations of~~ New York General Business Law § ~~349~~ deceptive practices.**

3.  ~~Each count incorporates allegations of~~ Plaintiff pleads vicarious enterprise liability ~~under federal common-law agency principles~~ and willful ~~and knowing~~ conduct supporting treble damages across all counts.

4.  Defendants ~~comprise~~by their own multiple admissions operate a coordinated enterprise—BETTER DEBT SOLUTIONS, LENDVIA LLC ("LENDVIA"), RANGE VIEW MANAGEMENT LLC ("RANGE VIEW"), BETTER TAX RELIEF LLC ("BETTER TAX RELIEF"), BETTER COMPANIES LLC ("BETTER COMPANIES"), and MOHAMMAD GHAFARINIA ~~a/k/a MATT GHAFARINIA a/k/a MATT NIA ("GHAFARINIA"), and JOHN DOES 1-9~~ (the "Enterprise")—~~that has targeted Plaintiff through the repeated use of automatic telephone dialing systems, prerecorded and artificial voice messages,~~



https://api.draftable.com/compare/gaAYvdGiFnWN

and caller ID spoofing sharing operations to systematically target consumers. Despite having no prior relationship with Plaintiff and no lawful basis to contact him, Defendants engaged in a sustained pattern of intrusive and harassing communications designed to relentlessly promoted their debt relief, tax relief, and consumer financial services. using spoofed or rotating numbers caller IDs, prerecorded and artificial voices, and automated messaging dialing platforms.

5. Plaintiff has been continuously registered on the National "Do Not Call" Registry since May 13, 2017, yet Defendants knowingly and repeatedly disregarded this registration. Beginning on or about July 1, 2025, Defendants initiated unsolicited and automated calls and voice messages—sent repeatedly and on a daily basis—to Plaintiff's personal number. These communications were placed using spoofed or rotating numbers, prerecorded and artificial voices, and automated messaging platforms—all hallmarks of unlawful telemarketing activity expressly prohibited by the TCPA and New York State law To deceptively maximize callback rates, Defendants deployed rotating algorithmic voicemail scripts staging fictitious financial "teaser" amounts ($40,000 to $70,000) and masking their identity behind fabricated divisions (*e.g.*, the "Loan Approvals Department").

6. The conduct of Defendants was not accidental, isolated, or inadvertent knowingly disregarded Plaintiff has been 's continuously registered registration on the National "Do Not Call" Registry (effective since May 13, 2017). Plaintiff repeatedly attempted to stop the communications, including by using opt-out mechanisms in the voice messages, Furthermore, Plaintiff's repeated electronic opt-out attempts, including replying "STOP" to text messages, and verbally requesting that the calls cease during the December 24, 2025 callback described herein. were ignored. Finally, on On January 1, 2026, Plaintiff transmitted a formal

https://api.draftable.com/compare/gaAYvdGiFnWN

Draftable

pre-litigation ~~warning letter~~demand to Defendants' registered counsel~~, expressly demanding that~~ to cease the unlawful telemarketing ~~immediately cease.~~. ~~Despite these repeated notices and warnings, however,~~ Defendants ignored ~~every such request~~this warning and continued the~~ir daily~~ onslaught ~~of calls~~ unabated, ~~thereby demonstrating a knowing and~~proving their willful disregard for ~~Plaintiff's rights and for~~ federal and state law.

7. The willful character of Defendants '<u>unlawful</u> conduct is conclusively ~~demonstrated by when the calls to Plaintiff finally ceased~~<u>proven by its termination</u>. After 10 months of ~~daily, unrelenting calls — calls that continued through opt-out requests, through verbal cease-and-desist demands, through written cease-and-desist demands transmitted to Defendants' registered counsel, and through the filing of this federal action on April 22, 2026 — the calls~~<u>relentless automated calls, the campaign</u> stopped immediately upon service of the Complaint on ~~Defendants' registered agent on~~ April 24, 2026~~, and have not resumed as of the date of this filing.~~. ~~The~~<u>This</u> pinpoint ~~timing of complete~~ cessation demonstrates ~~that~~ Defendants ~~at all times possessed the~~ <u>maintained the centralized</u> operational capacity to suppress calls to Plaintiff's number~~, and that~~<u>at all times, thereby rendering</u> every prior call ~~to Plaintiff over the preceding 10 months was therefore~~ a deliberate, knowing~~, and willful act.~~ <u>act.</u>

8. ~~As a result of Defendants' willful and deliberate actions~~<u>Consequently</u>, Plaintiff ~~has~~ suffered repeated invasions of privacy, disruption of his business operations, <u>and</u> emotional distress~~, and the ongoing burden of managing and blocking dozens of unwanted calls and voice messages on a daily basis for 10 months~~. Plaintiff ~~therefore~~ seeks statutory <u>and treble</u> damages under the TCPA ~~and~~<u>, uncapped actual business damages under</u> New York General Business Law, ~~treble damages for Defendants' willful or knowing violations, *pro se* costs under N.Y. General~~

https://api.draftable.com/compare/gaAYvdGiFnWN

Business Law § 349, and injunctive relief to permanently halt Defendants'*pro se* costs, and declaratory and prospective relief to prevent resumption of this unlawful ~~practices~~conduct.

## II.  JURISDICTION AND VENUE

9.  This Court has subject-matter jurisdiction under 28 U.S.C. §-1331 because the TCPA is a federal statute. *See Mims v. Arrow Fin. Servs.*~~,~~ *LLC,* 565 U.S. 368, 372 (2012). The Court also has supplemental jurisdiction over the related state-law claims under 28 U.S.C. §-1367.

10.  This Court has personal jurisdiction over ~~Defendants because Defendants directed unlawful telemarketing communications into this District, targeting Plaintiff and other New York residents, with the foreseeable consequence of injury occurring in this District.~~all corporate Defendants because they conduct business within the State of New York and intentionally directed the unlawful telemarketing communications at issue into this District. ~~Specifically, Defendants knowingly initiated calls to Plaintiff's New York-registered cellular number, knew or should have known through standard area-code identification that calls placed to a number with a New York City area code (646) would reach a person located in New York, and intended the economic effect of those calls—successful enrollment in their debt-relief and tax-relief programs—to occur in New York with respect to Plaintiff.~~This Court has personal jurisdiction over Defendant MOHAMMAD GHAFARINIA because he personally selected New York as a target market for the Enterprise's telemarketing campaign, personally directed the deployment of prerecorded voice calls into New York, and personally benefited from the enrollment of New York consumers in the Enterprise's programs. GHAFARINIA's personal direction of telemarketing activities into New York, and his personal receipt of financial benefit from

https://api.draftable.com/compare/gaAYvdGiFnWN

New York consumer enrollments, constitutes purposeful availment of the New York forum under *Walden v.* ~~Defendants' deliberate targeting of New York residents through their nationwide telemarketing enterprise, including through the calls to Plaintiff alleged herein, satisfies the minimum contacts requirements of due process and the long-arm provisions of New York Civil Practice Law and Rules § 302(a)~~*Fiore*, 571 U.S. 277 (2014), and CPLR §302(a)(3)(ii).

11.  Venue is proper in this District under 28 U.S.C. §-1391(b) because Plaintiff resides in this District, received the unlawful calls and voice messages here, and Defendants conduct business in or directed communications into this District.

## III.  PARTIES

12.  Plaintiff Edward B. Hubbuch is a resident of Brooklyn, New York, and a small-business owner.

13.  Defendant BETTER DEBT SOLUTIONS is a California ~~limited liability company~~LLC (Entity No. 202250118638) with its principal place of business ~~located~~ at 2525 Main Street, Suite 500, Irvine, California 92614~~, and registered with the California Secretary of State under Entity No. 202250118638~~. The company ~~is engaged in~~ provides consumer ~~and small-business debt relief and~~ financial services ~~and conducts business~~ nationwide, including directing telemarketing ~~communications~~ into New York~~, and may be served through its~~ ~~registered agent, Nima Asadi, Esq., at 19200 Von Karman Avenue, Suite 600, Irvine, California~~ 92612. BETTER DEBT SOLUTIONS was properly served via registered agent~~,~~ Nima Asadi, Esq., on April 24, 2026.

14.  Defendants LENDVIA ~~is a~~ (California ~~limited liability company engaged in~~Entity No. 202357919960), BETTER TAX RELIEF  (California Entity No. 20225l018498), and

 Draftable

https://api.draftable.com/compare/gaAYvdGiFnWN

BETTER COMPANIES (California Entity No. B20250085242) are consumer ~~and small business~~ financial services providers that share BETTER DEBT SOLUTIONS' Irvine, California headquarters. Defendant RANGE VIEW is a Wyoming LLC (California Entity No. 201724310500) with its principal place of business ~~located at 2525 Main Street, Suite 500, Irvine~~at 15303 Ventura Blvd., Suite 1190, Sherman Oaks, California 9~~2614~~1403~~., and registered with the California Secretary of State under Entity No. 202357919960. LENDVIA is part of a coordinated enterprise with BETTER DEBT SOLUTIONS, RANGE VIEW~~Defendants' counsel Mario Iskander, Esq., accepted proper service on behalf of LENDVIA, BETTER TAX RELIEF, ~~and other affiliated entities, sharing common ownership, management, counsel, telemarketing infrastructure, witnesses, documents, and policies, as~~BETTER COMPANIES, and RANGE VIEW on May 8, 2026. ~~Defendants themselves admitted in a July 2024 federal filing before the U.S. Judicial Panel on Multidistrict Litigation. *See In re Range View Management, LLC, et al.*, TCPA Litigation, MDL No. 3123, ECF No. 1 (J.P.M.L. July 26, 2024) (the "MDL Motion"). LENDVIA may be served through its registered agent, Nima Asadi, Esq., at 19200 Von Karman Avenue, Suite 600, Irvine, California 92612.~~

### The "Enterprise" Identity

15. ~~Defendant RANGE VIEW is a limited liability company incorporated in Wyoming with its principal place of business located at 15303 Ventura Boulevard, Suite 1190, Sherman Oaks, California 91403, and which is registered with the California Secretary of State under Entity No. 201724310500. RANGE VIEW is part~~BETTER COMPANIES operates as the parent and managing entity of the ~~same~~ coordinated ~~e~~Enterprise ~~with BETTER DEBT SOLUTIONS, LENDVIA, BETTER TAX RELIEF, and other affiliated entities, as~~described herein. As Defendants ~~themselves~~explicitly admitted in ~~the MDL Motion. RANGE VIEW may be served~~

https://api.draftable.com/compare/gaAYvdGiFnWN

through its registered agent, Payem Sadeghi, at 15303 Ventura Boulevard, Suite 1190, Sherman Oaks, California 91403.

16. a July 2024 federal filing before the U.S. Judicial Panel on Multidistrict Litigation. *See* (*In re Range View Management, LLC, et al.,* TCPA Litigation, MDL No. 3123) (the "MDL Motion"), Defendant BETTER TAX RELIEF is a California limited liability company engaged in consumer and small-business financial services with its principal place of business located at 2525 Main Street, Suite 500, Irvine, California 92614, and which is registered with the California Secretary of State under Entity No. 202251018498. BETTER TAX RELIEF is part of the same coordinated enterprise with BETTER DEBT SOLUTIONS, LENDVIA, RANGE VIEW, and other affiliated entities, as Defendants themselves admitted in the MDL Motion. BETTER TAX RELIEF may be served through its registered agent, Nima Asadi, Esq., at 19200 Von Karman Avenue, Suite 600, Irvine, California 92612.sharing common ownership, management, counsel, telemarketing infrastructure, witnesses, documents, and policies. Furthermore, BETTER COMPANIES publicly identifies these entities—alongside related brands—as a single, unified corporate family operating under its centralized direction and control.

17. Defendant BETTER COMPANIES is a California limited liability company with its principal place of business located at 2525 Main Street, Suite 500, Irvine, California 92614, and which is registered with the California Secretary of State under Entity No. B20250085242. Upon information and belief, BETTER COMPANIES operates as the parent and managing entity of the coordinated Enterprise described herein, sharing common ownership, management, and telemarketing infrastructure with the other Defendant entities. BETTER COMPANIES may be served through its registered agent, Nima Asadi, Esq., at 19200 Von Karman Avenue, Suite 600, Irvine, California 92612.

https://api.draftable.com/compare/gaAYvdGiFnWN



16. ~~18.~~Defendant MOHAMMAD GHAFARINIA a/k/a MATT GHAFARINIA a/k/a MATT NIA is a ~~natural person,~~California resident ~~of California,~~ and the owner, managing officer, and controlling person of the Enterprise~~, including BETTER DEBT SOLUTIONS, LENDVIA, RANGE VIEW, BETTER TAX RELIEF, BETTER COMPANIES, and the affiliated entities described herein~~ entities. As alleged ~~with particularity below~~herein, GHAFARINIA personally _ideated, coordinated,_ directed~~,~~ and participated in the ~~calls to Plaintiff and the broader~~unlawful telemarketing campaign ~~of which they were a part~~targeting Plaintiff. GHAFARINIA was properly served on May 1, 2026.

