UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDWARD B. HUBBUCH,<br>*Plaintiff,*<br>*v.*<br>BETTER DEBT SOLUTIONS LLC, its agents, affiliates, and marketers; LENDVIA LLC; RANGE VIEW MANAGEMENT LLC; BETTER TAX RELIEF LLC; BETTER COMPANIES LLC; MOHAMMAD GHAFARINIA a/k/a MATT GHAFARINIA a/k/a MATT NIA; and JOHN DOES 1-9,<br>*Defendants.* | Case No. 26-CV-2389-PKC-TAM<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

Plaintiff Edward B. Hubbuch, proceeding *pro se*, respectfully submits this Memorandum of Law in Opposition to the Motion to Dismiss filed by Defendants BETTER DEBT SOLUTIONS LLC; LENDVIA LLC; RANGE VIEW MANAGEMENT LLC; BETTER TAX RELIEF LLC; BETTER COMPANIES LLC; MOHAMMAD GHAFARINIA a/k/a MATT GHAFARINIA a/k/a MATT NIA; and JOHN DOES 1-9.

## PRELIMINARY STATEMENT

1. Defendants filed this Motion at 8:15 p.m. on the deadline day—after four months of silence following their abandoned Rule 11 sanctions threat, their rejected pre-motion conference request, and their inadvertent disclosure of internal executive emails directing the suppression of Plaintiff's telephone number.

2. The Motion is a roughly 10,000-word attempt to relitigate issues this Court has already clearly resolved against Defendants in its August 18, 2026 Text Order, and to ignore the judicial admissions, public evidence, and operational realities that make dismissal impossible.

3. *First*, Defendants ask the Court to dismiss Counts Two and Three by pretending that a cellular number registered on the National "Do Not Call" Registry since May 2017—more than a year before Plaintiff became a business owner and a number he shared with his wife and pre-teen son on a family plan—is somehow a purely "business line."

4. *Second*, Defendants also ask the Court to dismiss Count Five by ignoring clear Second Circuit and New York Court of Appeals precedent holding that no consummated transaction is required.

5. *Third*, Defendants ask the Court to dismiss all claims against Defendant MOHAMMAD GHAFARINIA by swearing under penalty of perjury that he did not "personally" do the things the Second Amended Complaint specifically alleges he did—while simultaneously admitting GHAFARINIA co-founded the very entities that placed the calls.

6. *Fourth*, Defendants ask the Court to strike public regulatory records and pattern evidence that go directly to willfulness.

7. *Finally*, Defendants ask the Court to pretend that an enterprise which stopped at least 730 calls across 10 rotating numbers and five brands within hours of being served did so through "obvious alternative explanations" rather than centralized control.

8. Not one of these arguments survives the Court's August 18 Text Order, the Second Amended Complaint's factual allegations, or Defendants' own judicial admissions.

## **LEGAL STANDARDS**

9. To survive a motion to dismiss under FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6), a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Determining plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

10. Although a *pro se* pleading is construed liberally, it must still satisfy that plausibility standard. Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009). The Court may consider the facts alleged in the complaint, documents attached as exhibits, and documents incorporated by reference. DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010). A motion must be decided on the pleading as filed; a plaintiff may not amend his complaint through an opposition. Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 156-57 (2d Cir. 2006).

11. On a RULE 12(B)(2) motion challenging personal jurisdiction, the plaintiff bears the burden of making a *prima facie* showing of jurisdiction as to each defendant. Walden v. Fiore, 571 U.S. 277, 284–86 (2014); Grp. One Ltd. v. GTE GmbH, 523 F. Supp. 3d 323 (E.D.N.Y. 2021).

12. RULE 12(F) motions to strike are "disfavored" and reserved for matter that is "scandalous or oppressive in some way and hence prejudicial to the non-pleader or at least conclusively not pertinent to the case." *Fitzpatrick v. Am. Int'l Grp., Inc.*, No. 10-CV-0142, 2013 WL 1311029, at *2 (S.D.N.Y. Mar. 20, 2013).

13. Under RULE 10(C), only a "written instrument" may be adopted as part of a pleading; affidavits are not written instruments. Smith v. Hogan, 794 F.3d 249, 254–55 (2d Cir. 2015).

## ARGUMENTS

### I. COUNTS TWO AND THREE SURVIVE: PLAINTIFF IS A RESIDENTIAL SUBSCRIBER AND THE FCC PRESUMPTION CONTROLS

#### A. The National DNC Registry Registration Predates Any Business Use by More Than a Year

14. Defendants' primary attack on Counts Two and Three rests on a selective reading of the Second Amended Complaint that ignores the timeline and nature of Plaintiff's telephone service.