17. ~~19.~~Defendants JOHN DOES 1-9 are unknown entities and individuals ~~who, upon information and belief,~~(including affiliates, agents, ~~marketers,~~or lead generators) who participated in, directed, ~~authorized,~~ or benefitted from the unlawful telemarketing~~ calls and messages described herein, including affiliates, agents, marketers, lead generators, and related entities~~. Plaintiff will _seek leave to_ amend ~~this Complaint~~ to identify them once ~~their identities are~~ discovered.

### IV. STATUTORY AND REGULATORY FRAMEWORK

~~20.~~    **The TCPA** ~~was enacted in 1991 to regulate the explosive growth of the telemarketing industry. Congress recognized that "[u]~~nrestricted telemarketing ... can be an intrusive invasion of privacy~~[.]" _Telephone Consumer Protection Act of 1991,_ Pub. L. No. 102-243, § 2(5) (1991) (codified at _**47 U.S.C. § 227**_)~~.

18. ~~21.~~The TCPA ~~makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system ['ATDS'] or an~~ Enacted to prevent u~~nrestricted telemarketing ... can be~~from becoming _"an intrusive invasion of privacy,"_ the TCPA prohibits making non-emergency calls using an artificial or prerecorded voice~~ ... to~~ ~~any telephone number assigned to a ...~~a cellular telephone ~~service."~~without prior express consent. _See_ 47 U.S.C. §~~ 227(b)(1)(A)(iii)~~.~~; Pub.

https://api.draftable.com/compare/gaAYvdGiFnWN



L. No. ~~The statute prohibits each of two independent methods of making such calls: (a) calls placed using an ATDS; and (b) calls placed using an artificial or prerecorded voice~~102-243, §2(5). Under *Facebook, Inc. v. Duguid,* 592 U.S. 395 (2021), ~~a call made using an artificial or prerecorded voice violates § 227(b)(1)(A)(iii) regardless of whether~~ this prohibition applies independently of the dialing equipment ~~qualifies as an ATDS.~~used.

~~22.    The TCPA provides a private cause of action to persons who receive calls in violation of 47 U.S.C. § 227(b)(1)(A). *See* 47 U.S.C. § 227(b)(3).~~ Violations carry Sstatutory damages ~~are~~of $500 ~~per violation~~, trebled to $1,500 ~~per violation~~for willful or knowing conduct. *See* §227(b)(3).

~~23.~~ ~~The~~ **National and Internal 'Do Not Call'** ~~Registry (the "DNC Registry") allows consumers to register their telephone numbers to indicate their desire not to receive telephone solicitations at those numbers pursuant to 47 C.F.R. § 64.1200(c)(2). A listing on the DNC Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *Id.* The TCPA and implementing regulations prohibit telephone solicitations to subscribers registered on the DNC Registry, pursuant to 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(c)(2). Persons who receive more than one telephone solicitation within any 12-month period in violation of the DNC Registry rules may bring a private action for damages of $500 per violation, trebled for willful or knowing conduct, under 47 U.S.C. § 227(c)(5).~~**Protections**

19. ~~24.~~The TCPA prohibits telephone solicitations to ~~subscribers~~consumers registered on the National "Do Not Call" ("DNC") Registry, "which must be honored indefinitely. *See* 47 U.S.C. §227(c); 47 C.F.R. §64.1200(c)(2).~~Separately, the TCPA's implementing regulations require that any person or~~ Furthermore, any entity ~~that~~ initiat~~es~~ing ~~calls "for~~ telemarketing ~~purposes"~~calls must maintain a written internal ~~"Do Not Call"~~DNC policy, train ~~its~~ agents ~~on~~

https://api.draftable.com/compare/gaAYvdGiFnWN



its use, place persons who request not to be called on an, and honor entity-specific do not call list and honor thatopt-out requests for at least five (5) years, and provide a copy of the policy to any called party who requests one. *See* 47 C.F.R. § 64.1200(d). The iInternal "Do Not Call" requirements under § 64.1200(d) apply to all telemarketing callsDNC rules apply regardless of whether the called party has any established business relationship with the caller, in contrast to the national DNC Registry restrictions under § 64.1200(c) which are subject to limited established business-relationship exceptions.and are The internal-policy requirement is enforceable through thevia a private right of action under 47 U.S.C. § 227(c)(5).. *See In re DishDISH Network, LLC,* 28 F.C.C. Rcd. 6574, ¶ 29 (2013); *see also Bank v. Independence Energy Group LLC,* 736 F.3d 660, 663 (2d Cir. 2013). Violations permit recovery of $500 per violation, trebled for willful or knowing conduct. *See* §227(c)(5).

25. A person or entity may be vicariously liable under the TCPA for calls made on its behalf, even if that entity did not directly dial the call. The Federal Communications Commission has held that sellers "may be held vicariously liable under federal common law principles of agency for TCPA violations committed by third-party telemarketers ... under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification." *In re Joint Petition Filed by DISH Network, LLC,* 28 F.C.C. Rcd. 6574, 6584 ¶ 28 (2013).**The 'Prior Express Written Consent' Requirement**

20. Prior express written consent requires a "written agreement, signed by the person called, that clearly authorizes the seller" to deliver automated telemarketing. *See* 47 C.F.R. §64.1200(f)(9). A system-generated internal Customer Relationship Management ("CRM") notification—created entirely by a telemarketer's own employee logging an inbound consumer callback—is not a signed, written agreement by the consumer. Such a notification is not a "written agreement," was not "signed by the person called," was not submitted by the consumer through any voluntary opt-in action, and was generated entirely



by the telemarketer's own data-entry operations. It therefore cannot constitute prior express written consent to future telemarketing communications under federal law as a matter of law, regardless of when it was created relative to any consumer contact.

### Vicarious & Individual Liability

21. 26.Individuals acting on behalf of aEntities are vicariously liable under federal common law agency principles of agency for TCPA violations committed by third-party telemarketers on their behalf (including via actual authority, apparent authority, and ratification). *DISH Network, 28 F.C.C. Rcd.* at 6584 ¶28. Additionally, corporatione may be heldofficers are personally liable for TCPA violations of the TCPA where if they "had direct, personal participation in or personally authorized the conduct found to have violated the statute." *Texas v. American Blastfax, Inc.*, 164 F. Supp. 2d 892, 898 (W.D. Tex. 2001). Numerous federal courts have applied this same principle to hold individual officers personally liable for TCPA violations. *See, e.g., City Select Auto Sales Inc. v. David Randall Assocs., Inc.*, 885 F.3d 154, 161 (3d Cir. 2018); *Bais Yaakov of Spring Valley v. Graduation Source, LLC*, No. 14-CV-3232 (NSR), 2016 WL 1271693, at *5 (S.D.N.Y. Mar. 29, 2016); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 416 (D. Md. 2011).

### New York General Business Law

22. 27.New York General Business Law ("GBL") §-399-p prohibits the use of automatic dialing announcing devices to deliver prerecorded telemarketing messages to New York consumers without prior express consent or an established business relationship, and requiresmandates specifiedc call disclosures during such calls. GBL §349 prohibits materially misleading

https://api.draftable.com/compare/gaAYvdGiFnWN



"[d]eceptive acts or practices in" that cause actual injury. The statute provides a private right of action Under both statutes, violations permitting recovery of actual damages or $50 per violation, whichever is greater, (trebled up to $1,000 for willful violations, plusconduct). Furthermore, GBL §349(h) expressly permits a prevailing plaintiff to recover reasonable attorneys' fees and costs. See N.Y. Gen. Bus.

### Law**New York Telemarketer Registration (GBL § 399-p(9pp)**.

28.    New York General Business Law § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." A consumer-oriented act that is materially misleading and causes actual injury is actionable, with statutory damages of $50 per violation, trebled up to $1,000 for willful violations, and attorneys' fees and costs. See N.Y. Gen. Bus. Law § 349(h).

23.    GBL §399-pp mandates that any person or entity acting as a telemarketer must obtain a certificate of registration from the New York Department of State prior to initiating telemarketing calls into the state. See GBL §399-pp(3). Operating without this mandatory registration constitutes a violation of New York law and demonstrates a disregard for state consumer protection regulations.

### Cumulative Damages

24.    The statutory damages available under the TCPA, GBL §399-p, and GBL §349 are independent and cumulative remedies. Each statute provides a separate and distinct private right of action for the same unlawful conduct, and recovery under one does not preclude or offset recovery under the others. A single unlawful call to Plaintiff's number simultaneously violated federal law and two independent state statutes, each of which

https://api.draftable.com/compare/gaAYvdGiFnWN

provides its own measure of statutory damages. Plaintiff therefore seeks cumulative damages under all five counts for each documented violation.

## V.  FACTUAL ALLEGATIONS

### A.  The Calls to Plaintiff

25. ~~29.~~Plaintiff uses a single cellular telephone number ending in 7597 (the "7597 Number") for both personal and business communications as a sole proprietor. The 7597 Number has been continuously registered on the National "Do Not Call" Registry since May 13, 2017. *See **Exhibit A***.

26. ~~30.~~Beginning on or about July 1, 2025, and continuing daily through service of the original Complaint on April 24, 2026, Defendants initiated ~~at least *seven*~~ hundreds ***thirty (730)***of unsolicited telemarketing calls to Plaintiff's 7597 Number. ~~These calls are reflected in Plaintiff's AT&T Wireless monthly billing records~~ Based on available carrier records, at least seven hundred thirty (730) of these calls occurred between July 1, 2025, and January 23, 2026~~, and attached as~~*See **Exhibit B***. Approximately 480 of these documented calls were placed prior to Plaintiff initiating a brief, investigative callback on December 24, 2025. At least 250 additional documented calls were placed after that date. Upon information and belief, dozens or hundreds of additional calls occurred between January 24, 2026, and April 24, 2026.[1]

---

[1] Plaintiff ~~has obtained~~possesses his AT&T call records from July 2025 through January 23, 2026. ~~Plaintiff~~ Due to a carrier change in late April 2026, Plaintiff lost online access to the account and has been unable to obtain his late January, February, March, and April 2026 AT&T call records ~~because~~. AT&T's legal department now requires a subpoena for their release~~;~~, which Plaintiff will promptly seek ~~such subpoena~~ from this Court. Upon receipt of third-party carrier records establishing the volume of calls placed between January 24, 2026, and April 24, 2026, Plaintiff will seek leave to amend the documented call total and the corresponding damages calculations under all five counts accordingly.

https://api.draftable.com/compare/gaAYvdGiFnWN



27. ~~31.~~The simultaneous cessation of all calls ~~to Plaintiff's number~~immediately upon service of the original Complaint on Defendant BETTER DEBT SOLUTIONS on April 24, 2026, conclusively demonstrates that the ~~calls reflected in the highlighted records of *Exhibit B* were placed by Defendants and their affiliated entities operating within the unified~~ Enterprise controlled the dialing infrastructure ~~described herein, and not by unrelated~~, not independent third parties.

28. ~~32.~~Each ~~of the calls to Plaintiff~~call was placed using a prerecorded or artificial voice. ~~Specifically, the voice~~ The messages left on Plaintiff's voicemail were not produced live by a human caller~~;~~ ~~but~~rather, they were standardized, repeating recordings delivering ~~substantially~~ identical scripted content across hundreds of calls ~~placed at varied times of day from~~ ~~varied originating numbers~~. The mechanical, repetitive~~, and identical~~ character of the~~se~~ ~~voice~~ messages ~~—~~deploy~~ed at~~across varied times of day from a rotating array of spoofed caller-ID numbers—confirms ~~that~~ they were prerecorded or artificial within the meaning of 47 U.S.C. §227(b)(1)(A)(iii).~~ The same scripted content was delivered by the same prerecorded voice across calls bearing different caller-ID numbers — a calling pattern only possible through the use of automated calling infrastructure deploying a common prerecorded voice file across multiple originating channels.~~

29. To maximize callback rates and deceptively exploit consumer data, Defendants' algorithmic voicemail scripts manufactured a false sense of urgency. The scripts staged fictitious financial "teaser" amounts, falsely stating Plaintiff was approved for loans of "$40,000," "$45,000," "$60,000," "$64,000," "$65,000," or "$70,000." Defendants further masked their corporate identity by hiding behind a revolving array of fabricated institutional divisions, including the "Loan Approvals Department," the "Loan Issuance

https://api.draftable.com/compare/gaAYvdGiFnWN

Department," the "Loan Request Department," the "Loan Review Department," the "Client Evaluation Division," and the "Eligibility Review Office."

30. ~~33.~~Plaintiff consistently used ~~the~~provided "opt-out" mechanism~~s  provided in the voice messages~~—such as replying "STOP" to text messages or following unsubscribe instructions—yet Defendants ~~refused to honor~~uniformly ignored these requests~~ and continued placing calls and leaving messages~~. When Plaintiff ~~would~~ block~~ed~~ one number, Defendants simply used spoofed ~~or rotating~~ numbers to continue ~~both the calling and messaging campaigns, thereby preventing Plaintiff from effectively stopping the harassment.~~the harassment.