15. The complaint alleges that Plaintiff's cellular number ending in 7597 (the "7597 Number") has been continuously registered on the National "Do Not Call" Registry ("DNC") since May 13, 2017. (**SAC ¶ 25**; ***Ex. A***.) The 7597 Number had been Plaintiff's personal cellular number since 2010—seven years before the DNC registration and eight years before Plaintiff became a sole proprietor. Moreover, Plaintiff had lost his job in January 2017 and was unemployed when he registered the number on the DNC Registry in May 2017. The registration was made in Plaintiff's personal capacity as an individual

consumer seeking to stop unsolicited telemarketing to his personal cell phone—not as a business owner, not as a sole proprietor, and not in connection with any commercial activity.

16. Plaintiff did not become a sole proprietor until June 2018—more than one year after the DNC registration. The line was never held out as a business number, never listed on business directories, and never disconnected from its original consumer purpose. Under the Federal Communications Commission's 2003 ruling,[1] wireless subscribers are presumptively residential, and that presumption is not rebutted by incidental business use of a line originally registered and maintained as a personal consumer number during a period of unemployment.

17. Defendants cite *Cacho v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195 (S.D.N.Y. 2024), for the proposition that a line's actual use controls residential status. But *Cacho* sustained residential-subscriber status where the facts supported personal use. Here, the 7597 Number was a personal consumer line from 2010 through 2017, registered on the DNC Registry while Plaintiff was unemployed and before any business use existed. The later, secondary use of the line for sole-proprietor communications does not retroactively strip a decade-long personal consumer number of its residential status.

---

[1] "*Rules and Regulations Implementing the Telephone Consumer Protection Act (TCPA) of 1991*" (https://www.federalregister.gov/documents/2003/07/25/03-18766/rules-and-regulations-implementing-the-telephone-consumer-protection-act-tcpa-of-1991)

## B. The Line Is a Mixed-Use Personal and Family Line, Not a Dedicated Business Line

18. Defendants' argument that the 7597 Number is a "sole business line" is contradicted by the Second Amended Complaint's own allegations and by objective reality.

19. The 7597 Number is on a family wireless plan (originally with AT&T Wireless until April 2026, now with T-Mobile) that includes Plaintiff's wife and Plaintiff's pre-teen son's Apple Watch with cellular service. It is not a dedicated business trunk line, a VoIP business account, or a line listed in commercial directories. It is a personal cellular number that—like millions of Americans' numbers—happens to double as a contact point for a small sole proprietorship.

20. Defendants cite *Bank v. Independence Energy Group LLC*, 2014 WL 4954618 (E.D.N.Y. 2014), for the proposition that a subscriber who holds his number out as a business line is not residential. But *Independence Energy* involved a plaintiff who affirmatively held out his number as a business line.

21. Here, the Second Amended Complaint alleges the opposite: the number is used "for both personal and business communications" (**SAC ¶ 25**)—not exclusively for business. The "structural disruption of commercial telephone operations" (**SAC ¶ 114**) describes the harm caused by the calls, not the line's primary character. A line can be used for business and still be a residential subscriber line under the TCPA; the statute does not strip DNC protections from sole proprietors who answer their own cell phones.

## C. Defendants' 'Abandonment' Argument Misreads Global Network and Contradicts the Second Amended Complaint

22. Defendants argue that Plaintiff "abandoned" the pleading by asserting in his pre-motion response that the number was his "personal cellular line since 2010." This is not an abandonment; it is a clarification consistent with the SAC.

23. The SAC alleges the number is used "for both personal and business communications" (**SAC ¶ 25**)—not that it is exclusively a business line. Defendants' attempt to amend Plaintiff's pleading through selective quotation violates the very principle they cite: under *Global Network Communications,* 458 F.3d at 150, 156-57, a motion must be decided on the pleading as filed, not on Defendants' preferred characterization of it.

24. Moreover, Defendants' reliance on *McLaughlin Chiropractic Associates, Inc. v. McKesson Corp*., 606 U.S. 146 (2025), backfires. *McLaughlin* holds that district courts must independently determine the TCPA's meaning and are not bound by FCC interpretations. But the FCC's presumption that wireless numbers are residential is not a contested statutory interpretation—it is an administrative framework that Congress has ratified and that courts routinely apply.

25. This Court need not defer to the FCC to recognize that a consumer-registered cell phone on a family plan is a residential line.