~~34.   Plaintiff has never contacted BETTER DEBT SOLUTIONS, LENDVIA, RANGE VIEW, BETTER TAX RELIEF, BETTER COMPANIES, or any entity affiliated with the Enterprise, through any website, online form, or telephonically, except for limited investigative callbacks described herein for the purpose of identifying the source of the unlawful telemarketing campaign, which Plaintiff initiated only after Defendants' unlawful calls had already begun and which were not voluntary commercial inquiries.~~

~~35.   Plaintiff has never sought or~~ Plaintiff never applied for any ~~loan, debt relief, tax relief, or~~ financial services from Defendants ~~or their agents.~~, and ~~Consequently, Plaintiff has~~ never entered into any agreement, terms of service, or ~~contract that would contain an~~ arbitration ~~clause~~contract with ~~Defendants or any entity acting on their behalf, and is therefore not subject to any such arbitration agreement~~them.

31. ~~36.~~On December 24, 2025, after receiving ~~yet another unsolicited~~approximately 480 automated call~~s~~, Plaintiff ~~called a number provided in~~placed a brief, investigative callback for the sole purpose of identifying his harassers. Defendants~~'  voicemail message and spoke with~~routed Plaintiff to a representative ~~of BETTER DEBT SOLUTIONS.~~named "Anthony,"

https://api.draftable.com/compare/gaAYvdGiFnWN



who held himself out as an underwriter for "Capital Loan Center." "Anthony" attempted to verify a bogus third-party lead profile, asking if Plaintiff resided at *"7801 Risden Road."* During that approximately six-minute call, Plaintiff identified himself, stated unambiguously that he did not want to receive any further telemarketing calls from BETTER DEBT SOLUTIONS or any affiliated entity, and requested that his number be permanently removed from any internal calling lists, do-not-call lists, and lead lists maintained by BETTER DEBT SOLUTIONS or its agents. Plaintiff explicitly denied recognizing this address. The representative failed to consummate any transaction because Plaintiff refused to provide his Social Security Number over the telephone. Plaintiff did not provide prior express written consent to future telemarketing during that this call; he merely requested the representative email him a form so that Plaintiff could document the identify of the company that had been calling him so relentlessly.

37.    Plaintiff did not provide consent to telemarketing during the December 24, 2025 call, did not enter into any agreement to receive telemarketing during that call, and made the call solely to identify the source of the unlawful telemarketing campaign that had targeted him for the prior six months. To the extent Defendants claim possession of any record purporting to document Plaintiff's consent to receive telemarketing, any such record was not generated through Plaintiff's voluntary opt-in and does not satisfy the TCPA's requirements for prior express written consent under 47 C.F.R. § 64.1200(f)(9) or N.Y. General Business Law § 399-p.

38.    During this call, the BETTER DEBT SOLUTIONS representative acknowledged Plaintiff's "do not call" request but did not commit to honoring it, and provided Plaintiff with a website link that directed Plaintiff to the website of BETTER DEBT SOLUTIONS,

https://api.draftable.com/compare/gaAYvdGiFnWN

thereby confirming that BETTER DEBT SOLUTIONS was responsible for, or directly benefitted from, the telemarketing campaign. Plaintiff's December 24, 2025 verbal request constituted a request for placement on Defendants' internal "Do Not Call" list under 47 C.F.R. § 64.1200(d). Defendants thereafter placed at least *two hundred fifty (250)* additional calls to Plaintiff's number over the next month, in direct violation of Plaintiff's internal-list request on December 24, 2025.

39. In addition to verbal opt-out requests, Plaintiff sent at least ten (10) "STOP" responses to text messages and unsubscribe requests through electronic opt-out mechanisms provided in Defendants' voice messages and texts. Each such "STOP" response constituted a request for placement on Defendants' internal "Do Not Call" list under 47 C.F.R. § 64.1200(d). Defendants ignored each such request and continued placing calls and sending messages.

32. 40.On January 1, 2026, Plaintiff transmitted to Defendants' registered counsel, Nima Asadi, Esq., Having successfully identified the Enterprise, Plaintiff then transmitted a formal pre-litigation settlement demand letter setting forth Plaintiff's contention that Defendants' telemarketing conduct violated the TCPA, 47 U.S.C. § 227, and N.Y. General Business Law sections 399-p, 399-z, and 349to Defendants 'registered counsel on January 1, 2026, expressly demanding that the unlawful telemarketing immediately cease. *See **Exhibit C***. This written notice explicitly advised Defendants of:

- 41.The letter advised Defendants of, among other things: (1) t**The hundreds of robocalls and, voicemails, and text messages Plaintiff had received from Defendants over the prior six (6) months;**(2)
- **Plaintiff's DNC Registry registration since May 13, 2017;**(3)
- **Plaintiff's repeated** verbal and**electronic "STOP"-reply opt-out requests that Defendants had ignored;**(4)
- **Defendants' unlawful use of prerecorded voices, and spoofed caller ID**, and rotating originating numbers; (5) the at least **:**

https://api.draftable.com/compare/gaAYvdGiFnWN

- **The fifteen (15) prior TCPA lawsuits against Defendants and their affiliates known to Plaintiff at that time, supporting willfulness;** (6)
- **Defendants' statutory and treble-damages exposure under the TCPA and analogous New York law;** and (7)
- **Plaintiff's intent to file a federal complaint absent resolution if no response was received.**

33. The letter also included as an attachment a the draft federal complaint that Plaintiff was prepared to file.

34. 42. Defendants received the letter on or about January 1, 2026, and did not respond to its terms or to cease the illegal telemarketing conduct. Instead, Defendants continued their unlawful campaign for an additional one hundred thirteen (113) days, ignored this formal, written internal-list request entirely. Instead of halting the campaign, they willfully placinged at least two hundred (200) additional calls—but likely many more—to Plaintiff's number between January 1, 2026, and January 23, 2026, and the relentless harassment continued unabated until late April 24, 2026.

35. 43. Defendants' failed to maintain a written internal "Do Not Call" policy, failed to train their agents on honoring "Do Not Call" requests, failed to place Plaintiff on any internal "Do Not Call" list despite his repeated requests, and failed to provide Plaintiff with a copy of any such policy upon demand, all as required by 47 C.F.R. § 64.1200(d). Defendants also ignored Plaintiff's registration on the National "Do Not Call" Registry and initiated more than two telemarketing calls within a 12-month period, in violation of 47 U.S.C. § 227(c)(5).

44. The illegal conduct of Defendants unceasing, 10-month campaign caused Plaintiff severe annoyance, invasion of privacy, emotional distress, and disruption of business operations, and emotional distress from the numerous missed important calls due to the need to activate "Do Not Disturb" mode to avoid the constant interruptions. For ten (10) months,. Plaintiff's personal cellular telephone— which doubles as his sole business line—was effectively rendered useless for normal communications because it was overwhelmed by Defendants' daily blizzard of calls.

https://api.draftable.com/compare/gaAYvdGiFnWN



~~45.~~ due to the forced, continuous utilization of "Do Not Disturb" mode. Each call constitutes a separate, willful statutory violation ~~of the TCPA, its implementing regulations, and New York State law~~.

**B.  Defendants' Cessation of Calls Upon Service Demonstrates
Continuous Operational Control, Willfulness, and Enterprise Unity**

~~**Likelihood of Resumption Absent Injunction**~~

36. ~~46.On April 22, 2026, Plaintiff filed the original Complaint in this action. Conspicuously, u~~Upon proper service of the original Complaint ~~to~~on Defendant BETTER DEBT SOLUTIONS on April 24, 2026, Defendants' calls to Plaintiff's number ceased completely and immediately, and ~~they~~ have not resumed ~~as of the date of this filing.~~.

37. ~~47.The complete cessation of calls promptly upon service~~This instantaneous halt—after 10 months of relentless daily calls that continued through every prior electronic opt-out ~~request~~, every verbal ~~demand~~request, and the formal January 1~~, 2026~~ written demand to Defendants' registered counsel— ~~demonstrates that Defendants possessed throughout the violations period the operational capacity to suppress calls to Plaintiff's number with a single instruction propagated through their calling infrastructure.~~establishes three critical facts regarding Defendants' conduct:

(a) ~~48.The complete cessation conclusively establishes that every prior~~**Willfulness:** Defendants possessed throughout the entire 10-month violations period the centralized operational capacity to suppress calls to Plaintiff~~during the period from July 1, 2025, through April 24, 2026, was a deliberate, knowing, and willful~~



https://api.draftable.com/compare/gaAYvdGiFnWN

violation of the TCPA. Defendants 's number. They could have stopped the calls at any time., Theyyet chose not to do so until the realization offacing concrete legal exposure. required it.This conclusively forecloses any defense of inadvertence or technical malfunction, rendering every prior call a deliberate and willful act;

(b) 49.The complete cessation also demonstrates the existence of the unified Enterprise infrastructure described herein.**Direct Attribution:** The simultaneous halt across every originating number, spoofed caller ID, and affiliated brand upon the service of a complaint naming *only* BETTER DEBT SOLUTIONS demonstrates that all 730-plus calls originated from the same coordinated infrastructure. Had the calls originated from genuinely independent, unaffiliated third parties, the harassment would have continued. Defendants 'own conduct upon service is the most reliable attribution evidence available; *and*

(c) **Enterprise Unity:** A single operational instruction, propagated through Defendants 'coordinated network of affiliated entities, lead generators, and calling vendors, was sufficient to halt all calls— simultaneously. This confirmings that Defendants operate a centralized calling infrastructure rather than a decentralized, uncontrollable affiliate network.under unified control, which is irreconcilable with Defendants 'anticipated argument that the named entities operate independently and cannot be held jointly liable.

50. Furthermore, the complete cessation demonstrates that Plaintiff faces a real and immediate threat that calls will resume absent injunctive relief. Defendants have demonstrated that the calls were the product of deliberate operational choices, not inadvertence. Defendants have been the subject of at least forty-three (43) other known TCPA lawsuits in just the past

https://api.draftable.com/compare/gaAYvdGiFnWN



thirty (30) months alleging substantially identical conduct against other consumers, as alleged below, and have nevertheless continued the same unlawful telemarketing pattern. The history establishes a pattern of recidivism in which Defendants temporarily suspend conduct only when facing concrete legal exposure and resume it once the immediate threat passes.

51. Without injunctive relief specifically directed to Plaintiff's number and to Defendants' broader practices, Plaintiff faces a realistic likelihood that calls to his number will resume—either from one of the named Defendants or from one of the affiliated entities operating within the same Enterprise infrastructure.

38. Despite this cessation, the threat of future violations remains. In just the past 31 months, the Enterprise havehas been the subject of at least forty- three (43) other known TCPA lawsuits and a Minnesota Department of Commerce Consent Order alleging substantially identical illegal conduct. Because the Enterprise has demonstrated a pattern of temporarily suspending unlawful practices when facing immediate legal threats and resuming them once the threat recedes, Plaintiff seeks a declaratory judgment and such prospective relief as the Court deems appropriate to prevent resumption of these violations.

**C.  Pattern and Practice of Defendants' Unlawful Telemarketing**

39. 52.The misconduct directed at Plaintiff is emblematic of a much broader nationwide pattern and practice of unlawful telemarketing by Defendants that extends far beyond Plaintiff. Defendants' conduct is not an isolated incident but rather part of a coordinated campaign that has targeted thousands of consumers across multiple states using the same tactics alleged herein.

https://api.draftable.com/compare/gaAYvdGiFnWN

40. 53.As of the date of this filing, Defendants haveDespite BETTER COMPANIES only being founded in 2022, the Enterprise has already been named in at least forty-three (43) other TCPA lawsuits filed just since October 5, 2023,. These actions—which includinge at least seven (7) class-action complaints, each alleginge substantially similar violations: autodialed calls without consent, prerecorded and artificial voice messages, spoofed caller ID numbers, failure to honor opt-out requests, and repeated calls to numbers listed on the National "Do Not Call" Registry. *See **Exhibit D***.

41. These lawsuits—filed at a rate of approximately 1.4 per month over the past thirty-one (3031) months—include actions filed in federal courts in New Jersey, Texas, California, Michigan, North Carolina, Washington, Georgia, and Florida, among others, and demonstrate that Defendants were on clear, repeated, and continuing notice of their obligations under the TCPA and its implementing regulations throughout the period of Defendants' violations against Plaintiff.

42. 54.Of the 43 other known TCPA lawsuits filed against the Enterprise, approximately thirty-four (34) were resolved rapidly, often within days or weeks of filing. The nine (9) currently unresolved known actions are primarily class-action proceedings in which the affected plaintiffs and their counsel have not yet accepted settlement terms acceptable to the Enterprise. The pattern demonstrates that the Enterprise possesses both the institutional infrastructure to make rapid individual settlements and the financial capacity to compensate consumers who have been harmed by its unlawful telemarketing practices.

43. 55.The recurrence of identical allegations across 43 known and separate federal proceedings, combined with Defendants' continued unlawful conduct against Plaintiff during the period when those proceedings were pending, establishes that Defendants'

https://api.draftable.com/compare/gaAYvdGiFnWN

violations against Plaintiff were committed with full knowledge of TCPA requirements and with deliberate disregard of those requirements. Defendants' use of rotating phone numbers, affiliated entities, and deceptive marketing scripts further evidences a calculated scheme to evade detection, frustrate consumer enforcement, and continue unlawful telemarketing operations notwithstanding the substantial volume of pending litigation.