## II. COUNT FIVE SURVIVES: GBL § 349 DOES NOT REQUIRE A CONSUMMATED CONSUMER TRANSACTION

26. Defendants argue that Count Five fails because Plaintiff "pleads no consumer transaction in New York," citing *Goshen v. Mutual Life Insurance Co. of New York*, 98 N.Y.2d 314 (2002). This is a misreading of both *Goshen* and the Second Amended Complaint.

27. *Goshen* held that the transaction in which the consumer is deceived must occur in New York. Here, the deceptive acts occurred in New York: the calls were received in New York, the spoofed caller IDs were directed at New York consumers, and the fictitious "departments" held themselves out as serving New York residents.

28. More importantly, however, *Goshen* does not require a consummated transaction. As the New York Court of Appeals held in Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, 85 N.Y.2d 20, 25 (1995), a private cause of action under NEW YORK GENERAL BUSINESS LAW § 349 "does not require a completed consumer transaction." The plaintiff need only show deceptive acts directed at consumers that caused actual injury.

29. The Second Amended Complaint alleges exactly that: systematic caller-ID spoofing, rotating fake loan amounts, fabricated department names, and the "Capital Loan Center" alias—all directed at New York consumers and causing Plaintiff actual injury in New York (privacy invasion, disruption of his phone line, emotional distress). *See* **SAC ¶¶ 118-120**. This Court applied the same standard in Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc., 37 N.Y.3d 169 (2021),

confirming that GBL § 349 protects consumers from deceptive solicitations, not merely deceptive sales.

30. Defendants' argument that Plaintiff *"never applied for any financial services"* (**SAC ¶ 30**) is irrelevant: the deception lies in the solicitation itself, not in a completed contract.

## III. THE COURT HAS SPECIFIC PERSONAL JURISDICTION OVER DEFENDANT GHAFARINIA, AND THE COMPLAINT STATES PLAUSIBLE CLAIM AGAINST HIM INDIVIDUALLY

### A. Plaintiff Pleads Direct, Personal Conduct by GHAFARINIA Purposefully Directed at New York

31. Defendants argue that this Court lacks personal jurisdiction over Defendant MOHAMMAD GHAFARINIA under *Walden*, 571 U.S. at 277. But *Walden* held that a defendant's contacts with the forum must arise from the defendant's own suit-related conduct—not that an officer can never be subject to jurisdiction in a state where his company directs telemarketing. Here, the SAC alleges specific, non-conclusory facts showing GHAFARINIA's own purposeful conduct directed at New York:

- GHAFARINIA "personally selected New York as a target market for the Enterprise's telemarketing campaign" (**SAC ¶ 10**);
- GHAFARINIA "personally directed the deployment of prerecorded voice calls into New York" (***id.***); *and*
- GHAFARINIA "personally benefited from the enrollment of New York consumers in the Enterprise's programs" (***id.***).

32. These are not *"formulaic recitations of control"* (**MTD** at **7**); they are specific allegations of purposeful direction of telemarketing activities into the forum state. Under CPLR 302(A)(3)(II), GHAFARINIA's alleged tortious acts outside the state (directing the campaign) caused injury in New York, and he allegedly derives substantial revenue from interstate commerce.

33. The SAC further alleges that GHAFARINIA "systematically selecting geographic targets, deliberately directing telemarketing into New York for his Enterprise's foreseeable economic benefit" (**SAC ¶ 48(e)**). That is precisely the "primary actor" standard Defendants demand. *See* Trisvan v. Heyman, 305 F. Supp. 3d 381 (S.D.N.Y. 2018).

## B. GHAFARINIA's Own Sworn Declaration Nullifies His Defense

34. Defendant MOHAMMAD GHAFARINIA submitted a sworn declaration that concedes the central premise of Plaintiff's enterprise-unity theory while making denials that are directly contradicted by public evidence.

35. GHAFARINIA admits under penalty of perjury that he is a *"co-founding member of Better Debt Solutions LLC and Better Tax Relief LLC."* (**Ghafarinia Decl. ¶ 5**.) This is not a "corporate capacity" admission that shields him from liability; it is a judicial admission that he personally created two of the allegedly independent entities that Defendants spend five pages arguing are not group-pleadable.