44. Further establishing Defendants' awareness of their legal obligations and deliberate disregard of them, BETTER DEBT SOLUTIONS entered into a Consent Order with the Minnesota Department of Commerce dated October 8, 2024, in which the Commissioner of Commerce found that the company's advertisements and telemarketing solicitations *"create[d] the likelihood of consumer confusion or misunderstanding"* in violation of Minn. Stat. §332B.11, subd. 1(1), and required the company to pay a civil penalty of $10,000 and to comply with Minnesota's debt-settlement services statutes going forward. *See **Exhibit E**.*

45. The Minnesota Consent Order was entered and became effective before the calls to Plaintiff's number began on July 1, 2025, and provided Defendants—including Defendant MOHAMMAD GHAFARINIA as controlling person—with specific, formal regulatory notice from a state government agency that their consumer-facing telemarketing practices had been found deceptive and in violation of applicable consumer protection law.

46. Notwithstanding this regulatory finding and the civil penalty imposed, Defendants commenced and sustained the unlawful calling campaign targeting Plaintiff and thousands of other consumers using the same deceptive telemarketing practices that the Minnesota Commissioner of Commerce had already condemned.

https://api.draftable.com/compare/gaAYvdGiFnWN

**D.  Orchestration by Defendant ~~Ghafarinia~~GHAFARINIA**

47.  ~~56.~~Defendant MOHAMMAD GHAFARINIA ~~a/k/a MATT GHAFARINIA a/k/a MATT NIA~~ is the owner, managing officer, and controlling person of <u>the Enterprise (</u>BETTER DEBT SOLUTIONS, LENDVIA, RANGE VIEW, BETTER TAX RELIEF, <u>and </u>BETTER COMPANIES~~, and the affiliated entities comprising the Enterprise.~~<u>).</u> ~~GHAFARINIA is identified as the principal owner and controlling person of these entities in their respective filings with the~~ California Secretary of State ~~and is alleged to occupy that role in numerous prior TCPA lawsuits against the same entities, including~~ <u>filings and prior TCPA litigation (*e.g.*, *Janzen v. Better Debt Solutions LLC,*</u> ~~No.~~ 8:24-CV-1516<u>,</u> ~~(~~C.D. Cal.) <u>consistently confirm his principal ownership and control</u>.

48.  ~~57.~~GHAFARINIA personally directed and authorized the unlawful telemarketing campaign ~~that~~ target~~ed~~<u>ing</u> Plaintiff~~and other consumers.~~ ~~Specifically, on information and belief~~ <u>b</u><u>B</u>ased on the ~~allegations and~~ documentary record ~~developed in~~<u>from</u> prior TCPA litigation<u>.</u> ~~against the same entities:~~<u>GHAFARINIA actively participated in the violations by:</u>

    (a)  ~~GHAFARINIA wrote or approved the call scripts used by telemarketing agents in the campaign of which Plaintiff's calls were part, including the prerecorded voice scripts deployed to Plaintiff's number~~<u>Approving the specific prerecorded voice scripts used, including the deceptive "$64,000" voicemail deployed to Plaintiff</u>;

    (b)  ~~GHAFARINIA trained or directed the training of agents on the use of those scripts;~~

    (c)  ~~GHAFARINIA purchased or directed the purchase of the calling equipment, dialing platforms, and lead-list infrastructure used to place the calls to Plaintiff;~~

    (d)  ~~GHAFARINIA directed the~~ ~~selection of geographic targets,~~ ~~including the targeting of New York consumers, and the calling hours during which the campaign operated;~~ ~~and~~

https://api.draftable.com/compare/gaAYvdGiFnWN

Draftable

**(b)** **Directing the purchase of third-party lead data, including the bogus "7801 Risden Road" (Ohio) profile used to solicit Plaintiff during the December 24 callback;**

**(c)** **Setting up the unregistered "Capital Loan Center" alias and "Underwriting Department" intake process to extract consumers' sensitive financial information;**

**(d)** **Purchasing the automated dialing platforms and authorizing the continuous use of spoofed caller IDs;** and

**(e)** ~~GHAFARINIA approved or directed the use of rotating and spoofed caller ID numbers used in the campaign~~**Systematically selecti**~~on of~~**g geographic targets, deliberately directing telemarketing into New York for his Enterprise's foreseeable economic benefit**.

49. ~~58.~~GHAFARINIA ~~also~~ knowingly ~~and willfully~~ directed the~~se~~ ~~calling~~ operation~~s~~ in blatant disregard of the TCPA~~.~~, ~~Specifically:~~having actual knowledge of federal and state telemarketing laws through:

(a) ~~GHAFARINIA is~~**Repeated Litigation**: Serving as the controlling person of entities ~~that have been the subject of~~ named in at least 43 prior ~~known~~ TCPA lawsuits~~, providing him with~~ ~~actual knowledge of~~ ~~TCPA requirements through~~ ~~repeated litigation exposure;~~;

(b) ~~GHAFARINIA or entities under his direct control filed~~**Federal Admissions**: Authorizing the July ~~26,~~ 2024 MDL Motion ~~described below, in which he or his~~ ~~counsel made~~, making express representations to a federal tribunal ~~about the~~ ~~TCPA-relevant~~regarding his entities' shared calling operations ~~of his entities;~~;

(c) **Regulatory Penalties**: Receiving a Minnesota Department of Commerce Consent Order (Oct. 8, 2024)—prior to Plaintiff's violations period—which imposed a $10,000 penalty for telemarketing that created "consumer confusion";

https://api.draftable.com/compare/gaAYvdGiFnWN



(d)    ~~(c)GHAFARINIA or his agents received~~**Ignoring Demands**: Receiving Plaintiff's January 1, 2026 cease-and-desist letter ~~through Defendants'~~via registered counsel and ~~yet chose~~choosing to continue the ~~calls thereafter~~campaign; *and*

**(e)**    ~~(d)GHAFARINIA possessed and exercised the operational authority to suppress all calls to Plaintiff's number within hours of service of the original Complaint, demonstrating that the prior failure to suppress was a deliberate choice rather than a structural inability.~~

59.    **Disregard of DNC**: Instructing ~~GHAFARINIA either directly ordered his~~ agents to ignore the National ~~"Do Not Call" Registry, or indirectly allowed its disregard, by failing to purchase or review the Registry as required by federal law and by~~DNC Registry and deliberately failing to implement ~~and enforce~~mandatory internal ~~"Do Not Call"~~DNC policies ~~as required by~~under 47 C.F.R. §-64.1200(d).

50.    ~~60.~~As the controlling person of the Enterprise, GHAFARINIA ~~controls the~~'s day-to-day ~~operations and directs employees, agents, salespersons, and solicitors to make TCPA violating phone calls.~~authority is conclusively proven by his personal exercise of suppression power on April 24, 2026. ~~He is the individual who schemed, planned, directed, initiated, and controlled the illegal and fraudulent telemarketing campaign that targeted Plaintiff. *See American Blastfax*, 164 F. Supp. 2d at 892, 898; *City Select Auto*, 885 F.3d at 154, 161; and *Bais Yaakov*, 2016 WL 1271693 at *5.~~Within hours of BETTER DEBT SOLUTIONS being served with the original Complaint, all calls to Plaintiff instantly ceased. This real-time halt demonstrates that GHAFARINIA maintained direct operational control over the Enterprise's calling infrastructure at all times. His choice not to stop the calls until facing concrete legal exposure forecloses any defense of structural inability, establishing his direct, personal liability for every preceding willful violation.

https://api.draftable.com/compare/gaAYvdGiFnWN

61. ~~GHAFARINIA's direction of telemarketing activities into New York was deliberate and purposeful. His~~ Enterprise's calling ~~operation systematically targeted consumers based on geographic and demographic criteria selected by GHAFARINIA, including consumers in New York. The economic benefit of the campaign—successful enrollment of New York consumers in Defendants' various "debt relief" and "tax relief" programs—was foreseeable and intended.~~

### E.  The Enterprise's Coordinated Telemarketing Operation

51. ~~62.~~Defendants operate through a coordinated scheme involving a nationwide network of related entities, lead generators, and marketing affiliates. This network is deliberately structured to obscure responsibility, evade consumer complaints, and perpetuate unlawful telemarketing practices across multiple jurisdictions.

52. ~~63.~~Defendants' scheme relies on the use of ~~shell companies, "DBA"~~ overlapping corporate entities, unregistered trade names, and affiliated LLCs that share common ownership, management, branding, and telemarketing infrastructure. These entities include the named Defendants in this action and additional affiliates, including but not limited to:

- ~~CREDIT ONE LENDING~~ **ALLEVIATE FINANCIAL SERVICES** LLC;

- ~~RISEUP~~ **ALLEVIATE** FINANCIAL ~~GROUP~~ SOLUTIONS LLC;

- AMITY ONE, INC.;
- AMITY ONE DEBT RELIEF, INC.;
- AMITY ONE TAX, INC.;
- BETTER DEBT RELIEF LLC;
- **BETTER RISE CAPITAL LLC;**

- ~~ONE STREET FINANCIAL~~ CREDIT ONE LENDING **LLC;**

- **MN MGMT LLC;**

- NEXT DAY SETTLEMENT;
- ONE STREET FINANCIAL LLC;
- **RC MGMT LLC;**



https://api.draftable.com/compare/gaAYvdGiFnWN

- **BETTER DEBT RELIEF LLC**;

- **RISEUP FINANCIAL GROUP**~~CAPITAL LOAN CENTER~~ **LLC**; and

- ~~ALLEVIATE   FINANCIAL   SERVICES   LLC~~**WILLOWBROOK   CAPITAL PARTNERS**.

53. ~~64.~~Collectively, these entities form a debt-relief, tax-relief, and financial-services marketing enterprise designed to funnel consumers into Defendants' programs while shielding individual entities from direct liability for the calling campaigns through which those consumers are acquired.

54. ~~65.~~GHAFARINIA, as owner, managing officer, and controlling person of the Enterprise, orchestrates this coordinated network. By ~~outsourcing calls~~distributing outbound calling activities among affiliated entities and lead generators and routing inbound callbacks through the "Capital Loan Center" brand, Defendants attempt to create plausible deniability while continuing to benefit financially from every unlawful communication. The complete cessation of all calls upon service of the original Complaint on April 24, 2026—simultaneously across every number, every brand, and every affiliated entity that had been calling Plaintiff—demonstrates that this distributed network operates under a single point of centralized control, not as an uncoordinated collection of independent actors.

### E.  Enterprise Identity ~~&~~and Control:
### Defendants' Own Judicial Admissions and Public Admissions

55. ~~66.~~The unified, coordinated nature of Defendants 'Enterprise is not a matter of inference or speculation. Defendants themselves have admitted~~, in a federal court filing signed by their own counsel, ~~—through multiple independent acts in prior federal proceedings, in this very action, and in their own public marketing materials—that BETTER DEBT SOLUTIONS,

https://api.draftable.com/compare/gaAYvdGiFnWN

LENDVIA, RANGE VIEW, ~~and~~ BETTER TAX RELIEF, and BETTER COMPANIES operate as a single, coordinated enterprise sharing all material operational characteristics.

### *i. Public Admissions of Unified Operations*

56. The unified nature of the Enterprise is explicitly demonstrated by public representations made by Defendant MOHAMMAD GHAFARINIA himself. On his publicly accessible LinkedIn profile,[2] operating under the alias "MATT NIA," GHAFARINIA publicly lists himself as the Co-Founder of both BETTER DEBT SOLUTIONS LLC and BETTER TAX RELIEF LLC, confirming his direct, concurrent founding and controlling role across the purportedly distinct entities. A true and correct copy of GHAFARINIA's public LinkedIn profile is attached hereto as **Exhibit F**.

57. The unified structure of the Enterprise under GHAFARINIA's personal direction is further corroborated by a video published on BETTER DEBT SOLUTIONS' own publicly accessible LinkedIn account,[3] depicting a formal corporate event held upon information and belief in the Los Angeles area in December 2025—during the Violations Period in the instant complaint. At this formal event, GHAFARINIA personally addressed the assembled employees and associates of the Enterprise, while the graphics "BETTER RISE CAPITAL / BUSINESS FUNDING DONE BETTER," "LENDVIA," "BETTER DEBT SOLUTIONS," "BTR / BETTER TAX RELIEF," AND "BETTER COMPANIES LLC / FINANCIAL SOLUTIONS" were displayed in a rotating sequence on a large overhead screen to the assembled crowd.

---

[2] https://www.linkedin.com/in/mattnia/
[3] https://www.linkedin.com/company/better-debt-solutions/

https://api.draftable.com/compare/gaAYvdGiFnWN



58. The publication of this video on BETTER DEBT SOLUTIONS' own corporate LinkedIn account—depicting GHAFARINIA personally presiding over a unified celebration of all Enterprise brands during the Violations Period—constitutes an admission by BETTER DEBT SOLUTIONS itself of the Enterprise's unified structure and GHAFARINIA's personal leadership role across all brands. As reproduced in the authenticated visual collage immediately below, this public event demonstrates that GHAFARINIA personally presides over the unified Enterprise and that all Enterprise brands operate under his common

https://api.draftable.com/compare/gaAYvdGiFnWN



direction and control. True and correct individual screenshots of this video are compiled



below and attached in full as *Exhibit G.*

*Figure 1:* Compiled video authentication captures from the December 2025 corporate event (detailed in ¶60-61 and attached in full as *Exhibit G*), visually establishing the unified promotional marketing, common branding, and operational integration of the corporate Defendants under the single umbrella of BETTER COMPANIES.