36. GHAFARINIA's declaration cannot be cabined to RULE 12(B)(2). As a party admission under FEDERAL RULES OF EVIDENCE 801(D)(2), it is admissible against him on the merits. And if GHAFARINIA testifies differently at deposition or trial, the declaration is

admissible to impeach him. He has now locked himself into a series of categorical denials —*"I did not personally select New York," "I did not personally direct telemarketing," "I did not personally control any dialing equipment"*—that are directly refuted by:

- The LinkedIn video (**SAC *Ex. G***) showing GHAFARINIA personally presiding over a unified corporate event featuring all Enterprise brands during the violations period;

- GHAFARINIA's public LinkedIn profile (**SAC *Ex. F***) identifying him as "Co-Founder" of both BETTER DEBT SOLUTIONS and BETTER TAX RELIEF;

- The Multi-District Litigation Motion (**SAC ¶¶ 59-61**), filed by entities GHAFARINIA co-founded, admitting shared telemarketing infrastructure and nationwide calling operations; *and*

- The pinpoint cessation (**SAC ¶¶ 36–38**), which demonstrates centralized control that GHAFARINIA does not even attempt to explain in his declaration.

**C. The 'Corporate Representative Capacity' Defense Is Legally Irrelevant Under Both New York and Federal Law**

37. Defendant MOHAMMAD GHAFARINIA's assertion that his actions were taken solely in a *"corporate representative capacity"* (**Ghafarinia Decl. ¶ 5**) is legally irrelevant to personal jurisdiction under New York law.

38. The New York Court of Appeals long ago explicitly rejected the "fiduciary shield doctrine" under CPLR 302. See Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 470 (1988) (holding that corporate officers are subject to personal jurisdiction when they

transact business in New York, regardless of whether they acted in a corporate capacity). Subsequent decisions have extended *Kreutter*'s rejection of the fiduciary shield to tortious-outreach cases under CPLR 302(A)(3). Under both New York jurisdictional law and federal TCPA standards, an officer cannot hide behind an LLC when directing tortious outreach into the forum state.

39. Defendants argue that GHAFARINIA's actions were taken in a "corporate representative capacity" and not his individual capacity. (**Ghafarinia Decl. ¶ 5**.) This defense fails as a matter of law. Under *Texas v. American Blastfax, Inc*., 164 F. Supp. 2d 892, 898 (W.D. Tex. 2001)—the very case Plaintiff cites in **SAC ¶ 21**—a corporate officer is personally liable for TCPA violations if he "had direct, personal participation in or personally authorized the conduct found to have violated the statute."

40. The SAC alleges exactly that: GHAFARINIA "personally ideated, coordinated, directed, and participated in the unlawful telemarketing campaign" (**SAC ¶ 47**); he approved scripts, directed lead-data purchases, set up the "Capital Loan Center" alias, purchased dialing platforms, and selected geographic targets (**SAC ¶ 48**). These are not passive boardroom decisions; they are direct, personal acts of operational control.

41. Moreover, the FCC's 2015 Declaratory Ruling confirms that "the seller" under the TCPA includes entities on whose behalf calls are made, and that vicarious liability extends to principals who "make" or "initiate" calls through agents. *In re Rules & Reguls. Implementing the TCPA*, 30 F.C.C. Rcd. 7961 (2015).

42. GHAFARINIA's personal direction of the campaign makes him the principal behind the calls, not a passive shareholder shielded by the corporate form.

**D. Request for Limited Jurisdictional Discovery**

43. In the alternative, should the Court conclude that Defendant MOHAMMAD GHAFARINIA's self-serving declaration creates a genuine issue of material fact regarding his personal direction of the Enterprise, Plaintiff respectfully requests leave to conduct immediate, limited jurisdictional discovery.

44. Specifically, Plaintiff requests the right to depose GHAFARINIA under oath regarding his operational oversight, his geographic target selections, his vendor authorizations with RANGE VIEW MANAGEMENT, and his direct role in suppressing Plaintiff's number upon service.

45. Courts routinely permit such limited discovery when a RULE 12(B)(2) motion presents factual disputes. *See, e.g.*, Mar-Oil, S.A. v. Morrissey, 982 F. Supp. 2d 325 (S.D.N.Y. 2013). Given GHAFARINIA's central role and his sworn denials, jurisdictional discovery is both appropriate and necessary.

## IV. THE COMPLAINT'S ENTERPRISE PLEADING IS SUFFICIENT UNDER THIS COURT'S PRECEDENT AND ITS AUG. 18 TEXT ORDER

### A. The Text Order Already Resolved The Group-Pleading Question in Plaintiff's Favor

46. Defendants devote five pages to arguing that the Second Amended Complaint commits impermissible group pleading. They ignore that this Court has already rejected their position.