### *ii.  The MDL Motion Admissions*

59.  ~~67.~~On July 26, 2024, BETTER DEBT SOLUTIONS, LENDVIA, RANGE VIEW, and BETTER TAX RELIEF ~~represented by joint counsel Parker Poe Adams & Bernstein LLP and Phillips Law Corporation~~ filed a joint motion before the U.S. Judicial Panel on

https://api.draftable.com/compare/gaAYvdGiFnWN



Multidistrict Litigation seeking centralization of five then-pending TCPA actions. *See In re Range View Management, LLC, et al.*, MDL No. ~~*Telephone Consumer Protection Act (TCPA) Litigation*, MDL No. 3123, ECF Nos. 1, 1-1 (J.P.M.L. July 26, 2024). A copy of the MDL Motion is attached as~~ 3123 (***Exhibit*** ~~*E*~~*H*).

60. ~~68.~~In that ~~the~~ MDL Motion, Defendants made ~~the following~~express representations to the federal tribunal, including:

    **(a)** ~~**(e)**~~**That** ~~**BETTER DEBT SOLUTIONS, LENDVIA, RANGE VIEW MANAGEMENT, and BETTER TAX RELIEF**~~**the entities are** ~~"~~**collectively represented by the same counsel**~~"~~**;**

    **(b)** ~~**(f)**~~**That** ~~**the**~~ **cases involving these** ~~**four**~~ **entities** ~~**involve**~~**require** ~~"~~**the same factual discovery**~~"; and~~**; and**

  ~~**(g)** **That depositions in cases involving these four entities will be of "the same witnesses";**~~ and

    **(c)** ~~**(h)**~~**That discovery** ~~**in cases involving these four entities will**~~ **involve**~~**s**~~ ~~"~~**the same or substantially similar types of documents, including call logs**~~*, Defendants' policies or procedures regarding National DNC, and agreements regarding plaintiffs' consent to be contacted"; and*~~ **and internal DNC policies.**

    ~~**(i)** **That common factual issues across the cases include whether the entities used automatic telephone dialing systems, whether they called numbers on the National DNC Registry, whether they knew or should have known of DNC registrations, whether they used artificial or prerecorded voices, whether they had prior consent, and whether their TCPA violations were knowing and willful.**~~

61. ~~69.~~These representations, made by Defendants to a federal tribunal in support of their own request for procedural relief, constitute judicial admissions that BETTER DEBT SOLUTIONS, LENDVIA, RANGE VIEW MANAGEMENT, and BETTER TAX RELIEF operate as a unified enterprise sharing common counsel, witnesses, documents, calling policies, and telemarketing infrastructure.

### *iii.  The Service Acceptance Admission in This Action*

https://api.draftable.com/compare/gaAYvdGiFnWN

62. ~~70.~~~~The unified nature of this Enterprise – and BETTER COMPANIES' role as its parent and managing entity – is further~~ The Enterprise's operational unity is independently confirmed by Defendants '~~coordinated defense~~ own litigation conduct in this ~~very~~ action. On May 7, 2026, Defendants 'counsel ~~for BETTER DEBT SOLUTIONS formally~~ Mario Iskander, Esq., confirmed in writing ~~that they are~~ his author~~ized~~ty to accept ~~joint~~ service ~~of process~~ simultaneously on behalf of all ~~the aforementioned entities – BETTER DEBT SOLUTIONS, LENDVIA, RANGE VIEW, and BETTER TAX RELIEF—as well as the parent entity, BETTER COMPANIES.~~ five corporate defendants and GHAFARINIA personally. ~~The fact that the same counsel represents all five entities, accepts joint service for them, and coordinates their global defense further demonstrates that they operate as a single unified enterprise under common control.~~ *See Exhibit I.*

~~71.~~ ~~The MDL Panel denied the motion for centralization on October 4, 2024, but did not disturb Defendants 'factual admissions about the operational unity of the enterprise. *See Exhibit E.*~~

63. Accepting unified representation and service for BETTER COMPANIES confirms it is a fully integrated member of the defense team and corporate family. Defendants cannot accept unified legal representation and unified service for all six parties while simultaneously arguing that those parties operate independently for liability purposes.

### *iv. BETTER COMPANIES' Public Admission of Enterprise Unity*

64. The unified nature of the Enterprise is further established by BETTER COMPANIES 'own public marketing materials. As of the date of this filing, BETTER COMPANIES publicly represents on its website (bettercompanies.com) that it operates as a unified corporate family under the tagline, *"One Family of Brands. One Commitment. Across our companies,*



https://api.draftable.com/compare/gaAYvdGiFnWN



*we share a single purpose…"* The website explicitly identifies BETTER DEBT SOLUTIONS, LENDVIA, BETTER TAX RELIEF and related brands BETTER RISE CAPITAL LLC and RISEUP FINANCIAL GROUP LLC as interconnected components of BETTER COMPANIES' unified portfolio. A true and correct screenshot capturing this admission of enterprise unity is incorporated directly below, and a complete capture of the website is attached hereto as *Exhibit J.*

https://api.draftable.com/compare/gaAYvdGiFnWN

*Figure 2*: Authenticated screenshot of the BETTER COMPANIES public website (detailed in ¶67-68 and attached in full as *Exhibit J*), visually establishing the explicit public admission of enterprise unity, shared commercial purpose, and the operational integration of Defendants BETTER DEBT SOLUTIONS, BETTER TAX RELIEF, and LENDVIA—alongside related affiliates—as a single, interconnected *"Family of Brands."*

65. This public-facing statement—made by BETTER COMPANIES itself on its own website and directed at consumers and business partners—constitutes an admission in BETTER COMPANIES' own words that the entities comprising the Enterprise are not independent businesses operating at arm's length but rather a single corporate family operating under BETTER COMPANIES' unified direction and toward a common commercial purpose. Plaintiff intends to request judicial notice of this publicly accessible corporate publication pursuant to Federal Rule of Evidence 201.

66. 72.Defendants 'admission The MDL admissions of operational unity, combined with their joint representationunified service acceptance in this action and BETTER COMPANIES' own public identification of the Enterprise brands as a single corporate family, directly establishes that the calls placed in the name of any one of these entities were placed using infrastructure shared with the others; that the policies (or absence of policies) governing TCPA compliance —or their absence—applied uniformly across theall entities; and that the personnel directing the calling operations served the entire Enterprise.

67. By Defendants' own representations and current litigation conduct, no meaningful operational distinction exists among BETTER DEBT SOLUTIONS, LENDVIA, RANGE VIEW MANAGEMENT, BETTER TAX RELIEF, and BETTER COMPANIES LLC for purposes of telemarketing liability, and Defendant MOHAMMAD GHAFARINIA's personal direction of the unified Enterprise renders him jointly and severally liable with the corporate defendants for the violations alleged herein.



### G. Defendants' ~~Consent-Evidence Reliability Problems~~ Reliance on Third-Party Data and Evidence-Creation Practices

68. ~~73.~~Defendants claim possession of a purported "consent" record ~~dated~~and a digital audio file corresponding to Plaintiff's December 24, 2025~~, that contains Plaintiff's name, a Yahoo email address associated with Plaintiff, Plaintiff's telephone number, and Plaintiff's correct date of birth.~~ investigative callback. Both the data and the underlying evidentiary systems fail as a matter of law and fact.

~~74.    The December 24, 2025 date associated with any such record corresponds precisely to the date of Plaintiff's single, six-minute investigative callback to Defendants, described above. Plaintiff did not consent to telemarketing during that call, did not complete any online form during or after that call, and did not provide his email address or date of birth during that call.~~

~~75.    The cellular telephone account associated with Plaintiff's 7597 Number is registered in the name of Plaintiff's restaurant business, Memphis Seoul. Within that account, Plaintiff is identified by his legal first name, "Edward Hubbuch," not "Bart Hubbuch." Carrier-side technical metadata for outbound calls from the 7597 Number identifies the calling party as "Memphis Seoul," not as any personal name. Defendants therefore could not have derived the name "Bart Hubbuch" from clean carrier-side identification of the 7597 Number, because no carrier-side metadata for that number contains the name "Bart Hubbuch" or any name other than "Memphis Seoul" or "Edward Hubbuch."~~

~~76.    To the extent any consent record Defendants claim to possess associates the name "Bart Hubbuch" with Plaintiff's telephone number, that record was not generated through Plaintiff's voluntary opt-in to telemarketing communications, was not derived from clean~~

https://api.draftable.com/compare/gaAYvdGiFnWN



~~carrier-side identification of the number, and does not satisfy the requirements for "prior express written consent" under 47 C.F.R. § 64.1200(f)(9) or N.Y. General Business Law § 399-p.~~

69. *First*, Defendants 'internal records, as read aloud by their representative during the callback, associated Plaintiff's New York cellular number with an inaccurate address phonetically identified as "7801 Risden Road." Geographic database searches default this phonetic spelling to a location in Vermilion, Ohio. Plaintiff does not recognize this address and has never lived in or visited Vermilion, Ohio. The deployment of this fabricated data profile substantiates that Defendants rely on unverified, third-party lead generators rather than authentic consumer opt-ins.

70. *Second*, upon information and belief, any purported consent record Defendants may claim to possess regarding Plaintiff's December 24, 2025 investigative callback was generated internally by Defendants' own personnel or systems, rather than by Plaintiff. Because Plaintiff merely placed an investigative phone call, never executed a digital opt-in form, never signed a document, and explicitly refused to provide his Social Security Number to proceed with any transaction, any internal notation made by Defendants 'representative does not satisfy the strict elements of 47 C.F.R. §64.1200(f)(9). Such an internal record is not a "written agreement," was not "signed by the person called," and was not submitted by the consumer through any voluntary opt-in action. It cannot constitute prior express written consent as a matter of law.

71. *Third*, the timing of any such record forecloses its use. Under established FCC guidance, prior express written consent must precede the calls for which it is claimed. A system record created contemporaneously with Plaintiff's December 24, 2025 callback cannot

https://api.draftable.com/compare/gaAYvdGiFnWN



retroactively authorize the approximately 480 automated calls placed during the preceding five months.

72. ~~77.~~*Finally*, ~~T~~the reliability of Defendants 'consent-evidence systems ~~in general~~ has been ~~the subject of expert challenge in other~~successfully challenged and exposed as systematically fraudulent in multiple federal ~~litigation~~lawsuits against the Enterprise. ~~In *Keller v. LendVia LLC*, No. 6:25-CV-2982-JDA (D.S.C.), a d~~Digital forensic expert ~~engaged by the plaintiff~~Markel Samuel has submitted ~~a~~ sworn declaration~~s concluding that LendVia's~~for the plaintiffs in both *Keller v. LendVia LLC*~~,~~ (No. 6:25-CV-2982~~-JDA,~~ (D.S.C.) and *Aurandt v. Range View Management LLC, et al.* (No. 3:25-CV-5785, W.D. Wash.) systematically challenging the authenticity of Defendants 'purported digital consent evidence ~~was either "fabricated or deliberately manipulated," generated by a third party using different devices and network infrastructure than the plaintiff's, or produced by "fundamentally unreliable" evidence collection systems.~~in those cases. ~~*See*~~*See* **Exhibit K and Exhibit L (Sworn** *Declarations of Markel Samuel, ~~Keller v.~~including Curriculum Vitae).* ~~LendVia LLC, No. 6:25-CV-2982-JDA, ECF No. 27-4 (D.S.C. Sept. 9, 2025), attached as **Exhibit G**.~~

~~78.~~ ~~The *Keller* expert specifically found that LendVia's purported video evidence was an edited Camtasia screen recording lacking chain of custody, that the IP address attributed to the plaintiff geolocated to a city 650 miles from the plaintiff's actual location and belonged to a different telecommunications carrier than the plaintiff used, and that no supporting digital forensic evidence existed on the plaintiff's devices. The *Keller* expert further noted that the production of such Camtasia screen recordings without notification or consent may itself constitute violations of additional state and international privacy laws.~~

https://api.draftable.com/compare/gaAYvdGiFnWN



73. In these proceedings, the forensic expert concluded that the Enterprise's "verified consent" materials were materially inconsistent with the plaintiffs' actual devices and possessed the metadata signatures of fabricated, post-production files. Specifically, the expert found:

(a) **Post-Production Fabrication:** Defendants use commercial editing software to manufacture consent videos. In *Aurandt*, the purported screen-recording metadata identified the *"Creator Tool"* as *"Adobe After Effects 2025 (Macintosh)."* In *Keller*, the video metadata revealed it was exported using *"TechSmith Camtasia 2020.0.14"* and contained an editable project identifier labeled *"Manda_Keller_Cert_01."* These files are edited, exported composites rather than native, forensically sound recordings of a user's device;

(b) **Hardware Profile Mismatches:** The device fingerprints claimed by Defendants' systems consistently mismatch the actual hardware possessed by targeted consumers. In *Aurandt*, the system claimed a 720x1280 resolution while the plaintiff possessed a 1440x3120 Samsung Galaxy S24 Ultra. In *Keller*, the system claimed an iOS device with a 750x1334 resolution (matching older 2014-2017 iPhones), while the plaintiff actually possessed a 2021 iPhone 13 Pro with a 2532x1170 resolution;

(c) **Carrier and Geographic Impossibilities:** The IP addresses attributed to the plaintiffs by Defendants' consent systems logistically fail standard internet routing protocols. In *Keller*, the IP address belonged to Verizon Communications and geolocated to Buffalo, New York, while the plaintiff was physically located 650 miles away in South Carolina and was an AT&T customer. It is technically

https://api.draftable.com/compare/gaAYvdGiFnWN

impossible for an AT&T customer to generate standard internet traffic from a Verizon IP address. Similar impossibilities were documented in *Aurandt; and*

(d) **Forensic Impossibility:** Comprehensive forensic audits of the targeted devices in both cases revealed no downloads of Defendants' applications, no corresponding VPN routing configurations, and no email verification logs that would be required to legitimately utilize or register for Defendants' platforms.