47. In its August 18, 2026 Text Order, the Court explicitly directed Defendants to address *"why Plaintiff's group pleading is impermissible in light of Plaintiff's allegations suggesting potential vicarious liability,"* citing *Calhoun v. Nani Brand, Inc*., No. 1:25-CV-0051 (DAE), 2025 WL 5257926 (W.D. Tex. Dec. 5, 2025). *Calhoun* collected cases finding that "allegations of relationship [are] sufficient in [the] TCPA context to permit vicarious liability." *Id*. at *18. By citing *Calhoun* and framing the issue this way, the Court has already signaled that the Second Amended Complaint's vicarious-liability allegations are sufficient to excuse any group-pleading concern.

48. Defendants try to distinguish *Calhoun* by noting it dismissed the claims before it. That is irrelevant. The Court cited *Calhoun* not for its outcome but for its collected authority showing that vicarious-liability allegations in TCPA cases routinely survive group-pleading challenges.

49. The Court's instruction makes clear that the Second Amended Complaint's enterprise-unity theory—supported by judicial admissions, public marketing materials, and unified litigation conduct—is precisely the type of vicarious-liability pleading that *Calhoun* and its collected cases permit.

**B. The Complaint Provides the Exact Individualized Attribution This Court Demanded in *Bank v. Alleviate Tax***

50. Defendants cite this Court's own decision in *Bank v. Alleviate Tax, LLC*, No. 23-CV-5457 (PKC) (PK), 2024 WL 1332635 (E.D.N.Y. Mar. 28, 2024), as controlling. They are correct that it controls—but it controls in Plaintiff's favor.

51. In *Alleviate Tax*, this Court dismissed Plaintiff's complaint because it was "barebones" and "conclusory": it contained no caller IDs, no call contents, no conversation details, and no connection between the defendant and the call initiator. The Court praised a later proposed amended complaint that provided "substantially more detail" across 33 paragraphs.

52. The SAC here is the antidote to *Alleviate Tax*. It provides exactly the specificity this Court demanded:

- **BETTER DEBT SOLUTIONS:** Directed the campaign, operated the "Capital Loan Center" inbound desk, received the January 1, 2026 Cease & Desist letter, and caused the pinpoint cessation upon service. (**SAC ¶ 87(a)**, **¶ 95(a)**, **¶ 104(a)**, **¶ 112(a)**, **¶ 121(a)**);

- **LENDVIA:** Shared call logs, infrastructure, witnesses, and DNC policies per the Multi-District Litigation motion admissions; accepted unified service. (**SAC ¶ 87(b)**, **¶ 95(b)**, **¶ 104(b)**, **¶ 112(b)**, **¶ 121(b)**);

- **RANGE VIEW:** Same Multi-District Litigation admissions; participated in lead-generation network via "LENDBEE" alias; accepted unified service. (**SAC ¶ 87(c)**, **¶ 95(b)**, **¶ 104(b)**, **¶ 112(b)**, **¶ 121(b)**);

- **BETTER TAX RELIEF:** Same Multi-District Litigation admissions; accepted unified service. (**SAC ¶ 87(d)**, **¶ 95(b)**, **¶ 104(b)**, **¶ 112(b)**, **¶ 121(b)**);

- **<u>BETTER COMPANIES</u>:** Parent and managing entity; "One Family of Brands" public admission; centralized operational authority. (**SAC ¶ 87(e)**, **¶ 95(c)**, **¶ 104(c)**, **¶ 112(c)**, **¶ 121(c)**); *and*

- **<u>GHAFARINIA</u>:** Personal direction of scripts, lead data, spoofed caller IDs, geographic targeting; personal exercise of suppression authority. (**SAC ¶ 87(f)**, **¶ 95(d)**, **¶ 104(d)**, **¶ 112(d)**, **¶ 121(d)**.)

53. This is not "group pleading." This is surgical, individualized attribution that complies precisely with the standard this Court applied in *Alleviate Tax*. Defendants' argument that the Second Amended Complaint "defines an 'Enterprise,' pleads virtually all conduct against that label, and then appends to each count near-identical recitations" (**MTD** at **9**) is dishonest. The Second Amended Complaint defines the Enterprise in **¶¶ 15–67** and then attributes specific conduct to each defendant in **¶¶ 87**, **95**, **104**, **112**, and **121**. That is exactly what this Court required.

## <u>C. The MDL Motion Is a Binding Judicial Admission of Enterprise Unity</u>

54. Defendants argue that the July 2024 Multi-District Litigation Motion is "cognizable only for the fact of its filing, not the truth of its contents," citing *Global Network*, 458 F.3d at 157. This is wrong. Judicial admissions are conclusive, not merely evidentiary.