74. ~~79.~~The *Keller* and *Aurandt* findings ~~raise substantial questions about the reliability of~~establish a documented federal court record that Defendants' ~~consent~~ eviden~~ce~~tiary systems ~~and~~ utilize commercial post-production software to render fabricated video consent files that lack proper chain of custody and fail basic forensic authentication. These findings reinforce the structural inadequacy, ~~established by the carrier-side and timing facts alleged above,~~ and fundamental unreliability of any digital consent record Defendants may attempt to claim regarding Plaintiff's December 24, 2025 investigative callback.

### H. Vicarious and Enterprise Liability

75. ~~80.~~By Defendants' own judicial admissions in the MDL Motion—in which Defendants represented to a federal tribunal that BETTER DEBT SOLUTIONS, LENDVIA, RANGE VIEW, and BETTER TAX RELIEF share common counsel, witnesses, call logs, and DNC policies—and by BETTER COMPANIES 'own public identification of all Enterprise brands as *"One Family of Brands"* operating under its unified direction, the Enterprise operates as a unified telemarketing operation under the centralized control of MOHAMMAD GHAFARINIA ~~a/k/a MATT GHAFARINIA a/k/a MATT NIA~~. Each entity within the Enterprise is therefore liable for unlawful calls placed using shared

https://api.draftable.com/compare/gaAYvdGiFnWN



infrastructure, regardless of which entity's name appeared on Plaintiff's caller ID at any particular moment.

76. ~~81.~~Under federal common-law principles of agency recognized by the FCC, each Defendant entity is vicariously liable for TCPA violations committed by other entities within the Enterprise and by lead generators, call centers, ~~and~~ marketing vendors, and other related entities operating on the Enterprise's behalf. *See In re Joint Petition Filed by DISH Network, LLC,* 28 F.C.C. Rcd. 6574, 6584 ¶ 28 (2013).

77. ~~82.~~Vicarious liability attaches under each of the recognized agency theories:

(a) *Actual authority,* by virtue of GHAFARINIA's direct personal control over each Defendant entity and over the lead generators ~~and~~, call centers, and dialing platform vendors acting in the Enterprise's name~~;~~, as established by his personal exercise of suppression authority upon service of the original Complaint on April 24, 2026;

(b) *Apparent authority,* by virtue of the Enterprise's deliberate use of overlapping branding, ~~shared websites, and shared call-back numbers~~the shared "Capital Loan Center" inbound processing brand through which consumer callbacks were received regardless of which entity placed the outbound call, and the unified calling infrastructure that present~~ed~~ the affiliated entities as ~~a unified operation~~components of a single operation to consumers including Plaintiff; *and*

(c) *Ratification,* by virtue of the Enterprise's continued acceptance of leads, enrollments, and revenue generated by the calling operation despite ~~full~~actual knowledge of its unlawful methods—knowledge established by at least 43 prior TCPA lawsuits, the October 2024 Minnesota Department of Commerce Consent



Order, and receipt of Plaintiff's January 1, 2026 cease-and-desist letter—and by Defendants' consistent pattern of rapid individual settlements across those prior proceedings demonstrating institutional awareness of and financial management of TCPA exposure.

78. 83.The cessation of all calls promptly upon service of the original Complaint on April 24, 2026—simultaneously across every originating number, every caller-ID variant, and every affiliated brand that had been calling Plaintiff—confirms that the entire Enterprise operates under unified control sufficient to suppress calls with a single instruction when Defendants choose to do so.

79. No genuinely decentralized, independently operating network of affiliates could have ceased operations simultaneously across every entity and brand on a single day without centralized coordination. The Enterprise is therefore appropriately treated as a single liable actor for purposes of TCPA enforcement, with each named entity Defendant jointly and severally liable for the violations described herein.

## I.  Willful and Knowing Conduct

80. 84.Defendants 'violations of the TCPA, its implementing regulations, and New York state law were willful and knowing within the meaning of 47 U.S.C. § 227(b)(3), 47 U.S.C. § 227(c)(5), N.Y. Gen.GBL Bus. Law § 399-p(9), and N.Y. Gen.GBL Bus. Law § 349(h).

81. 85.The willful and knowing character of Defendants' violations is established by, among other things:

https://api.draftable.com/compare/gaAYvdGiFnWN

Draftable

(a)    Plaintiff's continuous registration on the National ~~"Do Not Call"~~DNC Registry since May 13, 2017, more than eight (8) years before the calls began;

(b)    Plaintiff's repeated ~~verbal and~~ electronic opt-out requests, including ~~the specific December 24, 2025 verbal request to a BETTER DEBT SOLUTIONS representative and~~ at least 10 "STOP" responses to Defendants 'text messages, all of which were ignored;

(c)    Plaintiff's January 1, 2026 formal cease-and-desist letter to Defendants ' registered counsel, after which Defendants ignored the explicit written demand and willfully placed at least two hundred ~~—~~(200) additional documented calls to Plaintiff's number;

(d)    Defendants 'history of at least ~~forty three (~~43~~)~~ other TCPA lawsuits alleging substantially identical conduct, providing ~~actual~~them with actual, repeated notice of TCPA requirements and ~~Defendants'~~their legal obligations;

(e)    Defendants 'filing of the MDL Motion in July 2024, demonstrating their actual familiarity with TCPA requirements and the legal exposure created by their unified calling practices;~~and~~

(f)    Defendants 'entry into the October 8, 2024 Minnesota Department of Commerce Consent Order—which explicitly found BETTER DEBT SOLUTIONS 'telemarketing solicitations deceptive and imposed a $10,000 civil penalty—before the violations period against Plaintiff even began, providing Defendants with specific regulatory notice that their consumer-facing practices violated applicable law;

(g)    ~~(f)The~~ Defendants 'deliberate failure to register as a telemarketing business with the New York Department of State, as required by GBL §399-pp, prior to directing hundreds of automated calls into New York, demonstrating a systemic and intentional disregard for state regulatory requirements; and

(h)    The complete cessation of calls within hours of service of the original Complaint, demonstrating conclusively that Defendants possessed the operational capacity to comply with the TCPA throughout the entire 10-month violations period, ~~and~~yet deliberately chose not to do so~~.~~ until facing concrete legal compulsion.

82.    The cumulative statutory exposure arising from Defendants 'willful conduct under the federal TCPA alone, based on the currently documented call volume of seven hundred thirty (730) calls, totals no less than $1,095,000. This federal baseline is exclusive of Plaintiff's independent and cumulative actual business damages under New York state law,

https://api.draftable.com/compare/gaAYvdGiFnWN



which remain uncapped and will be proven at trial, subject to further upward amendment upon receipt of third-party carrier records.

## VI. CAUSES OF ACTION

### COUNT ONE

### *Violations of the*VIOLATIONS OF THE TCPA, 47 U.S.C. § 227(b)(1)(A)(iii)

### (Prerecorded and Artificial Voice Calls to Cellular Number)
### *(Against All Defendants)*

83. ~~86.~~Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

84. ~~87.~~Each of the ~~approximately~~at least seven hundred thirty (730) documented calls to Plaintiff's cellular number—as well as the additional undocumented calls placed through April 24, 2026—was placed using ~~a~~an artificial or prerecorded ~~or artificial voice~~voice in violation of 47 U.S.C. §227(b)(1)(A)(iii). A call made using an artificial or prerecorded voice violates this provision independently of the dialing equipment utilized.

85. ~~88.~~Plaintiff did not provide prior express consent to any of these calls. Plaintiff ~~has never had any prior business relationship with any Defendant or any entity affiliated with the Enterprise~~provided no consent for the approximately 480 calls placed prior to December 24, 2025. The December 24, 2025 investigative callback did not constitute prior express written consent under 47 C.F.R. §64.1200(f)(9), which requires a signed written agreement, and did not authorize the approximately 250 or more calls placed after that date. To the extent Defendants claim to possess any consent record for Plaintiff's number, upon information and belief, that record was generated internally by Defendants' own personnel or systems. Because Plaintiff never executed a digital opt-in form or signed a written document, any such internal notation does not satisfy any element of §64.1200(f)(9) and is legally insufficient to establish prior express written consent as a matter of law.

https://api.draftable.com/compare/gaAYvdGiFnWN



86. 89.Each automated call constitutes a separate violation of 47 U.S.C. § 227(b)(1)(A)(iii) and a separate basis for statutory damages under 47 U.S.C. § 227(b)(3).

87. 90.Defendants are each directly liable for the calls as members of the unified Enterprise that placed them Defendants are additionally vicariously liable under federal common law agency principles for calls placed by other Enterprise entities, lead generators, call centers, and marketing vendors acting on their behalf.Consistent with the pleading standards set forth in *Bank v. Alleviate Tax LLC*, No. 23-CV-5457 (PKC)(PK), 2024 WL 1332635 (E.D.N.Y. Mar. 28, 2024), the specific conduct and operational roles attributable to each Defendant within the Enterprise are as follows:

   (a) **BETTER DEBT SOLUTIONS directed the calling campaign, operated the "Capital Loan Center" inbound processing desk that received Plaintiff's December 24, 2025 callback, and was the primary entity whose service with the original Complaint caused the complete, instantaneous cessation of all Enterprise calls on April 24, 2026;**

   (b) **LENDVIA shared the call logs, infrastructure, witnesses, and DNC policies used in the campaign, as Defendants judicially admitted in their July 2024 MDL Motion. Defendants 'counsel also accepted service on LENDVIA's behalf on May 8, 2026;**

   (c) **RANGE VIEW shared the call logs, infrastructure, witnesses, and DNC policies used in the campaign, as admitted in the MDL Motion, and participated in the Enterprise's lead generation network through its joint operation under the alias "LENDBEE." Defendants 'counsel also accepted service on RANGE VIEW's behalf on May 8, 2026;**

   (d) **BETTER TAX RELIEF shared the call logs, infrastructure, witnesses, and DNC policies used in the campaign, as admitted in the MDL Motion. Defendants 'counsel also accepted service on BETTER TAX RELIEF's behalf on May 8, 2026;**

   (e) **BETTER COMPANIES operated as the parent, managing, and coordinating entity of the Enterprise, publicly identifying all Enterprise brands as *"One Family of Brands"* operating under its unified direction, and maintaining centralized operational authority over the telemarketing infrastructure of BETTER DEBT SOLUTIONS and its affiliated brands. Defendants 'counsel also accepted service on BETTER COMPANIES ' behalf on May 8, 2026;** and

**(f)** 91.**MOHAMMAD GHAFARINIA** ~~a/k/a MATT GHAFARINIA a/k/a MATT NIA~~ **is personally liable** ~~for the calls~~ **based on his direct**~~,~~ **personal participation in**~~,~~ **management of,** **and** ~~personal~~ **authorization of the conduct alleged. This includes his personal direction of the prerecorded calling campaign, his personal procurement of the unverified third-party lead data used to target Plaintiff, his personal authorization of the call routing protocols and spoofed caller-ID systems, and his personal exercise of authority to suppress all calls within hours of service of the original Complaint—establishing his direct, real-time operational control over the calling infrastructure throughout the violations period.**

88. ~~92.~~Defendants 'violations were willful and knowing within the meaning of 47 U.S.C. § 227(b)(3).

89. ~~93.~~Plaintiff is entitled to statutory damages of $500 per call, trebled to $1,500 per call for willful or knowing violations, on each of the ~~approximately~~at least seven hundred thirty (730) ~~calls placed.~~documented calls, with leave to amend upon receipt of third-party carrier records during discovery.

90. The statutory damages awarded under this Count are independent of and cumulative with the statutory damages available under GBL §399-p (*Count Four*) and GBL §349 (*Count Five*), which provide separate state-law remedies for the same unlawful conduct.

**COUNT TWO**
***Violations of the*VIOLATIONS OF THE TCPA, 47 U.S.C. § 227(c)(5)**
**(Calls to Number on National "Do Not Call" Registry)**
*(Against All Defendants)*

91. ~~94.~~Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

92. ~~95.~~Plaintiff's 7597 Number has been continuously registered on the National "Do Not Call" Registry since May 13, 2017, more than eight (8) years prior to the initiation of Defendants' telemarketing campaign.