55. When BETTER DEBT SOLUTIONS, LENDVIA, RANGE VIEW, and BETTER TAX RELIEF jointly represented to the U.S. Judicial Panel on Multidistrict Litigation ("MDL") that they share *"common ownership, management, counsel, telemarketing infrastructure, witnesses, documents, and policies"* (**SAC ¶ 60**), they made formal

admissions to a federal tribunal in support of their own request for procedural relief. They cannot now claim those representations were false or inadmissible. *See* In re Zinc Antitrust Litig., 155 F. Supp. 3d 337 (S.D.N.Y. 2016); Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC, 366 F. Supp. 3d 516 (S.D.N.Y. 2018).

56. The MDL Motion is not "other litigation" offered for propensity. It is a judicial admission by the defendants themselves that they operate as a unified enterprise. Combined with BETTER COMPANIES' public website ("One Family of Brands"), the LinkedIn video, and opposing counsel Mario Iskander's own unified acceptance of service in the instant complaint, the MDL Motion conclusively establishes that the calls placed in the name of any one entity were placed using infrastructure shared with all of them.

## D. The 'Obvious Alternative Explanations' for Pinpoint Cessation Are Conclusory Speculation

57. Defendants argue that the pinpoint cessation has *"obvious alternative explanations"*: *"independent responses by the actual callers"* or *"counsel's routine suppression and litigation-hold instructions to all affiliated brands upon service."* (**MTD** at **8**, **12**.) These are not alternative explanations; they are conclusory hypotheticals with no factual support in the record.

58. Under *Twombly*, a plaintiff's well-pleaded factual allegations must be accepted as true, and the court may not credit "obvious alternative explanations" that are themselves speculative. Here, the Second Amended Complaint alleges that all calls—across every rotating number, every spoofed caller ID, and every affiliated brand—stopped

simultaneously within hours of BETTER DEBT SOLUTIONS being served. (**SAC ¶¶ 36-38**.)

59. If "independent third parties" were responsible, the harassment would have continued. If a routine litigation-hold instruction caused the cessation, Defendants can produce it in discovery. But on a RULE 12(B)(6) motion, the Court must accept Plaintiff's plausible inference: a single operational instruction from a centralized controller halted the entire network. That inference is not just plausible; it is the only explanation consistent with the Second Amended Complaint's allegations.

## V. COUNT ONE SURVIVES: ATTRIBUTION IS ESTABLISHED BY DEFENDANTS' OWN CONDUCT AND JUDICIAL ADMISSIONS

### A. *Herrera*'s Low Pleading Threshold Is Easily Met

60. Defendants acknowledge that this Court cited *Herrera v. Navient Corps*., No. 19-CV-6583, 2020 WL 3960507 (E.D.N.Y. July 13, 2020), for the proposition that TCPA pleading standards are low and that "facts may include, for example, 'the robotic sound of the voice on the other line, the lack of human response when he attempted to have a conversation with the "person" calling him, [or] the generic content of the message he received.'"

61. The Second Amended Complaint alleges exactly that: the messages were "standardized, repeating recordings delivering identical scripted content across hundreds of calls" with a "mechanical, repetitive character" deployed from "a rotating array of spoofed caller-ID numbers." (**SAC ¶ 28**). That is *Herrera*'s paradigm.

62. Defendants try to distinguish *Herrera* by arguing it addresses "how the calls were made," not "who made them." But attribution is established by the pinpoint cessation, the MDL admissions, the unified service acceptance, and the enterprise-unity evidence. Defendants cannot simultaneously admit they share calling infrastructure and then argue Plaintiff cannot attribute calls to them.

### B. The Complaint Establishes Attribution Through a Three-Pillar Factual Chain

63. The Second Amended Complaint establishes attribution to each named Defendant through three independent, mutually reinforcing pillars:

- **The Investigative Callback (SAC ¶ 31):** On December 24, 2025, Plaintiff's callback to the number left on the automated voicemail routed directly to an underwriter ("Anthony") operating under the Enterprise's "Capital Loan Center" banner. This direct contact with an Enterprise representative establishes that the outbound calls originated from the same operational network;

- **The MDL Motion Admission (SAC ¶¶ 59-61):** BETTER DEBT SOLUTIONS, LENDVIA, RANGE VIEW, and BETTER TAX RELIEF jointly represented to a federal panel that they share centralized call logs, infrastructure, and lead management. This judicial admission conclusively attributes the calls to the shared enterprise; *and*

- **The Pinpoint Cessation (SAC ¶¶ 36-38).** The mathematical impossibility of at least 730 calls across 10 rotating numbers and five brands stopping simultaneously the exact day BETTER DEBT SOLUTIONS and MOHAMMAD

GHAFARINIA were served. Defendants' own conduct proves centralized control —and centralized control proves attribution.