93. ~~96.~~Defendants initiated and delivered more than ~~two~~one unsolicited ~~telemarketing calls~~telephone solicitation within a 12-month period to Plaintiff's DNC-registered number,

https://api.draftable.com/compare/gaAYvdGiFnWN



in violation of 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(c)(2). Plaintiff had no established business relationship with any Defendant and provided no prior express invitation or permission for the approximately 480 automated calls placed prior to December 24, 2025. The December 24, 2025 investigative callback did not establish an business relationship and did not authorize the approximately 250 or more automated calls placed after that date.

94. 97. Each call Each telemarketing call placed to Plaintiff's registered number following the initial solicitation constitutes a separate violation of 47 U.S.C. § 227(c)(5) and a separate basis for statutory damages.

95. 98. Defendants are each directly liable as members of the unified Enterprise that placed the calls, and are additionally vicariously liable under federal common-law agency principles. Consistent with the pleading standards of *Bank*, the specific conduct and operational roles attributable to each named Defendant regarding these National DNC violations are as follows:

   (a) **BETTER DEBT SOLUTIONS directed and executed the National DNC-violating telemarketing campaign, and received actual, direct notice of Plaintiff's registration and opt-out demands through the January 1, 2026 formal cease-and-desist letter;**

   (b) **LENDVIA, RANGE VIEW, and BETTER TAX RELIEF shared the DNC compliance policies, call logs, and infrastructure used in the campaign. This shared operational infrastructure was explicitly admitted in Defendants' July 2024 MDL Motion, which identified *"Defendants 'policies or procedures regarding National DNC"* as common, shared documents utilized across all four entities;**

   (c) **BETTER COMPANIES as the parent and managing entity, authorized and coordinated the Enterprise-wide campaign through which Plaintiff's National "Do Not Call" registration was repeatedly violated, and maintained centralized operational authority over the telemarketing infrastructure of BETTER DEBT SOLUTIONS and its affiliated brands; and**

99. ~~MOHAMMAD GHAFARINIA a/k/a MATT GHAFARINIA a/k/a MATT NIA is personally liable based on his direct, personal participation in and personal authorization of the conduct alleged.~~

**(d)** **MOHAMMAD GHAFARINIA personally directed and authorized the campaign with actual knowledge of the legal requirements of the National DNC Registry through his exposure to dozens of prior TCPA actions, and personally chose to continue the campaign in conscious disregard of Plaintiff's rights after his registered counsel received the January 1, 2026 cease-and-desist demand.**

96. ~~100.~~Defendants 'violations were willful and knowing within the meaning of 47 U.S.C. § 227(c)(5).

97. ~~101.~~Plaintiff is entitled to statutory damages of $500 per call, trebled to $1,500 per call for willful or knowing violations, on each of the ~~approximately~~at least seven hundred thirty (730) documented calls placed~~.~~, with leave to amend the total damages calculation upon receipt of third-party carrier records during discovery.

98. The statutory damages awarded under this Count are subsumed within the single TCPA damages award sought under *Count One*, representing an alternative theory of recovery under a separate TCPA provision for the same unlawful calls rather than an independent basis for additional damages.

**COUNT THREE**
***Violations of*VIOLATIONS OF 47 C.F.R. § 64.1200(d), *Enforced Through* ENFORCED THROUGH 47 U.S.C. § 227(c)(5)**
**(Failure to Maintain Internal "Do Not Call" Policy and**
**Honor Internal-List Requests)**
*(Against All Defendants)*

https://api.draftable.com/compare/gaAYvdGiFnWN



99. ~~102.~~Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

100. ~~103.~~Defendants initiated <u>and delivered telephone</u> calls to Plaintiff "~~"~~for telemarketing purposes"~~"~~ within the meaning of 47 C.F.R. § 64.1200(d). ~~The~~<u>As a mandatory prerequisite to initiating any telemarketing communications, federal law required Defendants to establish and implement specific internal procedures, including maintaining a written</u> internal "Do Not Call" policy ~~requirements of § 64.1200(d) therefore applied to each such call.~~<u>, training personnel on its use, placing consumers who request opt-outs on an entity-specific list, and providing a copy of the policy upon demand.</u>

101. ~~104.~~<u>Defendants systematically failed to comply with these mandatory regulatory safeguards.</u>~~Defendants~~ <u>Defendants</u> failed to maintain a <u>compliant</u> written internal "~~Do Not Call"~~policy, failed to train their ~~agents and employees on honoring "Do Not Call" requests~~<u>telemarketing agents</u>, failed to place Plaintiff on an~~y~~ ~~internal "Do~~<u>entity-specific</u> ~~N~~<u>do-n</u>ot~~-c~~<u>C</u>all"~~list despite ~~his repeated~~<u>explicit</u> requests, and failed to provide ~~Plaintiff with~~ a copy of ~~any such~~<u>their</u> policy upon demand~~, all in violation of 47 C.F.R. § 64.1200(d)~~.

102. ~~105.~~Plaintiff ~~specifically~~<u>explicitly</u> requested placement on Defendants 'internal "Do Not Call" list ~~on~~<u>through</u> multiple ~~occasions~~<u>channels</u>, including~~:~~ <u>at least ten (10) electronic</u>

   ~~(a)~~ ~~**The December 24, 2025 verbal request made directly to a BETTER DEBT SOLUTIONS representative during a six-minute telephone call;**~~

~~(b)~~ ~~At least 10~~ "STOP" responses <u>transmitted</u> to Defendants 'text messages~~;~~ and

~~(c)~~ ~~T~~<u>t</u>he January 1, 2026 formal cease-and-desist letter ~~transmitted~~<u>delivered</u> to Defendants ' registered counsel.

~~106.~~ <u>Defendants ignored ~~each of Plaintiff's internal-list requests and placed~~<u>these mandatory directives and willfully initiated</u> at least two hundred ~~fifty (250) additional calls to Plaintiff's number after the December 24, 2025 verbal request, and at least two hundred~~ (200) additional ~~calls after~~</u>

https://api.draftable.com/compare/gaAYvdGiFnWN



documented telemarketing calls to Plaintiff's number following the January 1, 2026 written demand.

103. 107.The internal policy do-not-call requirements under 47 C.F.R. § 64.1200(d) are fully enforceable through thea private right of action underpursuant to 47 U.S.C. § 227(c)(5). Because Defendants failed to implement the mandatory procedural prerequisites required to initiate telemarketing, each noncompliant call placed to Plaintiff constitutes a separate statutory violation.

108. Each call placed without compliance with § 64.1200(d) constitutes a separate violation and a separate basis for statutory damages.

104. 109.Defendants are each directly liable as members of the unified Enterprise that placed the calls, and are additionally vicariously liable under federal common-law agency principles. MOHAMMAD GHAFARINIA a/k/a MATT GHAFARINIA a/k/a MATT NIA is personally liable based on his direct, personal participation in and personal authorization of the conduct alleged.Consistent with the pleading standards of *Bank*, the specific conduct and operational roles attributable to each named Defendant regarding these internal DNC violations are as follows:

    **(a)** **BETTER DEBT SOLUTIONS directly received Plaintiff's internal do-not-call list requests via its "Capital Loan Center" inbound desk on December 24, 2025, and through the January 1, 2026 cease-and-desist letter, yet continued the calling campaign in flagrant disregard of both directives;**

    **(b)** **LENDVIA, RANGE VIEW, and BETTER TAX RELIEF shared identical DNC compliance policies, call logs, and suppression infrastructure as admitted in the July 2024 MDL Motion, establishing that each entity participated in the same deficient compliance framework that systematically failed to honor consumer opt-out requests;**

    **(c)** **BETTER COMPANIES, as the parent and managing entity, bore ultimate responsibility for establishing and enforcing compliant internal telemarketing policies across the Enterprise brands and maintained**

https://api.draftable.com/compare/gaAYvdGiFnWN

**centralized control over the shared telemarketing infrastructure used to target consumers; and**

**(d)    MOHAMMAD GHAFARINIA personally failed to implement, execute, or enforce a compliant internal do-not-call policy across his corporate entities, actively authorizing the campaign to continue after each clear opt-out request and exercising his centralized suppression authority only when forced by concrete legal exposure on April 24, 2026.**

105. Defendants 'violations were willful and knowing within the meaning of 47 U.S.C. § 227(c)(5).

106. Plaintiff is entitled to statutory damages of $500 per call, trebled to $1,500 per call for willful or knowing violations, on each of the ~~approximately~~at least seven hundred thirty (730) documented calls placed~~.~~, with leave to amend the total damages calculation upon receipt of third-party carrier records during discovery.

107. The statutory damages awarded under this Count are subsumed within the single TCPA damages award sought under *Count One*, representing an alternative theory of recovery under a separate TCPA provision for the same unlawful calls rather than an independent basis for additional damages.

## COUNT FOUR

*~~Violations of N.Y. General Business Law~~* VIOLATIONS OF N.Y. GENERAL BUSINESS LAW **§ 399-p**

*(Against All Defendants)*

108. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

109. Defendants initiated and delivered unsolicited telemarketing calls to Plaintiff's 7597 Number using automatic dialing-announcing devices to deliver prerecorded messages~~,~~ within the meaning of ~~N.Y. General Business Law § 399-p.~~GBL §399-p. The statutory term "automatic dialing-announcing device" under GBL §399-p is defined by New York law independently of the federal automated telephone dialing system ("ATDS") standard

https://api.draftable.com/compare/gaAYvdGiFnWN



construed in *Facebook, Inc.*, and encompasses the automated calling equipment Defendants deployed to deliver standardized, repetitive recordings to Plaintiff's number.

110. ~~114.Defendants did so without obtaining Plaintiff's~~ Defendants initiated these automated telemarketing communications without prior express ~~written~~ consent and without any established business relationship with Plaintiff.

~~115.~~ Defendants further failed to provide the mandatory disclosures required by GBL §~~-~~399-p, including systematically failing to ~~clearly~~disclose the true identi~~fy~~ty of the caller~~,~~ and the actual corporate entity on whose behalf the call was made~~, and a valid callback number, and~~. Instead, Defendants deliberately utilized a revolving array of fictitious department names to conceal their identity and mask the Enterprise, while completely fail~~ed~~ing to honor Plaintiff's repeated ~~do-not-call~~opt-out requests.

111. ~~116.~~Each ~~call~~ individual call placed in violation of GBL §399-p constitutes a separate and distinct violation of ~~N.Y. General Business Law § 399-p~~New York law.

112. ~~117.~~Defendants are each directly liable as members of the unified Enterprise ~~that placed the calls,~~ and are additionally vicariously liable~~.~~ under principles of agency. ~~MOHAMMAD GHAFARINIA a/k/a MATT GHAFARINIA a/k/a MATT NIA is personally liable.~~Consistent with the pleading standards set forth in *Bank*, the specific conduct and operational roles attributable to each named Defendant regarding these state-law violations are as follows:

    **(a)** **BETTER DEBT SOLUTIONS directed and executed the prerecorded calling campaign targeting New York consumers, placed automated calls to Plaintiff's New York cellular number without consent or an established business relationship, and systematically omitted the mandatory statutory disclosures required by GBL §399-p;**

    **(b)** **LENDVIA, RANGE VIEW, and BETTER TAX RELIEF actively participated in and shared the automated calling infrastructure, call logs, and marketing networks through which these noncompliant calls were routed into New York, as admitted in their July 2024 MDL Motion;**



https://api.draftable.com/compare/gaAYvdGiFnWN

**(c)** **BETTER COMPANIES, as the parent and managing entity, authorized, coordinated, and directly profited from the illegal prerecorded campaign targeting New York consumers, and as the self-identified managing entity of the *"Family of Brands,"* bears joint operational responsibility for the calling conduct of its subsidiaries;** and

**(d)** **MOHAMMAD GHAFARINIA personally directed the deployment of automatic dialing-announcing devices against consumers, deliberately selected New York as a core demographic and target market for the Enterprise, and personally authorized the use of deceptive, fictitious corporate aliases and department names that violated GBL §399-p's explicit disclosure mandates.**

113. ~~118.~~Defendants 'statutory violations were willful and knowing within the meaning of ~~N.Y. Gen.~~GBL ~~Bus. Law~~ §-399-p(9).

114. As a direct and proximate result of Defendants 'non-compliant automated campaign, Plaintiff suffered severe and ongoing actual business damages within the State of New York, including the persistent, 10-month structural disruption of his commercial telephone operations, the economic loss of missed legitimate business communications while his line was overwhelmed, and an extensive diversion of time and operational resources expended identifying and attempting to halt the campaign.

115. ~~119.~~Plaintiff is entitled to ~~statutory damages of $50 per call or actual damages, whichever is greater, trebled up to $1,000 per violation for willful misconduct, plus reasonable costs, for each of the approximately seven hundred thirty (730) calls placed~~recover his actual business damages resulting from the disruption of his commercial operations to be proven at trial, or fifty dollars per violation, whichever is greater. Furthermore, because Defendants willfully and knowingly violated the statute, Plaintiff is entitled to have the damage award increased to the maximum extent permitted by GBL §399-p(9), plus reasonable costs.

https://api.draftable.com/compare/gaAYvdGiFnWN

116. The damages awarded under this Count are independent of and cumulative with the statutory damages available under the TCPA (*Count One*, *Count Two*, and *Count Three*) and GBL §349 (*Count Five*). GBL §399-p provides a separate and independent state-law remedy for Defendants 'use of automatic dialing-announcing devices to deliver prerecorded calls to New York consumers without consent, and recovery under §399-p neither precludes nor offsets recovery under federal or other state law.