## VI. COUNT FOUR SURVIVES: GBL § 399-P IS INDEPENDENT OF AND BROADER THAN THE FEDERAL ATDS STANDARD

64. Defendants argue that Count Four fails because the Second Amended Complaint pleads neither *"storage capability"* nor *"operation without the use of an operator"* under GBL § 399-P(1)(A). This argument conflates the federal ATDS standard (construed narrowly in *Facebook, Inc. v. Duguid*) with New York's independent statutory definition.

65. The Second Amended Complaint explicitly pleads that GBL § 399-p "is defined by New York law independently of the federal [ATDS] standard construed in *Facebook*" (**SAC ¶ 109**) and alleges that Defendants "deployed automated calling equipment" to deliver "standardized, repetitive recordings" (**SAC ¶ 109**).

66. The "storage capability" element is satisfied by any system that stores telephone numbers for automated calling—a standard feature of modern dialing platforms, which the Second Amended Complaint alleges Defendant MOHAMMAD GHAFARINIA "purchased" and "authorized" (**SAC ¶ 48(d)**).

67. This element—"without the use of an operator"—is satisfied because the outbound voicemails were prerecorded messages delivered without live human intervention. The fact that inbound callbacks were routed to live representatives does not negate the automated nature of the outbound calls that form the basis of the claim.

## VII. PLAINTIFF HAS STANDING FOR DECLARATORY AND PROSPECTIVE RELIEF

68. Defendants argue that Plaintiff lacks standing for declaratory and prospective relief under *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), because the calls ceased on April 24, 2026. This ignores the Second Amended Complaint's allegations of a documented pattern of resumption.

69. The Second Amended Complaint documents that the Enterprise had been sued at least 43 times between October 2023 and June 2026, that it "temporarily suspend[s] unlawful practices when facing immediate legal threats and resume[s] them once the threat recedes" (**SAC ¶ 38**), and that the Minnesota Consent Order did not stop the campaign targeting Plaintiff.

70. This is not past, ceased conduct with no threat of repetition. It is an ongoing pattern of serial violations. Under Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167 (2000), voluntary cessation does not moot a claim when the defendant has a history of resuming the challenged conduct.

71. The declaratory relief sought—a judicial pronouncement that Defendants' conduct violated the law and an order requiring a compliant internal DNC policy—is precisely the remedy *Laidlaw* contemplates.

## VIII. THE OUT-OF-CASE MATERIALS ARE PROPERLY PLEADED AND SHOULD NOT BE STRICKEN

### A. The Minnesota Consent Order Is Public Regulatory Record, Not a Private Settlement

72. Defendants argue that the Minnesota Department of Commerce Consent Order (**SAC *Ex. E***) should be stricken under RULE 12(F) and RULE 408. This is meritless.

73. The Consent Order is a public regulatory enforcement document entered by a state government agency—not a private compromise between litigants. FED. R. EVID. 408 applies only to private offers to compromise civil claims; it does not bar public administrative consent orders offered to prove notice and willfulness.

74. The Consent Order is admissible under the public records exception and is directly relevant to whether Defendants acted willfully with actual knowledge of their legal obligations.

### B. The 43-Lawsuit Tally Is Directly Relevant to Willfulness

75. The 43-lawsuit tally (**SAC ¶¶ 38-43**; ***Ex. D***) is not propensity evidence. It is pattern evidence offered to prove that Defendants were on "clear, repeated, and continuing notice of their obligations under the TCPA" (**SAC ¶ 41**) and that their violations against Plaintiff were committed with "deliberate disregard" of those obligations (**SAC ¶ 43**).

76. This Court's decision in *Cowell v. Utopia Home Care, Inc.*, 144 F. Supp. 3d 398 (E.D.N.Y. 2015)—which Defendants cite—does not hold otherwise; it struck other-litigation references used to prove liability for the specific conduct at issue. Here, the tally

is used to prove knowledge and willfulness, not to prove that Defendants violated the TCPA in this instance because they did so in other cases.

### C. *Fitzpatrick* Requires 'Extraordinary Prejudice' That Defendants Have Not Shown

77. This Court's August 18 Text Order cited *Fitzpatrick* for the proposition that RULE 12(F) relief is reserved for matter that is "scandalous or oppressive in some way and hence prejudicial to the non-pleader or at least conclusively not pertinent to the case."