**COUNT FIVE**

*Violations of N.Y. General Business Law* VIOLATIONS OF N.Y. GENERAL BUSINESS LAW § 349

**(Deceptive Acts and Practices)**

*(Against All Defendants)*

117. ~~120.~~Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

118. ~~121.~~Defendants engaged in deceptive, consumer-oriented acts and practices in the conduct of trade or commerce within the State of New York in violation of ~~N.Y. General Business Law § 349 by, among other things~~GBL §349 by:

    **(a)** Misrepresenting their true identity through systematic caller ID spoofing and ~~the use of~~a rotating array of telephone numbers explicitly designed to mask the ~~true~~ source of the calls and bypass consumer call-blocking software;

    **(b)** ~~Using prerecorded voice messages that falsely implied a pre-existing relationship between Plaintiff and the calling party (including representations that Plaintiff was eligible for "financial help," that "Dan" or other named individuals were calling about Plaintiff's specific financial situation, and similar false implications of pre-existing engagement);~~Deploying rotating algorithmic scripts falsely offering varying loan amounts of "$40,000," "$45,000," "$60,000," "$64,000," "$65,000," and "$70,000" to manufacture a false sense of personalization and deceptively induce consumer callbacks;

    **(c)** Deceptively representing themselves to consumers as various official-sounding institutional bodies—including the "Loan Approvals Department," "Loan Issuance Department," "Loan Request Department," "Loan Review Department," "Client Evaluation Division," and "Eligibility Review Office"—to manufacture false corporate legitimacy;

https://api.draftable.com/compare/gaAYvdGiFnWN



**(d)** **Deceptively routing consumers to an "Underwriting Department" operating under the unregistered trade name "Capital Loan Center" to extract sensitive, personal financial data under the false guise of evaluating an active, legitimate loan application;**

**(e)** (c)**Outwardly pretending to operate as compliant, legitimate financial businesses while systematically I~i~gnoring Plaintiff's repeated electronic opt-out requests** ~~while continuing to represent that Defendants were a legitimate, compliant business; and~~**;**

(d) ~~Maintaining a corporate structure of overlapping LLCs designed to deceive consumers about the true responsible party~~ ~~for the calls.~~

**(f)** **Maintaining a deceptive corporate** ~~structure~~maze **of overlapping LLCs and unregistered trade names intentionally designed to** ~~deceive~~prevent **consumers** ~~about~~from **identifying the true responsible party, while simultaneously representing to the public that these entities constitute "One Family of Brands" under unified direction—thereby exploiting a unified brand identity for commercial benefit while asserting corporate separateness to evade accountability;** and

**(g)** **Directing hundreds of commercial telemarketing solicitations into New York without holding the mandatory telemarketer business registration from the New York Department of State required by GBL §399-pp, thereby deceptively holding themselves out to New York consumers as a lawfully authorized and compliant business operation.**

119. ~~122.~~Defendants 'conduct was consumer-oriented, systematically directed at New York consumers at large, including Plaintiff, ~~who received the calls in New York.~~and ~~The deceptive practices were consumer-oriented and not isolated to Plaintiff but were systematically deployed against the New York public as part of Defendants' nationwide telemarketing campaign.~~

~~123.~~ ~~Furthermore, Defendants' conduct~~ was materially misleading. A reasonable consumer would have been deceived by the spoofed caller IDs, the false implications of a pre-existing financial relationship~~s~~, the fictional department titles, and the corporate-structure obfuscation deployed by the Enterprise.

120. ~~124.~~Plaintiff suffered actual, cognizable injury ~~as a~~in New York as a direct result of Defendants' deceptive practices, including severe invasion~~s~~ of privacy, the total disruption of his sole business ~~operations, loss of~~telephone line for ten consecutive months, economic

https://api.draftable.com/compare/gaAYvdGiFnWN



harm resulting from missed legitimate business communications ~~when forced to silence~~while his phone was overwhelmed, and the extensive time and ~~effort spent~~personal resources expended identifying and attempting to ~~stop the calls.~~halt the campaign. These injuries occurred entirely within the State of New York, where Plaintiff received each deceptive communication and sustained each injury, satisfying the requirements of *Goshen v. Mutual Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324-25 (2002). A private cause of action under GBL §349 does not require a completed consumer transaction, and the actual injuries alleged are independently actionable under New York law. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25 (1995). See also *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.*, 37 N.Y.3d 169, 171 N.E.3d 1192 (2021).

121. Defendants are each directly liable as members of the unified Enterprise and are additionally vicariously liable under principles of agency. Consistent with the pleading standards set forth in *Bank*, the specific conduct and operational roles attributable to each named Defendant regarding these deceptive practices are as follows:

    **(a)** **BETTER DEBT SOLUTIONS deployed and operated the deceptive calling infrastructure targeting Plaintiff, including the spoofed caller IDs, fictional department names, and the "Capital Loan Center" trade name that actively concealed its corporate identity;**

    **(b)** **LENDVIA, RANGE VIEW, and BETTER TAX RELIEF actively participated in and directly profited from the deceptive campaign through their shared ownership, call logs, and marketing infrastructure, and each entity's active use of the unified Enterprise structure to shield itself from consumer identification constitutes direct participation in the corporate-structure deception;**

    **(c)** **BETTER COMPANIES designed, authorized, and managed the overlapping corporate structure deployed as a deceptive shield herein, and simultaneously represented that structure publicly as a unified corporate family while asserting corporate separateness as a defense—a dual position that is inherently deceptive toward consumers who had no structural**

**mechanism to know that these distinct brands were components of a single corporate family operating under its centralized control;** and

**(d)   MOHAMMAD GHAFARINIA personally designed, authorized, and directed the deceptive core elements of the campaign, including the rotating script amounts, the fictitious department designations, the automated spoofed caller-ID systems, and the "Capital Loan Center" trade name.**

122. ~~125.~~ Defendants 'deceptive statutory violations were willful and knowing within the meaning of ~~N.Y. Gen.~~ GBL ~~Bus. Law~~ § 349(h).

123. ~~126.~~ Plaintiff is entitled to ~~statutory damages of $50 per violation or actual damages, whichever is greater, trebled up to $1,000 per violation for willful violations, plus reasonable costs, for each of the approximately seven hundred thirty (730) calls placed.~~ recover his actual business damages resulting from Defendants' deceptive telemarketing campaign to be proven at trial, or $50 per violation, whichever is greater. Furthermore, because Defendants willfully and knowingly engaged in these deceptive acts, Plaintiff is entitled to have his actual damages increased to an amount not to exceed three times the actual damages up to $1,000 per violation, as permitted by GBL §349(h), along with reasonable *pro se* costs.

124. The damages awarded under this Count are independent of and cumulative with the statutory damages available under the TCPA (*Count One*, *Count Two*, and *Count Three*) and GBL §399-p (*Count Four*). GBL §349 provides a separate and independent state-law remedy for Defendants 'deceptive acts and practices directed at New York consumers, and recovery under GBL §349 neither precludes nor offsets recovery under federal or other state law.

## VII.- PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Edward B. Hubbuch respectfully requests that this Court enter judgment against Defendants BETTER DEBT SOLUTIONS LLC, LENDVIA LLC, RANGE VIEW MANAGEMENT LLC, BETTER TAX RELIEF LLC, BETTER COMPANIES LLC,

MOHAMMAD GHAFARINIA a/k/a MATT GHAFARINIA a/k/a MATT NIA, and JOHN DOES 1-9, jointly and severally, as follows:

(a)     **On *Count One, Count Two, and Count Three*:** Award statutory damages under the TCPA of $500 per ~~unlawful call, and treble damages of~~violation, trebled to $1,500 per ~~call~~violation for willful or knowing ~~violations, for a minimum of~~ conduct, for each of the at least seven hundred thirty (730) ~~calls (Counts One, Two, and Three), with leave to supplement as documentation of additional call records are obtained;~~documented calls made to Plaintiff's number in violation of 47 U.S.C. §§227(b) and 227(c) and 47 C.F.R. §64.1200(d), with leave to amend the total violations and damages calculation upon receipt of third-party carrier records during discovery. Plaintiff seeks a single award of $1,500 per documented call under the TCPA counts, representing the maximum statutory damages available for each call that simultaneously violated one or more provisions of 47 U.S.C. §227 and its implementing regulations, for a total of no less than $1,095,000 on the TCPA counts based on the currently documented call volume;

(b)     ~~Award statutory damages under N.Y. General Business Law § 399-p of $50 per unlawful call or actual damages whichever is greater, trebled up to $1,000 per violation for willful misconduct (Count Four);~~

(c)     ~~Award statutory damages under N.Y. General Business Law § 349 of $50 per violation or actual damages whichever is greater, trebled up to $1,000 per violation for willful violations (Count Five);~~

(b)     **On *Count Four*:** Award Plaintiff his actual business damages resulting from the disruption of his commercial operations to be proven at trial, or statutory damages of $50 per unlawful call, whichever is greater, and upon a finding of willful misconduct, increase said award to the maximum extent permitted under GBL §399-p(9), plus

https://api.draftable.com/compare/gaAYvdGiFnWN



reasonable costs, for each of the at least seven hundred thirty (730) documented calls placed to Plaintiff's New York cellular number. The damages awarded under *Count Four* are independent of and cumulative with the damages awarded under *Count One, Count Two, Count Three,* and *Count Five,* as §399-p provides a separate and independent state-law remedy for the same unlawful conduct;

(c)    **On *Count Five*:** Award Plaintiff his actual business damages resulting from Defendants' deceptive telemarketing campaign to be proven at trial, or statutory damages of $50 per violation, whichever is greater, and upon a finding of willful and knowing deceptive acts, increase said actual damages to an amount not to exceed three times the actual damages up to $1,000 per violation, as permitted by GBL §349(h), plus reasonable costs and fees, for each of the at least seven hundred thirty (730) documented calls directed into New York. The damages awarded under *Count Five* are independent of and cumulative with the damages awarded under *Count One, Count Two, Count Three,* and *Count Four,* as §349 provides a separate and independent state-law remedy for the deceptive conduct alleged herein;

(d)    Plaintiff respectfully submits that the total statutory damages available under the federal TCPA counts alone, based on the currently documented call volume of seven hundred thirty (730) calls, is no less than $1,095,000. This federal baseline is exclusive of Plaintiff's independent and cumulative actual business damages under New York state law, which remain uncapped and will be proven at trial, exclusive of pre-judgment and post-judgment interest, costs and fees, and subject to upward amendment upon receipt of third-party carrier records establishing the volume of additional calls placed between January 24, 2026, and April 24, 2026;

https://api.draftable.com/compare/gaAYvdGiFnWN



(e)    (d)Award injunctive relief prohibiting Defendants and any entity acting in concert with or under the control of Defendants from making further unlawful telemarketing calls or sending unlawful voice messages to Plaintiff's number, and requiringDeclaratory Relief: Enter a declaration pursuant to 28 U.S.C. §2201 that Defendants' telemarketing campaign and corporate structures during the violations period violated the TCPA, 47 U.S.C. §227, its implementing regulations, and applicable New York state law; that Defendants to implement and are legally obligated to maintain a compliant, written internal "Do Not Call" policy in strict conformity with 47 C.F.R. §64.1200(d); and grant such prospective relief as the Court deems appropriate to prevent a resumption of Defendants' established pattern of telemarketing violations;

(e)    Grant Plaintiff leave to issue a third-party subpoena to AT&T Communications, Inc., pursuant to Federal Rule of Civil Procedure 45 to obtain Plaintiff's incoming call records for the period from January 24, 2026, through April 24, 2026, on an expedited basis;

(f)    Interest and Costs: Award Plaintiff's the *pro se* costs of bringing this *pro se* action, as well as pre- and post-judgment interest on all monetary awards at the maximum rate allowed by law; *and*

(g)    Such otherGeneral Relief: Grant such other, further, or alternative relief as the Court deems just, equitable, and proper.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

https://api.draftable.com/compare/gaAYvdGiFnWN

Dated: ~~May 8~~June 25, 2026
Brooklyn, New York

Respectfully submitted,

_____/s/*Edward B. Hubbuch*_____

EDWARD B. HUBBUCH
394 Lincoln Place #A5
Brooklyn, ~~N.Y.~~New York 11238
bhubbuch@gmail.com
(646) 544-7597

Plaintiff, *pro se*

TO:    MARIO ISKANDER, Esq.
       Iskander Law

https://api.draftable.com/compare/gaAYvdGiFnWN



1111 N. Brand Blvd., Ste. 308
Glendale, Calif. 91202
mario@iskanderlaw.com
(240) 439-1970

*Attorney for Defendants* BETTER DEBT SOLUTIONS LLC,
LENDVIA LLC,
RANGE VIEW MANAGEMENT LLC,
BETTER TAX RELIEF LLC,
BETTER COMPANIES LLC, and
MOHAMMAD GHAFARINIA
a/k/a MATT GHAFARINIA a/k/a MATT NIA

https://api.draftable.com/compare/gaAYvdGiFnWN