78. Defendants have not shown that references to public regulatory orders and pattern evidence are "scandalous" or "oppressive." They are pertinent to willfulness, which is an element of Plaintiff's damages claims. The proper remedy is not striking but limiting the materials to their proper use—exactly what Defendants request "in the alternative." The Court should deny the motion to strike entirely.

### D. The Samuel Declarations Support Well-Pleaded Factual Allegations

79. Defendants argue that the Markel Samuel expert declarations (**SAC *Exs. K, L***) should be stricken because they are not "written instruments" under RULE 10(C). This elevates form over substance.

80. Even if the exhibits themselves are excluded as standalone instruments, the factual allegations derived from them within the Second Amended Complaint (**SAC ¶¶ 72-74**)—specifically that Defendants have a documented pattern of fabricating lead-generation consent data—remain well-pleaded factual assertions.

81. At the RULE 12(B)(6) stage, these allegations must be accepted as true to demonstrate Defendants' willful and deceptive operational mechanics.

## IX. THE CUMULATIVE DAMAGES DEMANDS ARE PROPERLY PLEADED AS ALTERNATIVE THEORIES

82. Defendants argue that Plaintiff cannot stack TCPA, GBL § 399-P, and GBL § 349 damages for the same 730 calls. This is a damages issue, not a pleading issue.

83. At the motion-to-dismiss stage, Plaintiff is entitled to plead alternative theories of recovery. The Second Amended Complaint explicitly subsumes Counts Two and Three into Count One (**SAC ¶¶ 98**, **107**) and seeks a single TCPA award of $1,500 per call. The state-law counts provide independent remedies for distinct statutory violations: § 399-P for automatic dialing-announcing devices, and § 349 for deceptive acts and practices.

84. Whether these remedies are cumulative or offsetting is a question for summary judgment or trial, not for RULE 12(B)(6).

## CONCLUSION

85. Defendants' Motion to Dismiss should be denied in its entirety. The Second Amended Complaint:

(a) Pleads specific, individualized facts attributing conduct to each defendant;

(b) Survives the low pleading threshold this Court established in *Herrera* and *Bank v. Alleviate Tax*;

(c) Establishes personal jurisdiction over Defendant MOHAMMAD GHAFARINIA through his own purposeful conduct; *and*

(d) Properly pleads alternative damages theories under federal and state law.

86. The out-of-case materials are relevant to willfulness and do not warrant the extraordinary remedy of striking. And GHAFARINIA's own sworn declaration—admitting he co-founded the Enterprise while denying personal involvement—only confirms that the Second Amended Complaint's allegations are not just plausible, but proven by Defendants' own conduct.

87. In the alternative, should the Court find any factual dispute regarding GHAFARINIA's personal jurisdiction, Plaintiff respectfully requests leave to conduct limited jurisdictional discovery, including a deposition of GHAFARINIA under oath.

**WHEREFORE**, Plaintiff respectfully requests that this Court deny Defendants' Motion to Dismiss in its entirety.

Dated: September 11, 2026
Brooklyn, New York

Respectfully submitted,

/s/***Edward B. Hubbuch***

394 Lincoln Place #A5
Brooklyn, New York 11238
bhubbuch@gmail.com
(646) 544-7597

Plaintiff, *pro se*

TO: MARIO ISKANDER, Esq.
Iskander Law
1111 N. Brand Blvd., Ste. 308
Glendale, Calif. 91202
mario@iskanderlaw.com
(240) 439-1970

*Attorney for Defendants* BETTER DEBT SOLUTIONS LLC,
LENDVIA LLC,
RANGE VIEW MANAGEMENT LLC,
BETTER TAX RELIEF LLC,
BETTER COMPANIES LLC, and
MOHAMMAD GHAFARINIA
a/k/a MATT GHAFARINIA a/k/a MATT NIA

## **CERTIFICATE OF COMPLIANCE**

I, Edward B. Hubbuch, proceeding *pro se*, hereby certify that the foregoing Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss complies with the applicable formatting and volume limitations set forth in the Local Civil Rules of the Eastern District of New York.

I further certify that:

1. **Word Count**: According to the word-count feature of the word-processing system used to prepare this document, the memorandum contains **5,380** words, excluding the parts of the document exempted by the rules (*e.g.,* the caption, signature blocks, and this certificate); *and*

2. **Typeface and Font Size**: This document has been prepared in a proportionally spaced typeface using 12-point Times font, with text double-spaced as required by the Local Rules.

Dated: September 11, 2026
Brooklyn, New York

/s/***Edward B. Hubbuch***
Edward B. Hubbuch
Plaintiff, *pro se*